FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 0 7 2006

JAMES W. McCORMACK, CLERK
By: _____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

GARY OXFORD,

: 
:                               PLAINTIFF
:
:
       vs.                    :        NO.: 3:04CV00196 GTE
:
L & L ENTERPRISES, INC.       :
d/b/a OL'MAN TREE STANDS       :
:                               DEFENDANT

---

**DEFENDANT L & L ENTERPRISES, INC. D/B/A OL' MAN TREESTANDS'
MOTION IN LIMINE TO PRECLUDE TESTIMONY FROM
PLAINTIFF'S EXPERT WILLIAM FORD, P.E.**

1.    This product liability claim arises out of a
treestand accident.

2.    On or about November 15, 2002 plaintiff filed a
complaint in which he asserted that "as soon as Oxford sat
in the seat, the right side of the seat broke away from the
main portion of the unit that was attached to the tree,
causing him to fall to the ground.  Oxford fell to his
right and struck the right side of the platform then fell
the remaining twelve (12) feet to the ground."  See
paragraph 7 of plaintiff's original complaint attached as
**Exhibit A.**

3.     Two years later plaintiff filed a substituted complaint in which he made the same claim.  See paragraph 9 of plaintiff's substituted complaint attached as **Exhibit B**.

4.     On May 15, 2003 defendant deposed plaintiff's first expert, William Jackson.  Mr. Jackson testified that according to what Mr. Oxford told him, the seat tube on his treestand broke while Mr. Oxford was sitting on the seat. Mr. Jackson testified "The tube snapped, he hit the bottom platform, and then everything else broke and fell to the ground along with him as reported."  See pages 24-25 of the deposition transcript of William Jackson attached as **Exhibit C**.

5.     Plaintiff retained his fifth expert, William Ford, on October 6 of 2004.  Mr. Ford spoke to plaintiff personally on October 25, 2004.  See page 56 of Mr. Ford's deposition transcript, attached in its entirety as **Exhibit D**.

6.     Mr. Ford's first report in this case, labeled a "Preliminary Report," is dated October 28, 2004, only three days after his telephone conversation with plaintiff.  In the report Mr. Ford notes that plaintiff "recalls hooking the hook on the appropriate bolt from the back of the stand, as indicated by the instructions."  **Exhibit E**, page

2. His Supplemental Report is attached as **Exhibit F** and his Second Supplemental Report is attached as **Exhibit G**.

7. Mr. Ford confirmed that in response to specific questioning plaintiff advised him that he placed the hook onto the stand from behind as indicated in the instructions. **Exhibit D**, pages 56-57, 58-59.

8. When defendant deposed plaintiff, on videotape, plaintiff demonstrated how he connected his stand. Plaintiff placed his hook onto his treestand from behind. See the videotaped deposition segment attached as **Exhibit H**.

9. Mr. Ford experimented with the stand and has reviewed experiments performed by defense experts Larry Burck and L. J. Smith. **Exhibit D**, page 34.

10. Mr. Ford testified that "their testing pretty well proved that, you know, as I would suspect that hooking the hook in from the back of the stand, I could not see a way that the hook would release in that position. And I think that their testing pretty well showed that." **Exhibit D**, page 36.

11. Despite the fact that plaintiff said he hooked the stand from the back, Mr. Ford claims the stand was hooked from the front. **Exhibit D**, pages 43-44 and 46.

12.   Mr. Ford admitted that he holds this opinion because he can not get the stand to unhook if it is hooked from behind (the scenario described to him by plaintiff). Mr. Ford performed testing "enough to see that there really wasn't a good way that I could see that the hook would come off the bolt when it's hooked from the rear.  And plus, they [defense experts] had done the testing too."  **Exhibit D**, page 51.

13.   He explained that he was hired to figure out what happened and that in doing so he formulated various hypotheses and tried to find evidence to either indicate or contraindicate his hypotheses.  Hooking it from the back did not seem to offer any opportunity for the hook to come loose. Hooking it from the front did.  **Exhibit D**, page 52.

14.   In addition to rendering this opinion diametrically opposing plaintiff's version of how the stand was connected, Mr. Ford also disagrees with the sequence of the accident.  He conceded that plaintiff believes that the seat arm broke causing him to fall from the seat to the platform, which then caused the platform and plaintiff to fall out of the tree.  **Exhibit D**, page 37.  See also, the allegations in plaintiff's complaints.  **Exhibit A**, paragraph 7 and **Exhibit B**, paragraph 9.

15.   Mr. Ford does not believe that happened because "if the arm had broken when he was sitting on it, I don't really see how the frame got bent the way it did." **Exhibit D**, pages 37-38.

16.   In opposition to plaintiff's version of the accident, Mr. Ford believes there is no connection between the broken seat tube and the hook release.  **Exhibit D**, pages 43 and 44.

17.   Mr. Ford believes the seat tube broke when the stand struck the ground and it was this striking of the ground that caused all of the other bends and twists on plaintiff's treestand, which can be seen in the photographs attached as **Exhibit I**.

18.   Mr. Ford did no testing to show what level of damage the stand might sustain in a fall to the ground even though he intends to testify that all of the damage to the stand occurred in a fall to the ground.  **Exhibit D**, pages 59-60 and 62.

19.   When asked if the stand could have sustained all of its damage in a 15 foot drop, Mr. Ford conceded "I haven't seen any testing to show it one way or the other." **Exhibit D**, page 62.

20.   Mr. Ford admitted that if someone presented evidence that the stand could not be damaged in a 15 foot

drop he would "have to consider the new information."
**Exhibit D**, page 76.

21.   Defendant's expert, L. J. Smith, dropped the
treestand in various orientations, including several drops
that appear identical to the orientation described by Mr.
Ford at deposition.  Compare the L. J. Smith videotape
attached as **Exhibit J** and Mr. Ford's description of how he
believes the stand landed and became damaged on pages 74-75
of **Exhibit D**.  Mr. Smith's test stand remains undamaged.

22.   In addition to admitting that he had not seen or
performed testing to validate his theory about the source
of the damage to plaintiff's stand, Mr. Ford also
testified, when speaking of the stand's bent parts, that
"whether or not the stand could land with sufficient
impulse, provide a sufficient impulse to deflect these of
that amount (sic), I'm not sure."  **Exhibit D**, page 64.

23.   Mr. Ford, who wishes to testify that all of the
damage shown on plaintiff's stand occurred when it struck
the ground, could not even estimate the treestand's weight
at deposition.  **Exhibit D**, pages 64-65.

24.   When defense counsel summarized Mr. Ford's damage
theory at deposition by indicating that "your explanation
is that a load applied to the edge of the treestand arm
basically pushing it in the direction of the arm

transmitted enough force through the arm to cause all that steel to bend," Mr. Ford testified "that is the best explanation that I can come up with to explain the damage that we see." **Exhibit D**, page 76.

25.   Mr. Ford never tested his "best explanation."

26.   When Mr. Ford performed his tests on an exemplar stand he misapplied the hook from the front of the stand in 3 different ways and achieved three results – the hook remained secured to the bolt; the hook came off the bolt, but caught onto the treestand frame preventing the treestand from falling; and the treestand fell completely to the ground.   **Exhibit D**, page 105.

27.   Mr. Ford testified that even when the stand was mishooked from the front, if the hook was completely engaged on the bolt, it would not come off.   If the hook was set up so that it could not seat on the bolt, the hook came off, but latched onto the treestand frame preventing the treestand from falling.   It was not until Mr. Ford used a pair of pliers to bend the latch on the hook into a particular shape that he was able to get the treestand to disconnect.   **Exhibit D**, pages 106-112 and **Exhibit G**.

28.   Plaintiff has testified at his deposition that when he connected his treestand, the "hook was completely

engaged" on the bolt.  See page 122 of plaintiff's

deposition transcript attached as **Exhibit K**.

29.   Mr. Ford shaped the latch on the hook with a pair

of pliers before he ever connected the hook to the stand to

begin with.  In other words, when he connected the hook to

the stand during his experiment, the latch on the hook was

**already** in a **bent** condition.  **Exhibit D**, page 112.

30.   Mr. Ford conceded that Mr. Oxford's latch was

brand new and **unbent** when plaintiff connected his stand to

the tree.  **Exhibit D**, page 112.

31.   In his report, when discussing shaping the latch

with pliers, Mr. Ford stated "it should be noted that it is

not known whether these testing conditions closely match

the conditions at the time of the incident, as those

precise conditions are not known."  **Exhibit D**, page 114.

32.   Mr. Ford further conceded that he does not know

whether his test conditions were "substantially similar" to

the conditions prevalent at the time of the accident.

**Exhibit D**, page 115.

33.   Mr. Ford conceded that all of his theories assume

plaintiff is incorrect about hooking his stand from the

back in accordance with the instructions.  Additionally,

Mr. Ford conceded that even when mishooked from the front,

the stand will function as long as the hook is fully seated. **Exhibit D**, page 116.

34.  Mr. Ford believes the hook was connected from the front, that the hook was not completely engaged on the bolt, and that the spring loaded latch was not snapped into place despite the fact that Mr. Oxford has claimed that the hook was connected from the back, it was completely engaged on the bolt, and the spring loaded latch was snapped into place.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE REGARDING TESTIMONY OF WILLIAM FORD

Under Federal Rule of Evidence 702, if

scientific,

technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In Farm Bureau Mutual Ins. Co. v. Foote, the
Arkansas Supreme Court adopted the seminal United
States Supreme Court case interpreting the standard
for admitting expert testimony, including testimony
concerning scientific evidence. Farm Bureau, 341 Ark.
105, 117, 14 S.W. 3d 512 (2000)(adopting Daubert v.
Merrell-Dow Pharm., Inc., 509 U.S. 569 (1993)). Under
Daubert, District Courts perform a gatekeepping
function to ensure that proffered expert testimony is
both relevant and reliable. See Dancy v. Hyster
Company, 127 F.3d 649, 652 (8th Cir. 1997)(citing
Penney v. Praxair, Inc., 116 F.3d 330, 333 (8th Cir.
1997); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d
293, 296 - 97; Pestel v. Vermeer Mfg. Co., 64 F.3d
382, 384 (8th Cir. 1995)).

Under Daubert, the trial court, when addressing
the reliability of expert testimony, should consider:
(1) whether the concept has been tested; (2) whether
the concept has been subject to peer review; (3) what
the known rate of error is; and (4)whether the concept
is generally accepted by the community. Dancy, 127
F.3d at 652 (citing Pestel v. Vermeer Mfg. Co., 64
F.3d 382, 384 (8th Cir. 1995)).

A review of the facts of this case and the opinions proffered by Mr. Ford leads to the conclusion that his testimony is neither reliable nor, in many respects, relevant.

## I.    Mr. Ford's Proffered Testimony Does Not Meet the Relevancy and Reliability Requirements of Arkansas Law.

For the first several years after plaintiff filed his complaint this case involved only the assertion that the seat on plaintiff's treestand broke causing him to drop down to the platform of the treestand, which he then bounced off of before continuing his drop to the ground. In the process, his treestand somehow unhooked from the tree.   The precipitating event, however, was always the breaking of the seat tube.   This is evidenced by plaintiff's complaint; plaintiff's amended complaint; the testimony of plaintiff's original expert, William Jackson; and the testimony of plaintiff's welding expert, Tommy Lewis.[1]

The nature of this case changed when William Ford became involved.   Mr. Ford does not believe the broken seat tube caused or contributed to the accident.   Instead,

---

[1] Plaintiff has also had the stand examined by an engineer named William Jackson, a welder named Tommy Lewis, an engineering outfit named St. Louis Testing Laboratories, and a metallurgical expert named R.J. Block (5 total liability experts).

according to Mr. Ford, the sole cause of this accident was the unhooking of plaintiff's stand.

Mr. Ford admitted at deposition that he was hired "to figure out what happened." (**Exhibit D**, page 52). Starting out with the conclusion that the cause of the accident was the unhooking of plaintiff's stand, Mr. Ford recognized that the manner in which the stand was hooked was a significant piece of evidence. Nineteen days after receiving the assignment (**Exhibit D**, page 56) and three days before authoring his first written report (**Exhibit E**) Mr. Ford spoke to plaintiff and asked him very specifically how he attached his hook. (**Exhibit D**, pages 57-58). As Mr. Ford has documented in his written report and at deposition, plaintiff told him that he recalled "hooking the hook on the appropriate bolt from the back of the stand, as indicated by the instructions." **Exhibit D**, page 57. He also recalled "hearing the hook latch click as expected." He also "ratcheted the strap snugly." E**xhibit E**, page 2. Plaintiff testified at deposition that the hook was "completely engaged" on the bolt to which he connected it. **Exhibit K**, page 122.

At the time he authored his Preliminary Report, the only opinion he rendered was that the accident occurred because of the release of the hook from its bolt. **Exhibit**

**E.**  Since that time Mr. Ford has received the benefit of several reports detailing tests performed by defense experts and he has tested an exemplar.  He has also had the benefit of plaintiff's deposition testimony in which plaintiff indicated that the hook in question was "completely engaged" on the bolt at issue and in which he confirmed that the spring latch on the hook was snapped in place before his accident.  **Exhibit K**, page 122.  Thus, the evidence supplied by plaintiff in this case establishes four things: (1) the hook was engaged from behind on the appropriate bolt; (2) the hook was fully engaged on the bolt; (3) the spring latch was snapped in place; and (4) the spring latch was in unbent, brand new condition when plaintiff connected the stand.  The testing that forms the basis for Mr. Ford's opinion ignores all four of these facts.

After receiving an appropriate exemplar, and reviewing the test results and reports of defendant's experts, Mr. Ford discovered that, when the stand was connected as described by plaintiff, it will not come off a tree.  Mr. Ford concluded that plaintiff's recollection of events must be incorrect and made it his job to find a way to make the stand fall **without regard for the facts of the case.**

Ultimately, Mr. Ford concluded that plaintiff must have connected his stand to the tree from the **front**, rather than from the back.   Further, Mr. Ford's photographs, demonstrating the attachment method that he says is subject to failure, also indicate that the hook on the stand is **not fully engaged** and the spring **latch is not clipped in place** as plaintiff testified.

Most significantly, Mr. Ford has conceded that even when he misapplied the hook to the treestand from the front, he was unable to cause the stand to unhook until he used a pair of pliers to manipulate the spring clip into a very particular position after which he connected the hook to the treestand **with the spring clip pre-bent by his own pliers**.

When Mr. Ford first experimented with the stand the spring latch on his exemplar stand was in like new condition, similar to the like new condition of plaintiff's stand on the date of loss.   With the spring latch in new condition, Mr. Ford could not get the hook to come off the bolt even by misusing the product and hooking it from the front in direct contrast to plaintiff's version of the accident.   Thereafter, Mr. Ford ignored a second aspect of plaintiff's account by not only connecting the hook from the front, but failing to engage the hook fully on the bolt

of the treestand.  With the hook misconnected from the
front and not engaged fully on the bolt (see "Plate 2" in
**Exhibit G** for a "similar" photograph) Mr. Ford was able,
eight times in a row, to get the hook to come off the bolt.
Unfortunately for Mr. Ford, each and every time the hook
came off of the bolt it grabbed the treestand frame and
prevented the treestand from falling to the ground.  Thus,
Mr. Ford had not yet achieved his goal of making the stand
fall.  Mr. Ford then took a pair of pliers and shaped the
hook's latch in an effort to make it match the shape of
plaintiff's hook latch.  Once he accomplished this, he only
partially engaged the hook to the treestand in a manner
similar to Plate 2 and he was able to get the hook to come
off the bolt and the treestand thereby allowing the stand
to fall.  It is worth noting that Mr. Ford did not take any
pictures of the stand connection after he shaped the hook
latch with pliers.  All he could say at deposition was that
the hook looked similar, but not identical, to the
photograph identified in his report as "Plate 2."  **Exhibit
D**, page 114.

Mr. Ford's deposition testimony and reports make it
clear that he **began** his only "successful" experiment with a
bent hook latch.  Mr. Ford's deposition testimony makes it
equally clear that he understood that plaintiff's latch was

in brand new undamaged condition with no bends when

plaintiff connected his stand on the day of the accident.

(**Exhibit D, p**age 113). Mr. Ford's "Second Supplemental"

(and final) report readily concedes that "it is not known

whether these testing conditions closely match the

conditions at the time of the incident, as those precise

conditions are not known." **Exhibit G,** page 2. Defendant's

respectfully disagree. Defendants assert that it **is** known

that Mr. Ford's testing conditions **do not** closely match the

condition at the time of the accident in a number of

critical respects that render Mr. Ford's opinions

inadmissible. Simply stated:

1. The hook is attached from the front, not the back as described by plaintiff;

2. The hook is barely touching the bolt rather than fully engaged as described by plaintiff;

3. The hook latch is not in place; and

4. The entire experiment began with a deformed latch that permitted Mr. Ford to position the hook in ways that he could not have positioned it with an unbent latch.

For these reasons, Mr. Ford's testing does not meet

the reliability and/or relevancy requirements of FRE 702

and Farm Bureau Mutual Ins. Co. v. Foote, 341 Ark. 105,

117, 14 S.W. 3d 512 (2000) (adopting Daubert v. Merrell-Dow

Pharm., Inc., 509 U.S. 579 (1993)).

## II.   MR. FORD'S TESTIMONY SHOULD BE EXCLUDED BECAUSE HE HAS FAILED TO PROVIDE ANY EVIDENCE OF A SAFER ALTERNATIVE DESIGN.

Plaintiff has the burden of proving the existence of a defect by showing that a safer alternative design actually exists.   Plaintiff cannot carry this burden without proving that his proposed alternative design will actually work. Dancy v. Hyster Company, 127 F.3d 649, 654 (8th Cir. 1997). In the case at hand, while plaintiff's expert has proposed an alternative design, he has not tested the alternative design in any meaningful way.   An expert should not be permitted to mock up an alternative design and advise a jury that it is safer than an original design without testing the alternative to prove that it works.

The only alternate design ever offered by plaintiff's expert, William Ford, is shown in the photographs attached to his Preliminary, Supplemental, and Second Supplemental Reports.   **Exhibits E, F, and G**.   Because Mr. Ford has not shown that his only alternate design would have been any safer than the product in question, he should not be permitted to testify at trial.

On Page 3 of Mr. Ford's Preliminary Report (**Exhibit E**) he indicates that using a rectangular metal crossbar with holes in the end would allow for the use of a ratchet strap

and "present the user with a secure place to hook the strap without concern as to the precise orientation of the hook."

In his Supplemental Report, on page 3, Mr. Ford says exactly the same thing and references "Plate 8" of his report for illustrative purposes. **Exhibit F**, page 3. Mr. Ford has conceded that the subject treestand, when connected appropriately, can not come off a tree. Even when connected inappropriately, the subject treestand will not come off a tree unless the user makes a combination of mistakes.[2] Consequently, this case has nothing to do with a properly connected treestand.[3] The fact that Mr. Ford has come up with an alternate design that will work appropriately when used appropriately establishes nothing. As Mr. Ford has conceded, the subject treestand works appropriately when used appropriately.

Attached as **Exhibit L** is the February 7, 2005 report of defense expert Dr. Larry Burck. Figures 1 and 2 of Mr. Burck's report demonstrate that the subject design will hold well even when the hook is misapplied from the front of the bolt rather than the back. This is a point that plaintiff's expert has conceded.

---

[2] All of which Mr. Oxford denies making.
[3] According to Mr. Ford.

Figures 3 and 4 in Mr. Burck's report demonstrate, beyond cavil, that Mr. Ford's proposed alternate design is subject to failure if it is not used as intended.  For example, in figure 3, Mr. Burck has connected only the tip of the hook to Mr. Ford's alternate design and has produced an accident waiting to happen.  In figure 4 Mr. Burck has misapplied the hook from the front of the alternate design rather than the rear (the same mistake Ford attributes to plaintiff) and has again produced an accident waiting to happen.  The court does not need a jury to determine that the alternate design proposed by Mr. Ford is no safer than the original design.  Instead, Mr. Ford's design, which requires a hunter standing on a stick ladder 15 feet in the air to thread a hook through a small hole, is, if anything, less safe than the original design which, by concession, can not fail when used as intended.  Simply stated, plaintiff's expert has developed an alternative design that he has not bothered to test.  There is not one word in any of Mr. Ford's reports concerning testing of the alternative design.  Mr. Ford has no experience designing or manufacturing treestands.  He does not even use treestands. He is not a hunter.  His opinions about his alternative design are not based on scientific, technical, or other specialized knowledge and they will not assist the trier of

fact to understand the evidence or to determine a fact in issue as required by F.R.E. 702.

WHEREFORE, defendants respectfully ask this court to enter an order precluding Mr. Ford from testifying at trial.

RAWLE & HENDERSON LLP

By: _____
        Peter A. Lentini

SNELLGROVE, LANGLEY,
    LOVETT & CULPEPPER

By: _____

Michael E. Mullally
– ABA #85202
P.O. Box 1346
Jonesboro, AR
72403-1346
Phone: 870-932-8357

Dated: _____3/7/06_____

Attorneys for
Defendant, L & L
Enterprises, Inc.
d/b/a Ol' Man Tree
Stands

## **CERTIFICATE OF SERVICE**

        The undersigned attorney certifies that he has served a copy of the foregoing pleading upon attorneys for all other parties in this action by placing same, properly addressed, in the United States Mail, with sufficient postage to insure delivery, this 7ᵗʰ day of March, 2006.

_____