FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 1 5 2002

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

JAMES W. McCORMACK, CLERK
By _____ DEP CLERK

GARY OXFORD

           Plaintiff,

v.

L & L ENTERPRISES, INC. d/b/a
OL' MAN TREE STANDS

           Defendant.

)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

3:02CV380

This case assigned to District Judge Eisele
and to Magistrate Judge Young

JURY TRIAL REQUESTED

## COMPLAINT

Comes now the plaintiff, Gary Oxford, by and through his attorney, Randel Miller, and for his complaint against defendant, states:

### JURISDICTION AND VENUE:

1.

The incidents giving rise to this lawsuit occurred on October 19, 2001, in Baxter County, Arkansas, wherein Gary Oxford sustained serious and permanent personal injuries directly caused by a defective product produced by the defendant. The defendant corporation is a Mississippi Corporation, thus is a resident of Mississippi, that does business within the state of Arkansas and is subject to service pursuant to the Long Arm Statute. This action is brought pursuant to the tort laws of the state of Arkansas and jurisdiction is invoked pursuant to 28 United States Code Sec. 1332. The damages sought exceed $75,000.00, exclusive of interest and costs, and is between citizens of different states. Baxter County lies in the Eastern District of the Arkansas Federal District Court. The pendant jurisdiction of the court is also invoked for the state causes of action. This Court has jurisdiction over the parties and venue is proper.

Exhibit "A"

## PARTIES:

**2.**

Gary Oxford, is a resident of Blytheville, Mississippi County, Arkansas. At the time the incident giving rise to this lawsuit occurred, he resided at 712 West Pecan, Blytheville, Arkansas 72315.

L & L Enterprises, Inc. d/b/a Ol' Man Tree Stands (hereinafter Ol'Man") is a Mississippi Corporation, thus is a resident of Mississippi, doing business at 32 Raspberry Lane, Hattiesburg, Mississippi 39402. The registered agent for service is John M Louk and can be served at the same address.

## NATURE OF CLAIM:

**3.**

This is a tort action brought as the result of serious and permanent personal injuries sustained by Gary Oxford on October 19, 2001, in Baxter County, Arkansas. Mr. Oxford was using a hanging deer stand that was manufactured and distributed by defendant. The product was defective, and when used by Mr. Oxford, broke and caused him to fall approximately 12 feet from a tree and land on the ground. Mr. Oxford sustained the injuries described herein. To date, Oxford has incurred $71,317.81 in medical bills and was unable to work for approximately one (1) year, and then only light duty work.

## FACTUAL BACKGROUND:

**4.**

Oxford purchased a tree stand that he intended to use hunting deer. The unit was purchased on the internet by Oxford and a friend from Bass Pro Shop for the price of $149.99. The name of the unit was Tara Elite (hereafter "Tara " or "tree stand"), and was manufactured by Ol' Man. The

2

unit has a metal frame that is attached to a tree by means of straps. The unit also has a metal platform that folds down and is designed for a person to stand on the platform. The unit also has a seat that consists of aluminum tubing and mesh. When the seat is folded down, the hunter can sit on the mesh that is being held by the aluminum tubing. The tree stand has a label that states it will hold a person of up to Three Hundred (300) pounds. Oxford weighed Two Hundred Sixty Five (265) at the time this incident occurred.

5.

On October 19, 2001, Oxford, and a few friends, traveled to Baxter County for the purpose of hunting deer. Oxford took with him the Ol" Man deer stand that he had recently purchased. Oxford had never used this stand before that date but had used other similar types of deer stands. Oxford also had reviewed the operating instructions that accompanied the product.

6.

Oxford, with the assistance of a friend and a ladder, attached the unit to a tree approximately twelve (12) feet above the ground. Oxford shook the unit to make sure it was securely fastened to the tree and then stepped onto the platform to check the view he would have. Oxford did not have a gun with him and had no intention of hunting that day, but was only getting the stand in place so he could come back to that location and hunt the next morning.

7.

Once Oxford was on the platform of the stand he elected to sit in the seat to accurately determine the view he would have. As soon as Oxford sat in the seat, the right side of the seat broke away from the main portion of the unit that was attached to the tree, causing him to fall to the ground. Oxford fell to his right and struck the right side of the platform then fell the remaining twelve (12) feet to the ground.

3

**8.**

Oxford was transported to Baxter Regional Medical Center by ambulance. After spending four (4) days at Baxter Regional Medical center, Oxford was transported to Baptist Memorial Hospital in Blytheville. After one day, Oxford was transported to The Med in Memphis were he spent approximately nine continuous days. For several weeks thereafter Oxford was in and out of the hospital for treatment, which included two (2) surgeries.

## COUNT I:

**9.**

Plaintiff realleges and reincorporates herein the allegations contained in paragraphs 1 through 8.

**10.**

At the time of its manufacture and sale, the tree stand was not fit for its intended use and therefore was defective and unreasonably dangerous. The tree stand was designed and manufactured in such a way as to allow the aluminum to break at the point it was welded to the steel frame or the weld was done improperly, thus in a defective condition, which rendered it unreasonably dangerous. Plaintiff's injury would not have occurred in the absence of some defect in the tree stand.

**11.**

As a direct and proximate result of the defective condition of the tree stand, plaintiff suffered the damages hereinafter described.

## COUNT II:

**12.**

Plaintiff realleges and reincorporates herein the allegations contained in paragraphs 1 through 8.

4

13.

Plaintiff assert defendant, Ol' Man, negligently failed to use ordinary care in the design, manufacture and selection of materials to be used in the tree stand and to adequately test and inspect the product. This act or omission subjected plaintiff to an unreasonable risk of harm while the tree stand was being used for its intended purpose and while being used for any purpose which should reasonably be expected by the manufacturer.

14.

As a direct and proximate result of defendant's negligence plaintiff have suffered the damages hereinafter described.

## COUNT III:

15.

Plaintiff realleges and reincorporates the allegations contained in paragraphs 1 through 8.

16.

Plaintiff asserts defendant impliedly warranted that the tree stand was merchantable at the time it was sold. However, the tree stand was not merchantable, or fit for the ordinary purpose for which it was to be used. Plaintiff was a person whom Ol' Man might reasonably expect to use, consume or be affected by the tree stand and to rely on the warranty.

17.

Plaintiff has notified Defendant of the breach of warranty by means of a letter dated December 6, 2001, by letter dated June 4, 2002, and by counsel meeting with representatives of Ol' Man to point out the defects in the product. These letters and meetings satisfy any notice requirement with regard to a breach of warranty claim.

5

**18.**

As a direct and proximate result of the breach of an implied warranty of merchantability, plaintiff has sustained the damages hereinafter described.

## COUNT IV:

**19.**

Plaintiff realleges and reincorporates the allegations contained in paragraphs 1 through 8.

**20.**

Plaintiff asserts defendant has breached an implied warranty of fitness for a particular purpose. At the time this product was designed, manufactured and sold, defendant had reason to know the particular purpose for which the tree stand was used. Defendant knew or should have known that a buyer would rely on Ol' Man skill or judgment to select or furnish a suitable product. Plaintiff alleges the product is not fit for the particular purpose for which it was required. Plaintiff was a person who Ol' Man would reasonably have expected to use, consume or be affected by the product and to rely on the warranty.

**21.**

Plaintiff has notified defendant of the breach of warranty by means of a letter dated December 6, 2001, by letter dated June 4, 2002 and by counsel meeting with representatives of Ol' Man to point out the defects in the product. These letters and meetings satisfy any notice requirement with regard to a breach of warranty claim.

**22.**

As a direct and proximate result of the breach of an implied warranty of fitness for a particular purpose, plaintiff has sustained the damages hereinafter described.

6

## COUNT V.:

### 23.

Plaintiff realleges and reincorporates herein the allegations contained in paragraphs 1 through 8.

### 24.

Plaintiff asserts Defendant has breached an express warranty. Defendant offered an express warranty on the tree stand, among others, that it would hold a person of up to Three Hundred (300) pounds, however the product did not conform to the express warranty created. Plaintiff was a person whom Ol' Man might reasonably expect to use, consume or be affected by the tree stand and to rely on the warranty.

### 25.

Plaintiff has notified Defendant of the breach of warranty by means of a letter dated December 6, 2001, by letter dated June 4, 2002 and by counsel meeting with representatives of Ol' Man to point out the defects in the product. These letters and meetings satisfy any notice requirement with regard to a breach of warranty claim.

### 26.

As a direct and proximate result of the breach of an express warranty, plaintiff has sustained the damages hereinafter described.

## DAMAGES:

### 27.

As a direct and proximate result of the defective condition and breach of warranty, plaintiff suffered severe and serious permanent and partial injuries, specifically:

7

## INJURIES (APPARENT)

a)     Impacted Fracture of the left radius

b)     Pelvis instability

　　　　　1.)     Dislocation of the symphysis pubis (approximately 4 cm)

　　　　　2.)     Disruption of the right sacroiliac joint (a normally fused joint)

## TOTAL INJURIES

a)     Colles fracture of the left wrist that required a reduction. When he returned to the clinic for a checkup, the wrist was displaced and then required a wrist fixation. A Medoff procedure was used to stabilize the wrist. This was done on 11-02-01. Gary returned 11-08-01 for an office visit and the wrist was in good position.

b)     Gary had a pubic diastasis and symphysis plating on 10-26-01. The pelvis was x- rayed on 11-08-01. The Symphysis Plating showed a little bit of diastasis but minimal change.

c)     Degenerative disk disease exacerbated by accident. Lumbar spine films from 03-14-02 show a definite degenerative disk at L5-S1 with a retrolisthesis of that area. This also shows minimal facet arthritis at L4-5 and L5-S1 and the facet joint shows subluxation at L5-S1, but not a L4-L5 on the oblique bilaterally.

d)     The Greenfield Filter was placed in the vena cava to minimize the danger of blood clots.

e)     Cannot rule out S1 Arthritis.

f)     Oxford's prognosis is one for having persistent back and wrist pain in the future. He will have weakness in his wrist and his back, the degree of which is still undetermined.

**28.**

As a direct and proximate result of the defendant's actions, plaintiff has suffered damages

for medical, hospital and related professional services, will incur future medical, hospital and related

8

professional services, has incurred lost wages, will incur lost future earnings and a loss of earnings

capacity and has and will undergo extreme pain and suffering, all of which Plaintiff requests

damages in the sum in excess of 1,250,000.00.

## JURY DEMAND:

### 29.

Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff, Gary Oxford, prays for judgment against defendant L &

L Enterprises, Inc. d/b/a Ol' Man Tree Stand, as follows:

1.    Compensatory damages for personal injuries, pain and suffering, medical care and

lost wages and loss of earnings capacity in a sum in excess of $1,250,000.00; and

2.    All costs and other just and proper relief to which Plaintiff is entitled.

DATED this _15th_ day of November, 2002

Randel Miller, P.A.
1009 South Main Street
Jonesboro, Arkansas 72401
(870) 972-9940

By:   _Randel Mill_

Randel Miller AR Sup. Ct. # 83127
Attorney for Plaintiff

c:\M_lawfirm\P1\Oxford\complaint

9

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

GARY OXFORD                           )
                                      )
                    Plaintiff,        ) CIVIL ACTION NO.
v.                                    ) 3:02CV380
                                      )
L & L ENTERPRISES, INC. d/b/a         )
OL' MAN TREE STANDS                   )
                                      )
                                      )
                    Defendant.        )

## CERTIFICATE OF SERVICE

I, Randel Miller, do hereby certify that a true and correct copy of the

foregoing Summons and Complaint was placed in the U.S. Mail Certified No.

7000 0600 0027 9542 4019 Return Receipt Requested with sufficient postage to

ensure delivery on this 11th day of December to:

John M. Louk, Registered Agent
L&L Enterprises, Inc.
32 Raspberry Lane
Hattiesburg, MS 39402

DATED this 10th day of January, 2003.

Randel Miller, P.A.
1009 South Main Street
Jonesboro, Arkansas 72401
(870) 972-9940

By: Randel Miller
Randel Miller AR Sup. Ct. # 83127
Attorney for Plaintiff



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

GARY Oxford v. L&L Enterprises

Postage $ .60
Certified Fee 2.30
Return Receipt Fee
(Endorsement Required) 1.75
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees $ 4.65

DEC 11 2002

Recipient's Name
John M. Louk, L&L Enterprises, Inc
Street, Apt. No.
32 Raspberry Lane
City, State, ZIP+4
Hattiesburg, MS 39402

7000 0600 0027 9542 4019

PS Form 3800, February 2000    See Reverse for Instructions

---

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by (Please Print Clearly) Klaudy Gilky   B. Date of Delivery<br>C. Signature<br>X Khondalti'el   ☐ Agent  ☐ Addressee<br>D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
| 1. Article Addressed to:<br>John M. Louk<br>L&L Enterprises, INC.<br>32 Raspberry Lane<br>Hattiesburg, MS 39402 | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)   7000 0600 0027 9542 4019 | |
| PS Form 3811, March 2001   Domestic Return Receipt   102595-01-M-1424 | |

---

Gary Oxford v. L&L Enterprises, INC.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 27 2004

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

**GARY OXFORD**                                                          **PLAINTIFF**

**VS.**                          **NO.** 3:04CV00196 GTE

**L & L ENTERPRISES, INC. d/b/a**
**OL' MAN TREE STANDS**                                    **DEFENDANT**

This case assigned to District Judge Eisele
and to Magistrate Judge Forster

## COMPLAINT

### JURISDICTION AND VENUE

1.   The United States District Court, Eastern District of Arkansas, Jonesboro Division, has jurisdiction of this case and the parties hereto because of the fact the prayer for damages is in excess of $75,000 and the Plaintiff is a resident of the state of Arkansas and the Defendant is a Mississippi corporation, thus doing business in Mississippi, is a resident of Mississippi, doing business at 32 Raspberry Lane, Hattiesburg, Mississippi 39402.   The registered agent for service is John M. Louk and can be served at the same address.   Therefore, there is diversity of citizenship and all other requirements for the filing of this Complaint in federal court.

2.  The venue for this action is in the Jonesboro Division, Eastern District of Arkansas, by reason of the fact that the incident occurred in Baxter County,

1

Exhibit "B"

Arkansas, but the Plaintiff, Gary Oxford, at the time of the incident, was a resident of Blytheville, Mississippi County, Arkansas.

3. Gary Oxford, at the time of the incident, was a resident of 712 West Pecan, Blytheville, Arkansas 72315. At the time of the filing of this Complaint Gary Oxford is a resident of 6707 Sunshine Lane, Jacksonville, Arkansas 72076.

4. Defendant, L & L Enterprises, Inc., d/b/a Ol' Man Tree Stands, is a Mississippi corporation, thus is a resident of the state of Mississippi, for diversity purposes, doing business at 32 Raspberry Lane, Hattiesburg, Mississippi 39402. The registered agent for service is John M. Louk.

## FACTUAL BACKGROUND AND ALLEGATIONS
## COMMON TO ALL COUNTS

5. This is a tort action brought as the result of serious and permanent personal injuries sustained by Gary Oxford (hereinafter "Oxford") on October 19, 2001, in Baxter County, Arkansas. Mr. Oxford was using a hanging deer stand that was manufactured and distributed by Defendant. The product was defective, and when used by Mr. Oxford, broke and caused him to fall approximately 12 feet from a tree and land on the ground. Mr. Oxford sustained the injuries described herein. To date, Oxford has incurred

$71,317.81 in medical bills and was unable to work for approximately one (1) year, and then only light duty work.

6. Oxford purchased a tree stand that is used in the hunting of deer. The unit was purchased on the internet by Oxford and a friend from Bass Pro Shop for the price of $149.99. The name of the unit is Tara Elite (hereinafter "Tara"), and is manufactured by L & L Enterprises, Inc., d/b/a Ol' Man (hereinafter "Ol' Man"). The unit has a metal frame that is attached to a tree by means of straps. The unit also has a metal platform that folds down and is designed for a person to stand on the platform. The unit also has a seat that consists of aluminum tubing and mesh. When the seat is folded down, the hunter can sit on the mesh that is being held by the aluminum tubing.

7. On October 19, 2001, Oxford, and a few friends, traveled to Baxter County, Arkansas, for the purpose of hunting deer. Oxford took with him the Ol' Man deer stand that he had recently purchased. Oxford had never used this stand before that date but had used other similar types of deer stands. Oxford also had reviewed the operating instructions that accompanied the product.

8. Oxford, with the assistance of a friend and a ladder, attached the unit to a tree approximately twelve (12) feet above the ground. Oxford shook the unit to make sure it was securely fastened to the tree and then stepped onto the platform to check the view he would have. Oxford did not have a gun with

-3-

him and had no intention of hunting that day, but was only getting the stand in place so he could come back to that location and hunt the next morning.

9. Once Oxford was on the platform of the stand he elected to sit in the seat to accurately determine the view he would have. As soon as Oxford sat in the seat, the right side of the seat broke away from the main portion of the unit that was attached to the tree, causing him to fall to the ground. Oxford fell to his right and struck the right side of the platform then fell the remaining twelve (12) feet to the ground.

10. Oxford was transported to Baxter Regional Medical Center by ambulance. After spending four (4) days at Baxter Regional Medical Center, Oxford was transported to Baptist Memorial Hospital in Blytheville. After one day, Oxford was transported to The Med in Memphis where he spent approximately nine (9) continuous days. For several weeks thereafter Oxford was in and out of the hospital for treatment, which included two (2) surgeries.

## COUNT I

11. As a cause of action and ground for relief, Plaintiff alleges the factual matters described in paragraphs Nos. 1 through 10, inclusive, of the Complaint as a part of this count.

12. This incident was caused by the negligence of the Defendant, which consists of, but is not limited to, the following, which negligence was a

-4-

proximate cause of the alleged injuries and damages sustained by the Plaintiff,

viz.:

 a. Failure to use ordinary care under the circumstances.

 b. Negligently failed to design, manufacture and construct a tree stand that operated properly under the circumstances.

 c. Negligently failed to design, manufacture and construct a tree stand that was suitable to be used by the Plaintiff under the circumstances.

 d. Negligently failed to provide adequate protection to the user, the Plaintiff herein, of the tree stand, in a situation as occurred in this case.

 e. Negligently designed, manufactured, and constructed and produced a tree stand that failed to protect Plaintiff from bodily injury under the circumstances.

 f. Failed to design, manufacture, and construct and deliver a tree stand that would protect Plaintiff from injuries and damages including, but not limited to, the failure to properly construct a tree stand that would not cause injury and damages to the Plaintiff.

 g. Negligently failed to use ordinary care in the design, manufacture and selection of materials to be used in the tree stand and to

-5-

adequately test and inspect the product, and this omission and failure on the part of the Defendant subjected Plaintiff to an unreasonable risk of harm while the tree stand was being used for its intended purpose.

h.     Was otherwise guilty of negligence that will be more particularly described during the course of litigation.

## COUNT II

13. As a cause of action and ground for relief, Plaintiff alleges the factual matters described in paragraphs Nos. 1 through 12, inclusive, of the Complaint as a part of this count.

14. Plaintiff contends that Defendant was engaged in the business of manufacturing, assembling, and selling tree stands and that the tree stand in question was supplied by Defendant in a defective condition which rendered it unreasonably dangerous and that the defective condition was a proximate cause of the Plaintiff's injuries and damages.

15. Plaintiff contends the Defendant is absolutely or strictly liable to the Plaintiff.

-6-

## COUNT III

16. As a cause of action and ground for relief, Plaintiff alleges the factual matters described in paragraphs Nos. 1 through 15, inclusive, of the Complaint as a part of this count.

17. Plaintiff contends the Defendant impliedly warranted that the tree stand was merchantable at the time it was sold to the Plaintiff. Plaintiff contends there was a breach of the implied warranty of merchantability. The tree stand was not fit for the particular purpose for which the tree stand was used and it was not adequately constructed and did not conform to the promises and affirmations of the Defendant. Plaintiff contends the Defendant breached the warranty of merchantability in that the Plaintiff sustained injuries and damages as a result of the tree stand sold to the Plaintiff which was not merchantable and the unmerchantable condition was a proximate cause of the injuries and damages sustained by the Plaintiff. Plaintiff was an individual whom Defendant would reasonably expect to use, consume, and be affected by the tree stand. Plaintiff gave reasonable notice to the Defendant of the breach within a reasonable period of time, but the Defendant failed to cure the breach.

-7-

## COUNT IV

18. As a cause of action and ground for relief, Plaintiff alleges the factual matters described in paragraphs Nos. 1 through 17, inclusive, of the Complaint as a part of this count.

19. Plaintiff claims damages from the Defendant on the ground that the tree stand was not fit for the particular purpose for which it was intended. Defendant, at the time of contracting for the tree stand, had reason to know the particular purpose for which the tree stand was required. Defendant knew Plaintiff was relying upon Defendant's skill and judgment to select and furnish a suitable tree stand. The tree stand was not fit for the particular purpose for which it was required and this unfitness was a proximate cause of Plaintiff's injuries and damages. Plaintiff was an individual whom Defendant would reasonably expect to use, consume, and be affected by the tree stand.

## COUNT V

20. As a cause of action and ground for relief, Plaintiff alleges the factual matters described in paragraphs Nos. 1 through 19, inclusive, of the Complaint as a part of this count.

21. Plaintiff claims damages from Defendant on the ground that the Defendant made and breached certain expressed warranties concerning the tree stand. Plaintiff contends expressed warranties were created by contract

-8-

executed between the parties when the Plaintiff purchased the tree stand.  The
tree stand delivered to the Plaintiff did not conform to the expressed warranties
created.  The failure of the tree stand to conform to the expressed warranties
was a proximate cause of the Plaintiff's injuries and damages and Plaintiff was
an individual whom Defendant might reasonably expect to use, consume, and
be affected by the tree stand.

22.  Plaintiff previously filed a Complaint in the United States District
Court, for the Eastern District of Arkansas, Jonesboro Division, Case No. 3:02-
CV-380 GTE, which was dismissed, without prejudice, on or about
November 14, 2003.  The previous Complaint and all pleadings pertaining to
Case No. 3:02-CV-380 GTE are incorporated herein by reference pursuant to
Federal Rule of Civil Procedure 10(c).

## DAMAGES

23.  Plaintiff sustained injuries and damages, as a result of the incident,
which injuries and damages consist of, but are not limited to, the following,
viz.:

a.  Permanent partial impairment.

b.  Past and future medical expense.

c.  Past and future pain and suffering.

d.  Past and future mental anguish.

-9-

e.   Loss of ability to earn in the future.

f.   Scars, disfigurement, and other visible results of his injuries.

g.   Other damages that will be more particularly described during the

course of the litigation.

24.   Plaintiff demands judgment against the Defendant for a sum in excess of $75,000, costs and all other relief to which the Plaintiff may be entitled.

## JURY DEMAND

25.   Plaintiff, pursuant to the applicable rules of the Federal Rules of Civil Procedure, demands a jury trial on all factual issues.

**GARY OXFORD, PLAINTIFF**

By:_____

**DAVID A. HODGES**
**Attorney at Law**
**Centre Place Building**
**212 Center Street, Fifth Floor**
**Little Rock, Arkansas 72201-2429**
**Arkansas Bar No. 65021**
**Telephone: (501) 374-2400**
**Facsimile:  (501) 374-8926**
**E-Mail:       david@hodgeslaw.com**
**Web:          www.hodgeslaw.com**

-10-

1    A.        As far as to look at this weld I have

2    reached the conclusion there.   I have been

3    recorded as far as the sequence of Mr. Oxford --

4    what happened.

5    Q.        What is your understanding of what

6    happened?

7    A.        Mr. Oxford had the stand installed.   He

8    went back subsequent to -- after it was installed

9    or I don't know if it was hours or the next day

10   and had the stand on the tree.   Then he went up,

11   climbed up the stand, got in it, sat down, and

12   then just everything supposedly failed.   He hit

13   the ground and the stand came down behind him.

14   Q.        So that the tube broke while Mr. Oxford

15   was sitting on the net seat?

16   A.        Per what he was telling me, yes, or

17   that's what the remnants of what was left, yes.

18   Q.        Do you based on what you've done thus

19   far have an opinion about why the tube would have

20   broken under those circumstances?

21   A.        I guess I could guess at it but as far

22   as the evidence that we really need are the

23   tests -- the failure analysis that we talked

24   about.   I mean, if this tube when it broke and he

25   came down and hit the platform shifting the load,

Exhibit "C"

 1    yes, that could be a -- that would be the first

 2    thing that was reported to me that happened.  The

 3    tube snapped, he hit the bottom platform, and

 4    then everything else broke and fell to the ground

 5    along with him as reported.  As far as testing

 6    wise we have not tested anything.  This is just

 7    as reported.

 8    Q.       Are you prepared with what you've done

 9    so far to render an opinion with a reasonable

10    degree of professional certainty about the

11    adequacy or inadequacy of this particular

12    product?

13    A.       No, sir.

14    Q.       You said that he would have fallen and

15    hit the platform or something?

16    A.       As reported.

17    Q.       There's other damage to this product

18    other than just the tube being broken, correct?

19    A.       Yes, sir.

20    Q.       Things look crooked or twisted or bent,

21    right?

22    A.       Uh-huh.

23    Q.       Do you have any theories about how the

24    rest of the product got in that condition?

25    A.       I do as far as the load.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

GARY OXFORD                                    PLAINTIFF

VS.            NO. 3:04CV00196GTE

L & L ENTERPRISES, INC. d/b/a
OL' MAN TREE STANDS                            DEFENDANT

ORAL DEPOSITION OF WILLIAM H. FORD, P.E.

APPEARANCES:

    MR. TIM CULLEN, Attorney at Law
    MR. DAVID HODGES, Attorney at Law
        The David Hodges Law Firm
        Centre Place, Fifth Floor
        212 Center Street
        Little Rock, Arkansas 72201
            *** For the Plaintiff ***

    MR. PETER A. LENTINI
        The Rawle and Henderson Law Firm
        Ten Lake Center Executive Park, Suite 204
        41 Route 73 North
        Marlton, New Jersey 08053
    MR. MATT MODELEVSKY
        Snellgrove, Langley, Lovett & Culpepper
        111 East Huntington Avenue, Second Floor
        P.O. Box 1346
        Jonesboro, Arkansas 72403-1346
            *** For the Defendant ***
    TAKEN BEFORE Amanda Poe, Certified Court Reporter,
Certification No. 639, Bushman Court Reporting, 620 West Third
Street, Suite 201, Little Rock, Arkansas, 72201 on February 14,
2005, at 217 West Second Street, Little Rock, Arkansas,
commencing at 11:40 a.m.

### INDEX

STYLE AND NUMBER  ..........................................  1

APPEARANCES  .................................................  1

    WITNESS: William H. Ford, P.E.

    Examination by Mr. Lentini.... ...........................  3

    Deposition Concluded  ......................................  123

COURT REPORTER'S CERTIFICATE  ...............  124

E X H I B I T S

MARKED:                              IDENTIFIED:

1.  Copy of 4-page Curriculm Vitae and List of Deposition
    Testimony of William H. Ford ..........................  5

- 2 -

Exhibit "D"

1  PROCEEDINGS

2 THEREUPON,

3                    WILLIAM H. FORD, P.E.,

4 having first been duly sworn by the undersigned Notary Public to

5 tell the truth, the whole truth and nothing but the truth,

6 deposed as follows:

7                    EXAMINATION

8 BY MR. LENTINI:

9 Q  Can you state your name for the record, sir?

10 A  William Howard Ford.

11 Q  Mr. Ford, my name is Peter Lentini. I'm an attorney

12 representing L & L in connection with Mr. Oxford's tree stand

13 claim. I'm going to take your deposition this morning. That

14 simply means that I'm going to ask you a series of questions,

15 and you're required to answer these questions under oath. That

16 does not mean you have to have an answer for every question. If

17 there's something you don't know or you don't remember or if

18 there's a question that is outside of your area of expertise, I

19 want you to go ahead and tell me that, okay?

20 A  Yes.

21 Q  I may ask a question that sort of unwittingly calls for an

22 opinion about something that you're not qualified to discuss.

23 And rather than just taking a guess, you can tell me, you know,

24 that's outside my area of expertise, okay?

25 A  Yes.

                        - 3 -

1 Q  What is your date of birth?

2 A  May 14th, 1953.

3 Q  What's your educational background?

4 A  I graduated from high school from a little town in Arkansas

5 called Arkadelphia, Arkadelphia High School. I went to two

6 years of college at a college there in Arkadelphia. The name of

7 that college is Ouachita Baptist University, and then completed

8 my engineering degree with three years at the University of

9 Arkansas in Fayetteville.

10 The two colleges had a cooperative program set up where you

11 took a pre-engineering program, a pre-engineering curriculum at

12 Ouachita and then completed that at the university ending up

13 with two degrees, a BA in Math from Ouachita and a BS in

14 Mechanical Engineering from Fayetteville.

15 Q  What are your areas of expertise that you are bringing to

16 this particular piece of litigation?

17 A  Just general mechanical engineering. In this case, my

18 understanding of mechanical engineering in general, and then

19 some previous work I've done with deer stands.

20 Q  Tell me about your previous work of deer stands.

21 A  Let me pull my information out here if that's okay. I have

22 a list of testimony with me and a CV and a schedule just in case

23 you're interested.

24 Q  Can we get that package of materials? We'll just identify

25 them and mark them as Exhibit Number 1, Ford 1.

                        - 4 -

1 (EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION)

2 A  Four pages.

3 Q  (By Mr. Lentini) You have attached those materials to at

4 least one of your reports if not all of them, and I have those

5 materials in front of me as well. If you need to refer to those

6 as you talk, go ahead. I think the question was I wanted to

7 know something about your prior experience with tree stands.

8 A  Right. Back in January of 2000, I testified in a

9 deposition regarding a case called Addison versus API Outdoors.

10 That was a climbing type of tree stand, Grand Slam, I believe.

11 And the question was the method by which it was attached to the

12 tree had failed. In February of 2001, I testified in a

13 deposition on a matter of Overstreet versus White Oak Tree

14 Stands. That was a set of climbing sticks, and the question was

15 the method by which they were attached to the tree. And then

16 July of last year, 2004, I testified in a deposition in the

17 matter of Reese versus Hunters View. And that was a ladder

18 stand. And the question was the method of securing the ladder

19 sections together. Is that what you're looking for?

20 Q  Yeah. I'll ask you a couple of follow-ups.

21 A  One of those cases did proceed to trial. And in September

22 of 2001, I testified at trial in the Overstreet versus White Oak

23 Tree Stand matter.

24 Q  And your adversary in that case was Mr. Hodge; correct?

25 A  Right. Hodges.

                        - 5 -

1 Q  Hodges. What was the Overstreet case about?

2 A  If you want to call it adversary, he was the opposing

3 attorney. I'm sure I feel quite like that. What was your

4 question? I'm sorry.

5 Q  What was the case about?

6 A  The White Oak Tree Stands?

7 Q  Overstreet.

8 A  Overstreet case, yes. That was the climbing sticks case,

9 and if I remember correctly, Mr. Overstreet had been climbing

10 the tree with a set of climbing sticks. I believe there were

11 three pieces in this set. And when he was on the top section of

12 the climbing sticks, it released from the tree, and he fell to

13 the ground.

14 Q  And how are they attached to the tree?

15 A  They used a plastic diamond braid hollow rope in a manner

16 much like the children's toy, the Chinese handcuffs. I don't

17 know if you know what I'm talking about there.

18 Q  The issue in that case was a splice in a hollow grade

19 polypropylene rope coming undone?

20 A  Yes. The splice utilized this tendency or this

21 characteristic about a hollow braid weave to grip itself if you

22 have sufficient engagement, and they had not researched the

23 methods of how to create a splice that would not be prone to

24 coming apart. They had used a clamp on the plastic rope, which

25 is not advisable. They had also allowed a set of the -- or at

                        - 6 -

1 least one of the units to get out the door with an insufficient
2 amount of engagement in the rope. So it was really --
3 basically, it was the method of attachment to the tree.
4 Specifically, it had to --
5 Q Characterizing it in the method of attachment to the tree,
6 but specifically, it was insufficient splice in a rope.
7 A Improper splice, right.
8 Q The splice was too short?
9 A Well, there's a way to make an eye splice in a rope like
10 that that makes it independent of the amount of engagement that
11 they use. And that's what I was recommending, was that they use
12 the method of making the eye splice that was actually
13 recommended by the rope manufacturer.
14 Q I understand. What about the Addison case? What was the
15 specific problem with that tree stand?
16 A That particular climbing stand used a double-pitch power
17 transmission chain much like you would see on a motorcycle
18 except that the pitch was longer on the chain, roller and link
19 type chain. Like I said, very similar to what you might see on
20 a motorcycle or bicycle except larger. And the issue was their
21 use of warnings. Well, actually the design was faulty, but they
22 tried to account for the deficiency by simply warning. And the
23 particular issue was the vulnerability of the design to a user
24 ending up using the last link in the chain. And the chain would
25 feed up into the arms of the deer stand. And for adjustment

- 7 -

1 purposes, they used what I would call a hitch pin, sometimes
2 called a spring pin or spring clip. It would pass through holes
3 in the arms and in through the links of the chain.
4 A power transmission chain like this is vulnerable in that
5 the last link is weak. It doesn't have a pin going through the
6 roller that you would see. And in this case, the user is up
7 against a fairly large tree, and it caused him to have to use
8 all of the chain. Then, that pin going through the last link
9 presented a danger. There was a warning on the stand about
10 this, but it was fairly small lettering. These stands are used
11 in the dark, and the alternative design would've added about $2
12 worth of materials to the cost of the stand, maybe $3.
13 Q So the case involved a climbing tree stand that
14 disconnected from a tree because the chain used during the
15 climbing process broke when the pin came out.
16 A It broke when the last roller released on the chain. And
17 the fix was to put what's called a half-link, a standard
18 off-the-shelf item as the last link in the chain. That
19 presented too small of an opening to get the hitch pin through,
20 which prevented the use of the last link of the chain. And I
21 don't know if they've incorporated that into their versions of
22 that stand now or not. I notice it is still for sale, at least
23 it was last year.
24 Q I understand. But that -- I'll call it a motorcycle chain,
25 which is really what it most resembles. That motorcycle chain

- 8 -

1 physically broke.
2 Right. The last link released. And it's inherent with the
3 chains that this is a weakness that you don't want to use the
4 last link. See, in actual practice where the chain's being used
5 for a power transmission, which is the most common use for them,
6 there is no last link. It's a continuous loop.
7 Q When you say a power transmission, you mean when it's being
8 used on, say, a motorcycle or some other type of engine?
9 A Right. When transmitting power from one sprocket to
10 another.
11 Q Understood. The Reese case, the ladder stand, what
12 happened in that?
13 A That was a matter of a ladder stand, like we said. The
14 gentleman had been up to the top of the ladder stand and secured
15 the rachet strap to the tree using a hook-in-hole type of
16 arrangement that they had on this particular stand. And the
17 stand utilized three ladder sections to increase it's
18 transportability through the woods to keep from having one big
19 long section of ladder. The top ladder section included the
20 platform and the foot platform as well. And they simply used a
21 technique to reduce the cross sectional size of the top ends of
22 the ladder rails to slip into the bottom end of the ladders
23 above it.
24 Q They put a crimp in one side so you could fit it in the
25 other.

- 9 -

1 A Right. They put the crimps in the tops of the two ladder
2 rails on the section below to slip into the legs of the section
3 above.
4 Q And after securing the top with a ratcheting strap,
5 somebody was climbing up or down and the ladder section
6 separated and fell.
7 A He was on his way back down that initial time, the first
8 time the stand had been used, and it disconnected and he fell to
9 the ground.
10 Q Was there, in fact, a ratcheting strap at the top of that
11 stand with a S hook on it?
12 A Yes.
13 It was used to secure the top to the tree.
14 A Right.
15 Q And the top of that stand remained secure to the tree and
16 that's why, in fact, the bottom sunk into the ground and
17 separated?
18 A Well, the top of the stand did fall, and the rachet strap
19 broke. The hook that had been at the end of the loose end, if
20 you want to call it that or the rachet strap, that would be the
21 strap that winds into the drum or the rachet, that hook was
22 never found. And he was in an area that had some fairly tall
23 grass at times of the year. And the strap appeared to have
24 broken at a line of stitching at the hook end. And so that was
25 what we were left with there.

- 10 -

1 Q Did you perceive that to be a stitching failure case or a
2 ladder section and separation case?
3 A That was a ladder section separation case. And my opinion
4 of what happened was that one of the legs of the ladder sunk
5 into the soil and allowed the ladder to rotate in that
6 direction. And the section separated on that side and caused
7 the whole thing to come down.
8 Q And that may have altered the load on the top section
9 causing the stitching to rip.
10 A That's the likelihood. I don't know. Now, we never really
11 answered that question through testing. It became kind of a
12 side issue. But the fellow was fairly heavy, and if he fell and
13 temporarily tried to hang his weight from the platform that was
14 still attached to the tree, that's likely what broke the strap.
15 Q And put some kind of leverage load on the strap --
16 A Right.
17 Q -- and damaged it?
18 A Yes. That is possible.
19 Q Have you testified in any of your prior cases at all about
20 the need to wear a safety belt at any time while using a tree
21 stand?
22 A I believe that some of the previous testimony did touch on
23 that issue some. It was usually a side issue and concentrating
24 on the mechanical issues of the stand itself. I was asked, you
25 know, questions about it. I did my best to answer them.

- 11 -

1 Q Have you ever rendered an opinion or do you consider
2 yourself qualified to render an opinion about the proper use of
3 a safety belt in connection with a tree stand?
4 A Well, the first part of your question is had I ever
5 rendered an opinion, and I'd have to go back and review some of
6 those cases to see exactly what I did have to say about that. I
7 believe that the testimony may have been limited as to how
8 difficult or whether it was practical to use a particular type
9 of a fall protection device while you're going up and down a
10 tree or a ladder stand to get to a deer stand.
11 Q In connection with the Overstreet case, you had somebody
12 who climbed up some sticks and then got into a hang-on stand?
13 A Right. He was in the process of stepping off the sticks
14 onto a hang-on stand, yes.
15 Q A fixed position stand?
16 A Right.
17 Q And in Mr. Oxford's case, we're also dealing with what they
18 call a fixed position or hang-on stand; correct?
19 A Right.
20 Q Did you render any opinions in Overstreet about the need to
21 wear a safety belt once you finished climbing?
22 A I don't recall.
23 Q Tell me about your work history.
24 A My work history? Well, after graduation, which was in late
25 '76, early '77, I moved to Little Rock and went to work for a

- 12 -

1 company by the name of Jack Tyler Engineering Company and was
2 there until '82. They are a local engineering company, family
3 owned. They provide engineering equipment to industry and
4 commercial companies.
5 Q I don't need to know in great detail what they did. Tell
6 me what you did when you worked there.
7 A Okay. Well, in that five years I was there, I started at
8 the ground level and worked my way up to senior sales engineer.
9 I did everything from handling incoming requests from customers
10 to running the fabrication shop and the service shop which
11 involved designing and overseeing the construction of engineered
12 systems, pumping systems, air compression systems, deairation
13 equipment for boilers pumps of all sorts.
14 After leaving there, I went to a company called Orbit Valve
15 Company, another local company, manufacturer of petroleum valve
16 systems. And they basically take big -- different sizes of
17 steel castings and machine them into valves that are used in the
18 oil and gas industry. For them, I ran their computerized design
19 system. I trained the users, performed some design work myself
20 there, went to work actually in --
21 Q How long?
22 A Excuse me?
23 Q How many years did you do that?
24 A I worked there for about three years.
25 Q And then where?

- 13 -

1 A Then, I went to a company called Windsor Door Company.
2 They manufacture overhead doors. The part that I worked for was
3 mainly commercial industrial overhead doors. I was a product
4 engineering manager there for a time and had several folks
5 working for me in that design department.
6 Q How long were you there?
7 A I was there for two years.
8 Q What did you do next?
9 A At that time, the original company right out of college
10 approached me and asked me if I would come back to work for
11 them. And I did and worked there for seven years and did more
12 of the work that I'd done before with regard to working with the
13 customers, putting together systems that would meet their
14 requirements. We're talking about paper companies, lumber
15 companies, you know, commercial buildings, that sort of thing
16 and was eventually branch manager of that engineering office.
17 Q So what did you do after leaving Jack Tile the second time?
18 A That was -- I went to work for Arkla Gas Company. They are
19 the local natural gas provider. I think they're called Center
20 Point Industries these days, Center Point Energy. I was the
21 engineering person in the marketing department, worked with
22 industrial and commercial users on their needs for natural gas,
23 boilers, heaters, piping systems and that sort of thing. And I
24 worked there from '95 through '98. And it was at that time that
25 I hooked up with my current partner in a company called ARTI

- 14 -

1 which is an abbreviation for Accident Reconstruction and
2 Technical Investigations. And we've been doing that since
3 October of 1998.
4 Q   Did you have a sales position when you were at Jack Tyler
5 during your ten years there?
6 A   It varied. Of course, everybody in the company had to do
7 with the sales of the company. But to answer your question,
8 sometimes yes and sometimes no. The sales force was made up
9 mostly of degreed engineers, mechanical engineers. A couple of
10 us were professional licensed engineers. And so some of the
11 internal engineering work did not have much to do with sales,
12 but we were always tied into that.
13 Q   This ARTI that you work for, what percentage of your work
14 for ARTI involves litigation?
15 A   A fairly small percentage. I can't quote a definite
16 number. I know that I don't spend a lot of time in the
17 litigation, although it seems to be a growing percentage.
18 Q   Is it ten percent of what you do there?
19 A   Excuse me? What was your question?
20 Q   Is it ten percent?
21 A   Oh, litigation? No more than that. Most of what we do
22 involves insurance losses, the evaluation of property loss by
23 insurance companies.
24 Q   Well, what does that have to do with engineering? Explain
25 that.

- 15 -

1 hurt. I was asked to assist them in the defense of their case.
2 Q   You said eight times in court. How many of those were
3 these insurance matters versus, you know, outside litigation
4 that you were hired to help with?
5 A   I never really thought of it separated like that. Bear
6 with me just a minute. Well, I can see one that I know was a
7 result of insurance work. The others, I believe, were just
8 contacts from attorneys.
9 Q   So even though 90 percent of what you do is insurance
10 investigation, it appears that about seven of the eight times
11 you've testified, it's been litigation work for attorneys.
12 A   Right. Going back to, what did I say, '96?
13 Q   I understand.
14 A   Yeah.
15 Q   The work that you do for attorneys, can you tell me how
16 often you're hired by the plaintiff versus the defense?
17 A   Well, it's more plaintiff than defense. I haven't ran any
18 numbers to see what the percentage is. But I would say, you
19 know, the majority is the plaintiff.
20 Q   Can you give me an estimate?
21 A   Oh, maybe 60/40, 80/20, something like that. That's just
22 an estimate.
23 Q   I understand.
24 A   Sometimes, it's a little hard to tell the insurance stuff.
25 Q   Have you ever designed a tree stand?

- 17 -

1 A   Well, if an insurance company insures a piece of equipment
2 or structure and something happens to that and costs them money,
3 they might want to know what went wrong. You know, if it's a
4 fire in a structure and the origin and cause investigator
5 identifies the origin of the fire as being at or near a piece of
6 mechanical equipment, it might be a vehicle that was parked in
7 the structure, it might be an appliance. Then, we might be
8 asked to go in and evaluate that mechanical device,
9 electromechanical device and see if it was at fault in some way
10 or not.
11 Q   What percentage of your work since you've gone to ARTI has
12 been that sort of insurance work or, you know, accident
13 investigation?
14 A   Probably 90 percent or better. Take for example, I've
15 testified in court for a sum total of one, two, three, four,
16 five, six, seven, eight times. And actually, it goes all the
17 way back to '96.
18 And I've neglected earlier to mention that as early as my
19 second tenure at Jack Tyler Engineering Company, which would go
20 back to the early 90's, I did a little bit of forensic work
21 along the way as I was working for both Jack Tyler and for Arkla
22 Gas, you know, maybe a case a year or something like that. I
23 was first asked to testify or to actually look at a forensic
24 case for a former employer, Windsor Door Company, whenever they
25 were sued after I left there by a user of a garage door that got

- 16 -

1 A   No.
2 Q   Have you ever built a tree stand?
3 A   Well, I have modified tree stands, so I guess there's some
4 design work involved there. I've never built one from scratch.
5 The --
6 Q   Modified stands, that's in connection with litigation.
7 A   Yeah. Take for example the Reese case we were talking
8 about. I modified that stand to include hitch pins to hold the
9 legs together so that they wouldn't come apart. In the Addison
10 case, I modified the chain to include --
11 Q   The half links.
12 A   -- the half links that we were talking about. There wasn't
13 much to do with the climbing sticks, the Overstreet case.
14 Q   Other than tell them to follow the rope manufacturer's
15 recommendations for how to splice a rope?
16 A   That would certainly have made a lot of sense.
17 Q   I understand. Was that manufacturer Wellington?
18 A   No. The manufacturer was White Oak Tree Stands. Are you
19 talking about the Overstreet case?
20 Q   I'm talking about the rope itself.
21 A   Oh, gosh, I don't remember. That doesn't sound -- what was
22 that again?
23 Q   Wellington.
24 A   Wellington? That may have been it. I don't remember.
25 Q   Aside from the few modifications you've made working on

- 18 -

1 litigated cases, have you ever designed a tree stand?

2 A No.

3 Q Has anybody ever paid you, a tree stand company or you

4 decided to do it on your own, to build or design a tree stand?

5 A No.

6 Q Do you hunt?

7 A No.

8 Q Have you ever used a tree stand?

9 A Yes.

10 Q Explain.

11 A Well, I used it in these cases, but I've not used it to

12 hunt from.

13 Q So you've experimented with some in connection with

14 litigation, but other than that, you've never been in one.

15 A I hadn't really thought if I'd ever been in a tree stand at

16 all in my life other than with regard to this. That goes back

17 quite a ways. I can't say that I can answer your question for

18 sure.

19 Q As you sit here today, February of 2005, can you ever

20 remember being in a tree stand for any reason other than the

21 three or four cases you've worked on?

22 A I believe I can. A friend of mine that is a hunter showed

23 me his deer stand, and I climbed up in it.

24 Q Was that a manufactured product or a homemade thing?

25 A It was manufactured.

- 19 -

1 Q Do you know what kind of stand, climbing or hang-on?

2 A I believe it was a ladder stand.

3 Q Aside from that one occasion, do you have any other

4 experience with tree stands?

5 A I don't recall anything right now.

6 Q When you experimented with -- well, the Overstreet case,

7 for example, that wasn't a tree stand case, that was a climbing

8 stick case; correct?

9 A Right.

10 Q So you would've experimented with climbing sticks; correct?

11 A Yes.

12 Q And the API case, that was a climbing tree stand case?

13 A Yes. Excuse me, yes.

14 Q You used an API tree stand to climb a tree?

15 A Yes.

16 And the Hunter's View case, which was the ladder stand

17 case, did you install a ladder stand on a tree?

18 A Yes.

19 Q And did you go up and sit in that?

20 A Yes. The one that I modified.

21 Q You drilled some holes through the connections and put a

22 locking pin in.

23 A Right.

24 Q How about Mr. Oxford's tree stand? Did you ever put one of

25 those Ol' Man stands on a tree and use it?

- 20 -

1 A Yes.

2 Q Did you ever put it up on a tree at elevation or just down

3 at ground level?

4 A Down at ground level.

5 Q How many times did you use the Oxford stand to support your

6 own weight?

7 A Oh, gosh, I didn't count.

8 Q Is it something that you did 2 or 3 times or something you

9 did 10 or 20 times? Just give me some idea.

10 A More than 2 or 3, less than 10 or 20.

11 Q Fair enough. Have you listed in your reports all the

12 material that you have examined to form your opinions?

13 A I'm not sure. I know that in the first report called the

14 preliminary report, I did a list there.

15 Q That's the October 28, '04 report; correct?

16 A Right, correct. And after that, I didn't go into great

17 detail. Let's see. I guess the supplemental report, I've

18 listed a few more things there, maybe the second supplemental.

19 I believe I've listed everything there. I haven't gone through

20 my file, which I have with me today, to make sure that I listed

21 everything that I did see. Mr. Hodges is in the habit of

22 sending quite a bit of paper out, as you probably know. And I

23 don't know that every single item that he sent I've listed, but

24 certainly the file is available here today.

25 Q Can you flip through your file and identify what's in there

- 21 -

1 for the court reporter so that she can create an index of what's

2 in that file?

3 MR. CULLEN: Peter, it's about four inches thick.

4 MR. LENTINI: Yeah. I'm not sure if it's a hundred

5 different things or four inches thick might only be eight

6 different items so --

7 MR. CULLEN: That's true.

8 MR. LENTINI: -- let's see how it turns out.

9 Well, I notice that about an inch or so of that is --

10 Q (By Mr. Lentini) Depositions?

11 A -- depositions. So it's fewer than that. Let's see how --

12 we'll proceed if you want to slow it down, speed it up. Just

13 say so. I'm going to kind of lump things together a little bit

14 rather than going through page by page if that's okay. I have

15 our original assignment record. I have some notes and other

16 things that I've generated in my handwriting or drawings and

17 sketches and things like that, several pages of that. An

18 agreement that I've tried to start each case with. I have the

19 three reports that I -- actually, the three separate documents

20 that make up the report for myself. I have Mr. Burks' report

21 and his supplemental and his resume attachments and such. I've

22 got Mr. Smith's report and his attachments. I have some copies

23 of some of the photographs that I've taken, some photographs

24 that others have taken. I have a report, or actually, it's a

25 booklet of photographs taken by James Swindoll dated March 8th.

- 22 -

1 I have various correspondence from Mr. Hodges and Mr. Burner

2 about his --

3 Q Burner?

4 A Burner from Mr. Hodges' office, Dean Burner. Apparently,

5 he was in on this case early. I think he's no longer there. I

6 have some motions. Let me get through some of this

7 correspondence. That's the correspondence from Hodges' office

8 about scheduling of depositions and that sort of thing. I have

9 copies of some motions of that extent in the discovery time,

10 copies of some email correspondence between myself and Mr.

11 Hodges' office. I have a printout of the online dealer locator

12 from Ol' Man Tree Stands for dealers inside Arkansas that I used

13 in an attempt to find an exemplar stand.

14 Printout from a Thomas register, all this stuff. It's an

15 online Internet stuff trying to find the hooks that we were

16 needing to complete the exemplar. Some printouts of Internet

17 pages from the Ol' Man site. I have a set of instructions for

18 the Ol' Man Tara & Tara Elite II that came with one of the

19 exemplar stands that Mr. Hodges' office found. Discovery

20 responses, defendant's deposition, that sort of thing, a copy of

21 the complaint, request for production responses. It's like 4,

22 5, 7, 12. I know there's a 10 in here somewhere. Gary Oxford's

23 deposition of May 14th, 2003, Lynwood Williams' deposition of

24 October 6, 2004, Tim Crawley's deposition of October 6th, and

25 Danny Green's deposition of 2003, May 14, 2003. That's it.

- 23 -

1 A Done.

2 Q (By Mr. Lentini) Now, I think we were at the point where

3 you were telling me what you have reviewed. And with that out

4 of the way the first and second reports, you list in bullet

5 fashion the items that you have reviewed in preparation of those

6 reports. And as I understand it, when you got down to the

7 second supplemental report, the only additional item you

8 reviewed was the exemplar tree stand.

9 A I believe that's right. Hold on a second. I don't believe

10 that there is anything else substantially that was reviewed for

11 that. I know that there's been various times when different

12 photographs came in. I don't know exactly where chronologically

13 all that follows, but I believe that's substantially correct.

14 Q If I were to ask you to list for me all the things that

15 you've reviewed in preparing your reports, would you do anything

16 other than read the list and the reports?

17 A Not as I sit here today, no.

18 Q I won't ask you to do that, then, because we can both read.

19 If there's anything that you note to be missing from the list

20 and the reports, then you can go ahead and let me know now or if

21 you think of it later.

22 A I appreciate that.

23 Q In addition to reviewing the items listed in your various

24 reports, did you do anything else to gather information in order

25 to form your opinions? Let me ask you this, for example. Did

- 25 -

1 Q Is that the end?

2 A Yes. I thought you heard me. I'm sorry. I said that's

3 it, but maybe you didn't understand me.

4 Q I'm going to have -- most of that stuff sounds like I

5 already have so I don't need copies. But I would ask that you

6 would get us copies of your notes.

7 A Right.

8 Q Objections, your contractor agreement with counsel, your

9 photos, any photos you have whether they're yours or anybody

10 else's photos, and any correspondence with counsel, whether

11 they're letters or emails or notes or otherwise.

12 A Sounds reasonable.

13 Q And the rest of this stuff, I don't need you to send me

14 back reports I've already seen and depositions I already have.

15 Most of that file, it sounds like I already have. I'm guessing

16 the things I've asked for won't be much more than ten percent of

17 the whole pile you have there.

18 A That's probably a good estimate, yes.

19 Q You know what, if you could do me a favor. You can keep

20 your reports because you're going to need those to testify. But

21 if you could pass your file to defense counsel so that he can

22 kind of have a look at it, that way when we're finished, if

23 there's something else in that stack that he thinks I need to

24 see, he can let me know.

25 MR. MODELEVSKY: That sounds good.

- 24 -

1 you interview anybody?

2 A I did talk to the plaintiff, and I think maybe I listed

3 that. Let's see.

4 Q Yeah. I see a section in your first report, interviewed

5 via telephone.

6 A Okay, right.

7 Q Do you have notes of that phone conversation?

8 A Yes. They're included in the file.

9 Q Are they handwritten?

10 A Yes.

11 Q Did you take any of your own photographs?

12 A Did I take my own photographs?

13 Q Yes.

14 A Yes. I think there's several hundred in there, and they're

15 digital photographs. And I don't have them all printed out.

16 Q I'd like to have those if you can get them.

17 A But I can copy those for you on CD if that would be okay.

18 Q That would work out best, and then we can go through them.

19 You have selected out of those several hundred digital

20 photographs pictures that you think that illustrate your point

21 and then actually included those photographs in the body of your

22 reports; correct?

23 A Yes. I always anticipate that the full body of photographs

24 will be available. Often times, I actually include it in the

25 back of the report. This time, it did not seem appropriate.

- 26 -

1 But I do keep those, and I do have a CD for those. That would
2 contain all of that body of photographs that you'd like.
3 Q And we'll ask you to get a copy of that CD to us. I
4 understand how digital photography works now. There's always a
5 couple of hundred photographs anymore instead of one roll of
6 film.
7 A Yeah. It's a curse. We used film for years, and I
8 switched to digital. I find that I take a lot more photographs,
9 which can be very handy if you are some distance from your
10 subject and you find that you may have not concentrated on
11 something, it may be in a photograph. But when it comes time to
12 describe all of them and print them all out, it becomes a real
13 problem.
14 Q Let me ask you this. Have you received and reviewed the
15 reports of Mr. Lewis, the welding expert?
16 A No.
17 Q No?
18 A No.
19 Q Do you have any idea what opinions Mr. Lewis, the welding
20 expert, has expressed in connection with this accident?
21 A I spoke with him briefly this morning. It was my first
22 contact with him. I know what he told me at the time.
23 Q What did he tell you this morning?
24 A We only had a moment or two. But basically, that it was a
25 characteristic there he referred to as overwelding. And I'm not

- 27 -

1 sure if I'm familiar with the technical term definition. But
2 apparently, he felt like that may have caused some brittleness
3 in the welding of the tubing and that it -- I think the bottom
4 line was is that the joint was somewhat weaker than it would've
5 been otherwise had it been welded the way he would have liked to
6 have seen it done. He also mentioned something about trimming
7 back the piece of angle that was used to secure the tubing of
8 the arm to the pivot bracket, as part of the pivot bracket.
9 That's pretty much it. He went into some other details. I'm
10 not a -- you know, I studied welding in school, but I'm not a
11 welder. So I'd have to take his points into consideration.
12 Q Did you study metallurgy at all in school?
13 A Yes.
14 Q And how much of your curriculum involved metallurgy?
15 A Well, one semester in a course purely for metallurgical
16 study. You know, the other courses in engineering would touch
17 on it as a necessary part of carrying that study forward and
18 applying the principles learned the metallurgical class into the
19 design end of things. I also worked for a time for one of the
20 mechanical engineering professors in a metallurgical lab where
21 we evaluated metallurgical samples. Ironically, I realized
22 later that what we were doing was working on his forensic work.
23 I didn't realize it at the time that what he was doing was
24 outside forensic work.
25 Q Do you recognize the field of metallurgical engineering as

- 28 -

1 a separate field from mechanical engineering?
2 A Well, personally, I don't. I know that people in
3 mechanical engineering sometimes do go into other specialities.
4 We consider metallurgy to be part of the overall mechanical
5 engineering umbrella of types of engineering. And when you
6 start talking about legally and does the term legally apply,
7 different states handle it different things. Don't quote me on
8 this, but I think Texas may list all these different types of
9 engineering as separate specialities. I believe Arkansas takes
10 more of a general approach of mechanical engineering, and they
11 don't offer separate licenses for all these different
12 subcategories of engineering.
13 Q Yeah. It's not a legal question. I don't know what the
14 legalities are, but what I'm wondering is do you recognize
15 metallurgy for the subspecialty of engineering?
16 A Well, I think your term subspecialty would be appropriate.
17 Q For example, do you consider yourself qualified to
18 determine the type of alloy that would be best to use to make
19 tubing in a nuclear power plant?
20 A Well, I certainly wouldn't. I think you're talking about
21 now one of the more understood subcategories of engineering.
22 And nuclear engineering, you know, that's some pretty particular
23 stuff. So you would have to have a fairly specific subset of
24 skills to address that.
25 Q You would have to have a fairly specific knowledge of

- 29 -

1 materials and metals in order to make that type of decision, and
2 that would be something you would consider as sort of the
3 outside of your specific area of expertise?
4 A If someone came to me and asked me to evaluate that
5 specific instance of what type of tubing used in a nuclear power
6 plant, considering that that particular knowledge wasn't shared
7 in college and that was, again, about 25 years ago, I'm sure
8 there's been changes along the way. And considering the
9 ramifications for public health, you know, I would not choose to
10 comment on that.
11 Q Do you have some understanding of what happened to Mr.
12 Oxford?
13 A Well, I guess your term understanding would be kind of a
14 combination of what I learned in my talking with him and what I
15 see as the evidence on the stand itself. And from that, I've
16 derived an understanding as to how I think it happened. Is that
17 what you're asking?
18 Q Yeah. I think an opinion might be a better word, given the
19 way you defined it. Based on your review of all the materials,
20 your phone interview, your read of the deposition transcripts --
21 I noticed by the way, did you ever receive the statements given
22 to me by Mr. Oxford or Mr. Green?
23 A I don't believe I did. I saw in the deposition where
24 they'd offered some clarifications up to those statements but
25 never saw the statements themselves. So there was references to

- 30 -

1 the statements in the depositions.

2 Q  You saw my Larry Burks' reports?

3 A  Excuse me, Dr. Burks?

4 Q  Yes.

5 A  You mean his original report and then a supplementary that

6 was issued recently?

7 Q  Yes.

8 A  Yes.

9 Q  Did you see any report from the St. Louis Tech

10 Laboratories?

11 A  Bear with me just a second. I want to be sure that this is

12 not what you were talking about. I've seen a report by

13 Associated Metallurgists from Norman, Oklahoma. That obviously

14 is not the one you're talking about.

15 Q  What is the name of the person that issues that report?

16 A  Swindoll, James S. Swindoll.

17 Q  What's the date of that report?

18 MR. CULLEN: That's the attorney.

19 A  Oh, I'm sorry. That's the attorney.

20 Q  (By Mr. Lentini) Yeah.

21 A  I see, submitted to Swindoll. Jay Block, consulting

22 metallurgical engineer. The date is March 8th of 2004.

23 Q  And what does that report say?

24 A  It's really not an opinion piece at all. It's just a set

25 of photographs of the stand, which is important.

- 31 -

1 Q  I would ask that we be certain to get those. I'm not sure

2 I've seen that document, but we'll include those in the things

3 we get copied.

4 The title of it is -- it's from Associated Metallurgists.

5 The title of it is Photographs of the Subject Ol' Man Tree

6 Stand. From my familiarity with the stand, it is a subject

7 stand. And this fellow had taken photographs of it mounted to a

8 pole and did some close-up work of the fractured arm and all

9 that, but I didn't see where he offered any kind of an opinion

10 about it. Just basically presented the photographs with a

11 description, a brief description of the photographs.

12 Q  So based on your review of the deposition transcripts and

13 your personal interview with Mr. Oxford and your examination of

14 the tree stand itself, have you sort of put that all together to

15 form an opinion about what happened?

16 A  Yes.

17 Q  Tell me what your opinion is about what happened.

18 A  Right, yes.

19 MR. CULLEN: He said tell him --

20 Q  (By Mr. Lentini) Can you tell me what that opinion is?

21 A  Oh, I'm sorry. I thought you were clarifying your earlier

22 question. I misunderstood.

23 Q  That's okay.

24 A  So you're asking what do I think happened?

25 Q  Yeah. And does this as an opinion that you have hold with

- 32 -

1 a reasonable degree of engineering certainty?

2 A  Yes.

3 Q  So tell me what that opinion is.

4 A  Well, let me work my way into it a little bit here. And in

5 my talking with Oxford and his deposition and all, it's clear

6 that they -- he and his buddy, Green, had bought this stand and

7 had mounted it to a tree. He got on the stand, and then within

8 about 30 seconds, he and the stand were on the ground. And the

9 arm, one of the arms on the seat support was broken. And, you

10 know, when I first saw the stand, it was, of course, interesting

11 that this seat arm was broken.

12 But as I got into the case, it seemed to me that the real

13 issue was that the stand fell out of the tree. And that is that

14 the breaking of an arm in this particular mechanism should not

15 affect the attachment system that holds it on the tree. And by

16 attachment system, I'm referring to the frame that touches the

17 tree, the bolt that the rachet strap attaches to, of course, one

18 end of the rachet strap is sort of permanently attached to the

19 bolt, and then the hook. And you can actually remove the seat

20 assembly and still expect the stand to remain on the tree.

21 So the broken arm is interesting and part of the story.

22 But the real question to me is how does the stand end up on the

23 ground after it's all -- after the dust is settled. And it's my

24 understanding that the rachet strap did not feed out of the

25 rachet mechanism itself. The only real damage to that

- 33 -

1 attachment system was the bent spring latch on the hook, which

2 is most remarkable. And that it's sieged to provide evidence as

3 to how the hook was attached, that spring clip as pointed out in

4 Dr. Burks' first report as being pushed to the side as though

5 with some sort of heavy force. And considering that about the

6 only way that I can envision this tree, this stand falling out

7 of the tree and not having either a broken strap or some other

8 problem is that the hook had to come unattached. So the hook

9 released. And here's the hook with this fairly significant

10 remarkable feature about it, which is the spring latch.

11 If you place this hook on the subject stand in various

12 positions, it will give you an indication as to how the hook was

13 hooked on. And I've experimented around with it some. Dr.

14 Burks has experimented with it some, and I appreciate the work

15 that he did. Mr. Smith also did some similar work, and their

16 work seemed to eliminate one of the possibilities of one of the

17 scenarios or one of the theories or hypothesis you might want to

18 call it as to how this stand was fallen out of the tree. And in

19 all their work up to Dr. Burks' supplemental report had had the

20 hook going in from the back of the stand. And understand that

21 we -- for purposes here today, the back of the stand would be

22 the side of the stand contacting the tree and the front will be

23 the side away from the tree. And I refer to right and left as

24 you would be if you were -- well, I mean, we can define that

25 however we want.

- 34 -

1 Q  Yeah. But to be consistent with your reports, the right
2 would be the hunter's right as the hunter is seated in the tree
3 stand?
4 A  Okay. Is that what I said?
5 Q  Yes, which is the broken side.
6 A  Okay, good.
7 Q  And the left would be the hunter's left as he is seated in
8 the tree stand.
9 A  I thought that was the case. I was about to go back and be
10 sure.
11 Q  That's the way he would be seated. The front of the tree
12 stand would then be the part in front of the hunter, which is
13 the furthest away from the tree.
14 A  Right.
15 Q  And the back of the stand would be behind the hunter, the
16 part that touches the tree.
17 A  Much like if you were to be sitting in the stand and your
18 front is, you know, in front and back and right and left
19 correspond to the stand.
20 Q  Not much like it, exactly like it.
21 A  Sure.
22 Q  Just so we have those directions straight. When we talk
23 right, left, front, back, when we're going to talk about it in
24 that fashion throughout this deposition.
25 A  Agreed.

- 35 -

1 Q  So --
2 A  Where was I?
3 Q  Did the defendants eliminated what notion?
4 A  Oh, that their testing pretty well proved that, you know,
5 as I would suspect that hooking the hook in from the back of the
6 stand, I could not see a way that the hook would release in that
7 position. And I think that their testing pretty well showed
8 that. Dr. Burks' loading of the sand bags and the seat of the
9 stand, his exemplar, exhibited how strong the arm can be and
10 would pretty well say to me that barring any of these welding
11 issues that the other -- what was his name, the welder's name?
12 MR. CULLEN:  Today?
13 Q  (By Mr. Lentini)  Lewis.
14 A  Tommy Lewis, Mr. Lewis! Mr. Lewis might put forth. But it
15 appears to me that that shows the strength of the arm in a
16 fairly good fashion. So my reports would show that my opinion
17 about the broken arm is that it broke when it hit the ground.
18 And I believe that the work that Dr. Burk did showing how strong
19 the arm could be probably would preclude its having broken with
20 Mr. Oxford sitting in it.
21 Q  Let me just stop you right there for a minute. What you're
22 saying is that you are convinced that the seat didn't break off
23 the stand to fall out of the tree.
24 A  Well, yeah. Not much testing has been done to really show,
25 none by me, and as far as I know, none by the other experts to

- 36 -

1 show precisely how the arm did break. I think they've shown how
2 it did not break. But we've got a broken arm, and we've got
3 this hook that released.
4 Q  In your opinion, did that arm break while the plaintiff was
5 sitting in the seat?
6 A  My opinion is that it broke when it hit the ground.
7 Q  It did not break while it was sitting in the seat?
8 A  Right, right. Hitting the ground is what broke it, not his
9 sitting in it.
10 Q  Well, and I asked you, and I let you go for a while because
11 it was interesting, but it wasn't exactly the question that I
12 wanted answered. And my question wasn't clear so that was my
13 fault.
14 A  Well, I apologize for not listening.
15 Q  I asked you of what your opinion is or what your
16 understanding was of what happened. I wasn't necessarily asking
17 you to go right into your opinions about the case. What I was
18 more or less interested in knowing is factually, what is the
19 scenario that took place in the woods? And, for example, you
20 know from reading his deposition that the plaintiff said that he
21 was sitting in the tree stand and that he believed the arm broke
22 causing it to drop down and bounce off the right side of the
23 platform and fall. Did you read that in his deposition?
24 A  Yes.
25 Q  Do you believe that happened?

- 37 -

1 A  No.
2 Q  So just from a nuts and bolts scenario of what did happen,
3 can you give me some idea? Do you have an opinion about what
4 happened and instead of what the plaintiff thinks happened?
5 A  Well, when you get into the -- it kind of goes back to some
6 of my experience where there are some basic things that
7 witnesses can get right, and then there's some fine details they
8 may or may not get right. In this case, we have a stand in the
9 tree, and then later it's on the ground. And so I am looking at
10 the evidence and what it tells me about what happened. And I
11 suppose it could be possible that the arm would break first, but
12 then you still have the damage to the frame of the stand itself.
13 And it seems to me that the breaking of the arm shows some
14 consistencies with the bending of the frame. And if the arm had
15 broken when he was sitting on it, I don't really see how the
16 frame got bent the way it did.
17 Q  Do you understand that Mr. Burks has rendered an opinion
18 that from the seat tube that he is able to determine the
19 direction of the fracture?
20 A  I've read that, yes.
21 Q  And do you believe it is possible to determine a direction
22 of a fracture?
23 A  I believe that there's some things you can derive from what
24 you see there. And I know that when I first saw the fracture
25 and looked at it closely, I had the impression that it would not

- 38 -

1 have broken in that way or that fracture surface would not
2 necessarily look like that if it had been broken when someone
3 was sitting on it or when it was loaded up with sand bags.
4 Q   Would you agree with me, for example, that if you were
5 sitting on the seat of the tree stand and the seat is that net,
6 that the load being applied to the right arm would be a load
7 that was downward and inward?
8 A   Well, there's about, I think, four different loads that you
9 would need to analyze back at that place where the fracture
10 occurred.  You're right in that there would be a bending load
11 downward.  There would be a bending load inward, which I don't
12 believe Dr. Burk mentioned in his analysis.  I may be wrong
13 about that.  But there would also be torsion due to the arm of
14 the seat sticking out and the load applied to that.  There would
15 also be a sheer, which is basically just the weight straight
16 down across the face of that fracture.
17 So there's really four stresses that you would need to
18 analyze back at that point.  Some would add together, some would
19 be stacked against each other.  It's a fairly complicated issue
20 that I was in the process of looking at and analyzing.  But when
21 I came to the conclusion that the real issue was the release of
22 the hook from the stand and its subsequent falling from the
23 tree, I abandoned that laborious effort.
24 Q   I understand.  With looking at a fracture, is it possible
25 to determine whether there is a torsional component to the

- 39 -

1 A   That's possible.
2 Q   From what you are able to analyze when you look at that
3 fracture, does it appear to you that the fracture started at the
4 bottom and went up?
5 A   Well, I've looked at it with that question in mind several
6 times in trying to match the damage to the arm, in this case the
7 break, to the racking of the frame.  And it appears that there
8 is -- when you first look at it, you may see that it's broken in
9 an upward direction mostly.  But if you look closely, there's
10 also some inward component of that as well.  And that seems to
11 be consistent with the racking of the frame.  And that if the
12 arm was flipped up, mostly pointing up and a load applied or a
13 shock load applied to the tip of the arm, then, it would break
14 it in an inward direction.  Some of the distortion at the final
15 break area is in that direction.
16 I don't know that anybody's really tested to see what it
17 would look like broken in that direction.  I do know that Dr.
18 Burk tested it in the other direction, but we haven't seen one
19 tested in an inward or an upward direction to see what it would
20 look like particularly with the weld that was part of the
21 fracture service, which is going to affect the way it breaks.
22 So I don't -- have I answered your question?
23 Q   Okay.  Would you agree with me that when you break an
24 aluminum tube like that, that you would expect some outward
25 curling of the material at the very end of the fracture?

- 41 -

1 fracture?
2 A   I believe that's right.  And in this case, we've got a 45
3 degree break across the surface.  I believe, having to go back
4 to some of my earlier studies now, I believe that may be a
5 characteristic of a torsional fracture.
6 Q   But as you sit there today, can you say one way or the
7 other whether there is or is not a torsional component to this
8 fracture?
9 A   Well, no.
10 Q   And if you were sitting on the tree stand, you would expect
11 the torsional component if the fracture occurred while you were
12 in the seat; correct?
13 A   It should be, yes.
14 Q   Putting aside whether there is a torsional component or
15 not, is it possible to determine just looking at the fracture
16 that it started on this side of the tube and ran in this
17 direction and finished on that side of the tube?
18 A   I believe in general you can do that.  Now, there's going
19 to be some asymmetries thrown in.  You know, if you've got -- in
20 this case, we've got this weld on one side, and the fracture
21 does go into the weld in an area, that might cause it to proceed
22 in an asymmetrical fashion or around the break.
23 Q   And a torsional load could cause the beginning and the end
24 to be in locations other than directly opposite of each other
25 also; correct?

- 40 -

1 A   It's possible.
2 Q   Is it inevitable?
3 A   I can't answer that.  I'm not a metallurgist as I sit here,
4 but I -- it seems likely, but I don't know that it's inevitable.
5 Q   Once the material has ripped 90 percent of the way around
6 and you're left with just that little almost flat piece of metal
7 still holding, wouldn't you expect that little flat piece of
8 metal, the last, you know, 10 percent, the last 36 degrees of
9 the circle we'll call it, that flat piece of metal as it bends
10 and breaks, you would expect that to curl outward, wouldn't you?
11 A   Right.  Now, the thing that's going on here is with the
12 weld in there.  We don't know whether that's where that the
13 final tear was in the direction of the load flight, or if might
14 have been to the side somewhat.  You know, I don't know what the
15 asymmetry that's thrown in by the weld being there, how that
16 would affect it.
17 Q   Does it appear to you from your examination of that tree
18 stand, which I understand you have right there with you now,
19 don't you?
20 A   Yes.
21 Q   Does it appear to you that that seat tube broke?  Now, let
22 me get it oriented.  When you have it an horizontal position and
23 you're sitting in it, the tree stand, does it appear to you that
24 that tube broke upward?
25 A   Well, it is possible that it did.  There is some curling

- 42 -

1 out of the metal at the top, and that's the reason I --
2 Q You got away from the seat tube as the cause of this
3 accident?
4 A Right. That's part of it. And the other is just the basic
5 premise that we have really two things that's happened here.
6 One is the seat tube broke, and it's associated -- well, I guess
7 there's really three things. But there's a racking of the frame
8 as well, but you can tie those two together. And then you've
9 got the hook released. So does it make sense to say that the
10 tube broke and caused the hook to release, or does the hook
11 release cause the tube to break?
12 And to me, there's really no way that I can, as I sit here
13 today, find a connection between a tube breaking and causing the
14 seat to break and that, in turn, causing the hook to release.
15 But the other way around, I can release the hook and have the
16 tube break because of impact with the ground.
17 Q Is this something that you're basing on evidence, or is
18 this just a hypothesis that you put together trying to make
19 sense of evidence?
20 A Excuse me? Could you --
21 Q I'm trying to figure out if you're basing this on any
22 testimony that Mr. Oxford gave you or have you decided that his
23 testimony is unreliable and you're ignoring his testimony and
24 just figuring this out entirely on your own.
25 A Well, I can see where you're going in that -- there -- he

- 43 -

1 round bar below. But I do believe that it was engaged on that
2 bolt, yes.
3 Q You understand that this was the one and only time that Mr.
4 Oxford ever put that stand on a tree?
5 A I believe that's his testimony, yes.
6 Q So is it your understanding that all the bends and twists
7 and things that we see in that stand came from this accident?
8 A No, it's not my understanding.
9 Q What is your understanding in that regard?
10 A Well, the stand has been around. It's made the rounds, and
11 it's been looked at. There are marks on it now that plainly
12 were not there in some of the early photographs. I know that --
13 take for example Dr. Burk in his original report and in his
14 supplemental refer to markings that would indicate to him that
15 the hook had been hooked in from the back. If you look at the
16 report -- actually, it's not a report. The set of photographs
17 that I referred to earlier from Associated Metallurgists, I'm
18 assuming that Dr. Burks' report, original report --
19 THE WITNESS: Let's pull that out for a second. Do
20 you know where his report is?
21 MR. CULLEN: I believe it's in there.
22 THE WITNESS: Somewhere behind you?
23 MR. CULLEN: There you go.
24 A Let's see here. Bear with me just a minute.
25 Q (By Mr. Lentini) Sure. Just so we can be clear because

- 45 -

1 did testify that he -- or at least he told me that he thought he
2 hooked the hook in from the back, which is contrary to what I
3 think happened. But I guess what I'm looking at is the evidence
4 in trying to formulate a hypothesis as to how the evidence got
5 into the state that it's in. And --
6 Q Let's just clear up this issue with the seat thing. Do you
7 believe the seat, the broken seat had anything to do with the
8 cause of this accident?
9 A No.
10 Q So the fractured seat tube is irrelevant?
11 A It's relevant in that it's part of the evidence that I'm
12 looking at, so I would not say it's irrelevant. I would say
13 that I think the initiating incidence was the release of the
14 hook.
15 Q And you believe that the seat tube broke because of the
16 accident. The accident did not happen because of the broken
17 seat tube.
18 A Right.
19 Q But the only relevance to the broken seat tube is that you
20 are using to explain a transfer of force that caused the other
21 damage we see on the stand.
22 A That's part of it, yes.
23 Q Do you believe the tree stand, the hook was engaged on the
24 appropriate bolt when Mr. Oxford installed his stand?
25 A Well, I suppose that it could've been engaged on the little

- 44 -

1 you and I understand what you're talking about, but I don't
2 think you've said it yet. It's your opinion that this stand was
3 hooked from the front?
4 A Yes.
5 Q And you believe that because you can't get it to come off
6 if you hook it from behind, can you?
7 A One of the reasons that hooking from behind, you formulate
8 hypotheses as to how, in this case, a hook might come loose.
9 And through the process of elimination is one of the processes
10 that we use to confirm or deny a particular hypothesis. I think
11 the work that I looked at, the work of Dr. Burk and Mr. Smith,
12 which seemed to preclude that as a possibility. Now, back to
13 what I was talking about earlier --
14 Q Now, hold on a minute because I appreciate that answer, but
15 I just want to be real clear about this. Have you ever figured
16 out a way to get that stand to unhook if you hook it from
17 behind?
18 A No.
19 Q And neither have Mr. Burk or Mr. Smith according to your
20 reading of their report.
21 A According to my reading of their reports.
22 Q Okay.
23 A Now, let --
24 Q Because you simply can't get it off a tree if you hook it
25 from behind, you have then said he must have hooked it from the

- 46 -

MINIDEP by Kenson

1 front.

2 A  Well, there's more to it than that. And bear with me just

3 a second. I found what I was looking for in Dr. Burks' report.

4 He says markings on the frame of the subject tree stand show

5 evidence of the hook having been attached to the right end of

6 the cross bolt from the rear with the strap welding attached to

7 the left end of the bolt. And again in his supplementary, he

8 mentions that -- those markings. This is despite the fact as

9 noted by the initial report markings on the accident tree stand

10 frame indicate it was hooked from the rear. Then, these reports

11 are dated -- the original one is dated November 23rd of 2004,

12 and the supplemental is February 7th of this year. In March 8th

13 of 2004, we have photographs showing where the metallurgist has

14 our subject tree stand hooked to a pole with the hook hooked in

15 from the back. So yeah, there may be markings showing that the

16 hook was hooked in from the back. And certainly, I would expect

17 there to be considering that there's some folks that had a hold

18 of this stand before either I saw it and apparently before Dr.

19 Burks saw it that had hooked it from the back after our crash or

20 after our incident.

21 Q  So let me ask you, then, about those marks. Do you agree

22 that there are marks on this tree stand that evidence the fact

23 that at one point, it was hooked from the back?

24 A  There are so many marks on there, I don't know that you can

25 reliably say one way or the other.

- 47 -

1 Q  I thought you just said they were there, but you think the

2 expert or somebody else playing around with the stand might have

3 put them there.

4 A  I think that I said was that I can understand why they

5 would be there.

6 Q  Are they there?

7 A  (No response)

8 Q  Look at plate 5 of your original report.

9 A  Okay.

10 Q  Plate 6, do you have it in plate 6? Do you have that stand

11 hooked from the rear?

12 A  I believe that is hooked from the rear. Now, keep in mind,

13 all I did is just place the hook on there gently. I did not put

14 a load on it.

15 Q  I understand. But you can tell that that's hooked from the

16 rear because with the hook going downward, the spring is bent in

17 the wrong direction; correct?

18 A  Right.

19 Q  So that if you put the hook pointing upward, that would be

20 consistent with this thing -- in other words, plate number 6 is

21 hooked from the rear?

22 A  Right.

23 Q  Plate number 5, there are marks on the hack corner

24 suggesting that that they, at some point, had been hooked from

25 behind.

- 48 -

1 A  That's possible. There are marks on the front as well.

2 Q  I understand.

3 A  And there's a mark on that little cross member that's just

4 below that as well.

5 Q  I understand. The marks on the back of the frame are

6 spaced such that they are directly underneath both sections of

7 the hook. You can lay the hook, in other words, right on top of

8 the marks; correct?

9 A  I believe there are marks in that area like there are in

10 other places as well.

11 Q  So marks in that area are entirely consistent with this

12 stand having been attached from behind; correct?

13 A  I suppose you can say that.

14 Q  Well, I did say that, but do you agree with that?

15 A  I guess what I'm saying is if you're focusing in on a

16 particular set of marks, yes, they would be consistent with

17 that. But you can hook it either direction that way. And plus,

18 we see photographs where we know it's been hooked up like that.

19 Q  I understand that. So what we would need would be the

20 earlier photographs if more people were playing around with it.

21 A  That would be helpful. And there are some photographs, but

22 I don't know if they get in that detail.

23 Q  I understand. Do you know if there are photographs of this

24 stand that were taken before it even went into litigation?

25 A  Yeah. I've seen photographs, and I've never really had a

- 49 -

1 clear indication as to when they were taken.

2 Q  If there were photographs taken of this tree stand before

3 it ever went into litigation and they show clear evidence that

4 the stand had been hooked from behind, would that be interesting

5 to you?

6 A  Oh, it would be. I don't know that it would prove any

7 particular part of this hypothesis. It fails to explain the

8 bending of the spring clip.

9 Q  If you take the stand and you hook it from the rear in an

10 upward fashion, can you bend the spring in the manner that Mr.

11 Oxford's spring is bent?

12 A  Well, I did look at that. And I've got a drawing of --

13 Q  Well, we looked at it, but you said it was consistent with

14 that, didn't you?

15 A  Right. Now, after I took that photograph, I did some more

16 work, just basically laid the tree stand out on a tree. And I

17 did some more work with that to see what angle you might expect

18 the hook to reside at if it were coming out the back of the

19 tree. On a tree in this case was about 18 inches in diameter or

20 so. And it doesn't seem to give us the same characteristics or

21 this same arrangement that would be necessary to bend that tang

22 to the side.

23 Q  What if you rotate the tree stand?

24 A  Well, my experience with it was that it would not have

25 caused it to release from the tree. And I'll tell you, I don't

- 50 -

1 know that I've tried that to see if you could bend the tang.

2 Q  Did you, in fact, hook this stand up and then try broke

3 bending it to see what would happen to the hook?

4 A  I did some limited stuff with one of the exemplars. But

5 not to the extents that Dr. Burk did.

6 Q  When you said in one of your reports that you could get the

7 hook to come off the bolt but then it would catch on the tree

8 stand frame, didn't it rotate off the bolt and onto the tree

9 stand frame?

10 A  Right. And it was --

11 Q  So in the process of rotating off the bolt and onto the

12 frame, don't you have to push the spring out of the way?

13 A  Well, actually, the spring is already pushed out of the way

14 by that point. The tip of the hook slips by the frame as you're

15 ratcheting that strap down tight, and that's what pushes the

16 clip to the side. And that's clipped from the front again. And

17 that was what was going on during those tests where the hook

18 would rotate off the bolt, and get caught on the frame of the

19 stand. That was with it hooked from the front.

20 Q  And did you try those tests from the rear?

21 A  Well, yes. I tried it enough to see that there really

22 wasn't a good way that I could see that the hook would come off

23 the bolt when it's hooked from the rear. And plus, they had

24 done the testing, too.

25 Q  I understand. In your first report, in an earlier report

- 51 -

1 when you got this assignment from counsel, what was your

2 understanding that you were being hired to do?

3 A  Let's see. I wrote that down in here on my original

4 assignment sheet. And we call it the new assignment records.

5 Consult regarding engineering aspects of the incident. And that

6 was, you know, what I understood my assignment was.

7 Q  Does that mean you were hired to figure out happened?

8 A  Yes.

9 Q  Are you satisfied as you sit today giving this deposition

10 that you understand what happened in this case?

11 A  Yes. And I hesitate because this is just like we were

12 talking about earlier. We formulate these hypotheses and try to

13 find evidence to either indicate or contraindicate a particular

14 hypothesis. And hooking it from the back doesn't seem to offer

15 any opportunity for the hook to come loose. Hooking it from the

16 front does. And then we've got further evidence that seems to

17 be consistent with the hook from the front.

18 Q  So the marks on the back of that post which are consistent

19 with it having been hooked from behind are inconsistent with

20 your theory; correct, that you would have to figure out some

21 other explanation for that.

22 A  If you could -- well, actually, I could concentrate on that

23 and see if there was some other way for those marks to be

24 created.

25 Q  Have you ever done that?

- 52 -

1 A  Not specifically for the marks that we see here because the

2 marks as I see them are indistinguishable from marks that would

3 be subsequent to the incident. In other words, you don't know

4 if you're looking at the marks that were created before, during

5 or after.

6 Q  I understand what you're saying. In your first report --

7 A  You mean the preliminary report.

8 Q  Yes. You reference 28 photographs by R.J. Block. Who's

9 Mr. Block.

10 A  That's the metallurgist that I was referring to, the

11 photographs of the stand attached to what appears to be a metal

12 pole.

13 Q  I believe this fellow that was hired by some attorney named

14 Swindoll.

15 A  I assume that's true. Well, it's a report submitted to a

16 Mr. Swindoll in Little Rock. I don't know Mr. Swindoll.

17 Q  Did anybody ever supply you with photographs of this tree

18 stand sitting on a wooden sawhorse?

19 A  I don't recall. I saw some photographs. I thought it was

20 on a tailgate, but it may have been a --

21 Q  I'm talking very specifically about photographs of the tree

22 stand sitting on a wooden sawhorse.

23 A  Where are my photographs?

24 Q  Aren't these pictures taken from, you know, far away?

25 You've got to kind of look, but there are pictures of the

- 53 -

1 fractured tube, and there are pictures of the ratcheting

2 mechanism. And there are pictures of the area where you connect

3 the tree stand to the bolt. And if you try to look at some of

4 these pictures carefully, you can see that the stand is sitting

5 on a wooden sawhorse in some of these photos, actually sit on

6 them in all the photos. You can only see the sawhorse in some

7 of the photos.

8 A  Oh, yes, I am looking at these.

9 Q  Do you know the dates that those photos were taken?

10 A  No.

11 Q  Are there marks on those photographs that are consistent

12 with the stand having been hooked from behind?

13 A  Let me look here and see. Let me get this oriented. I've

14 looked at these before, but it's been a little while. Give me

15 just a minute while I match it up to the stand. Well, there are

16 several marks on this stand, and I see what you're talking

17 about. I also see one that's consistent with being hooked from

18 the front.

19 You do see marks in that photo consistent with hooking from

20 behind; correct?

21 A  Well, I see marks in there. And as we sit here today, I

22 haven't looked at those to see if there is some other way for

23 that to be generated. So I'll say I see the marks you're

24 talking about, but I'm not convinced that they were a result

25 from being hooked from the back.

- 54 -

IDEP by Kenson

1 Q Do you consider the direction of the hooking to be an
2 important issue in this case?

3 A The direction that it was hooked from either the front or
4 the back?

5 Q Yeah.

6 A Yes. Now, and the mark I'm referring to is the mark just
7 above -- and this is the way I'm looking at this photograph.

8 Are you looking at page that's got a ratchet mechanism at the
9 bottom and a picture of the marking on the deer stand at the
10 top?

11 Q No. There's no ratchet mechanism.

12 A Okay.

13 Q I've got a page with two photographs on it which we
14 supplied on response to discovery. And it has basically a
15 close-up picture of the bolt that you put the hook on.

16 A Well, I've got two close-ups.

17 Q I have two as well, but they're both on the same --
18 photocopied onto the same sheet of paper.

19 A Well, these are on two different ones. The one I'm looking
20 at is the lighter one.

21 Q Okay.

22 A And if you look, there are some marks that are kind of
23 radial to the bolt, and those would be consistent with the hook
24 from the front.

25 Q There are marks on the back inside corner of the seat tube

- 55 -

1 had been hooked from the front and drew the diagram like that.

2 He later pointed out that he thought it had been hooked from the
3 rear. But what I was after was --

4 Q When he later said he thought it was hooked from the rear.

5 Was that during that same conversation or at some other meeting?

6 A I believe it was in the same conversation. I think this is
7 the only time I actually spoke with him.

8 Q So then you actually misunderstood something, and he
9 corrected you?

10 A No. I asked him specifically did he hook it from the back
11 or the front.

12 Q Did you --

13 A And he said he thought it was from the back.

14 Q And he told you from the back.

15 A He thought it was from the back.

16 Q In fact, you wrote in your report under the heading witness
17 accounts, he recalls hooking the hook on the appropriate bolt
18 from the back of the stand as indicated in the instructions.

19 A Right.

20 Q So that's what he told you.

21 A Right. And then below that, I asked him how much he
22 thought the webbed seat might droop. And he estimated three to
23 four inches. And my --

24 Q This is in your notes?

25 A It's in my notes. And my intent there was to aid in any

- 57 -

1 of the tree stand frame; correct?

2 A Correct.

3 Q Do you know if you lay a hook on top of those marks whether
4 they are spaced perfectly up underneath the hook?

5 A They appear to be close. But like I said, I haven't done
6 that to see for sure if there's some other way that those marks
7 could've been made.

8 Q You'll agree with me, though, that they appear that they
9 could've been made from the tree stand being hooked from behind.

10 A Could've been.

11 Q One of the first things that you did when you got this
12 assignment was to contact Mr. Oxford and talk to him about the
13 accident?

14 A I'd have to look back in my notes to see exactly when that
15 was.

16 Q Would you do that?

17 A Looks like I spoke with Mr. Oxford on the 25th of October.

18 My original assignment was on the 6th of October.

19 Q And can you read your notes into the record in their
20 entirety concerning your conversation with Mr. Oxford?

21 A It was very short. I was basically just trying to get a
22 feel from him about the incident and whether or not anything --
23 well, I'll just answer your question. G. Oxford, hook and
24 ratchet was positioned like this. And I draw a little diagram.
25 And at the time, I actually thought that the stand -- well, and

- 56 -

1 analysis of the loads on the seat tubes since the loading on the
2 seat tube would be dependent somewhat on the amount of droop in
3 the seat.

4 Q All right. Continue reading your notes.

5 A That's it.

6 Q So the only two portions of his conversation with you that
7 you deemed noteworthy was the indication that he hooked it from
8 behind and the amount of droop in the seat?

9 A No. Well, the indications hooked from behind may have been
10 another conversation. I think that one may have occurred later,
11 and that was all I was after so I didn't take any notes. This
12 one, the main thing I was looking for was the stand to his right
13 and which side did he have the ratchet on because, as you know,
14 on the stand, you can slide the ratchet to one side or the
15 other, and then the hook goes on the opposite side. And I was
16 just really trying to get a picture in my mind of his position
17 and how the stand was applied to the tree. It was an early
18 conversation.

19 Q So you believe you have a subsequent conversation, and the
20 only purpose for the subsequent conversation was to find out how
21 he had the stand hooked, from the front or from the back.

22 A I don't believe that was the only reason for the
23 conversation, but it was one of the primary questions that I had
24 is what his recollection would be.

25 Q And you didn't write any notes of that conversation because

- 58 -

Case 3:04-cv-00196-GTE Document 55-2 Filed 03/07/06 Page 39 of 72
MILRIDEP by Kenson

1 you clearly recall what he told you?
2 A Right.
3 Q I mean, it was a simple enough conversation where you
4 didn't have to write that down?
5 A Right.
6 Q If he is correct and he hooked his tree stand from behind,
7 in your analysis, this accident is all wrong, isn't it?
8 A If we can prove that, I'd have to reconsider my analysis,
9 yes.
10 Q In reading his deposition transcript, did you see anywhere
11 where Mr. Oxford testified under oath that he had completely
12 engaged his hook on the bolt in that the spring-loaded keeper
13 was, you know, clipped closed.
14 A I did see where he said that. I would expect that.
15 Q Do you believe Mr. Oxford landed on his tree stand?
16 A It would explain a few things for me. But they insist that
17 he didn't so, you know, I'm not sure. It is of interest, and it
18 would come to play in how much damage the tree stand suffered.
19 Q It would make your life a lot easier, wouldn't it?
20 A Well, I wouldn't say that. Now, we haven't done any
21 testing to show what level of damage might be expected from a
22 fall to what he described as hard ground.
23 Q Where would all that damage to that tree stand come from?
24 A There's really -- accepting the premise that they put the
25 stand in the tree and sat in it, and then they were all on the
- 59 -

1 statement. Do you recall that?
2 A Okay, yes.
3 Q And he did not change or correct anything plaintiff landing
4 on the tree stand.
5 A I think you just said that he stated -- and I haven't read
6 this recently, but that the stand landing behind Mr. Oxford's
7 fall?
8 Q To his left.
9 A Okay. So the stand was on -- as he was standing, as Mr.
10 Green was watching this, the stand was behind Mr. Oxford, from
11 him?
12 Q The stand would've been to Mr. Oxford's right --
13 A And he was --
14 Q -- as he's looking at Mr. Oxford. Now, that would be to
15 Mr. Oxford's left from Mr. Oxford's perspective.
16 A Right. And it sounds to me like the stand landed on the
17 ground behind -- Mr. Oxford was between Mr. Green and the stand
18 when it hit the ground?
19 Q Well, when I say behind, I don't mean front to back. I
20 mean top to bottom meaning that Mr. Oxford came down the little
21 -- he hit the ground a little bit before the tree stand hit the
22 ground.
23 A Okay. Well, that's awfully good detail memory, and you
24 know, it may be reliable, it may not be. But I do remember
25 seeing that, yes.
- 61 -

1 ground together, that the damage had to come from the fall to
2 the ground.
3 Q And you have seen Danny Green's repeated sworn testimony in
4 which he has indicated that he is absolutely certain that Mr.
5 Oxford did not land on his tree stand?
6 A Yes.
7 Q And he has repeated to that fact on a number of occasions;
8 correct?
9 A I don't know how many times he's repeated it. I did see
10 where he stated that he did not land on the stand.
11 Q And you've told me earlier that you have not seen his
12 recorded statement; correct?
13 A Right.
14 Q I want you to assume hypothetically that he stated in his
15 recorded statement repeatedly that he is absolutely, positively
16 100 percent certain that Mr. Oxford's tree stand landed three or
17 four feet to Mr. Oxford's left and that it came down slightly
18 behind Mr. Oxford that he recalls, meaning that Mr. Oxford hit
19 the ground first. Have you accepted -- well, first of all, let
20 me ask you this. Is that scenario consistent with what you read
21 in his deposition?
22 A Yes. Well, I guess. I mean, I know that I did see that,
23 and I suppose it's his deposition where I saw it.
24 Q And he was given his statement during his deposition and
25 given an opportunity to change or correct anything in the
- 60 -

1 Q Do you except that testimony that Mr. Oxford did not land
2 on his tree stand?
3 A Not necessarily. But I don't know that I needed that one
4 way or the other. You know, we've got damage to the stand, and
5 if the incident occurred at all like our witnesses state that it
6 did, then, the damage had to occur in the fall.
7 Q Do you believe it is possible to damage that tree stand to
8 the extent that you're looking at there in the room by dropping
9 it 15 feet onto the ground?
10 A I haven't seen any testing to show it one way or the other
11 so I don't --
12 Q How long have you been an engineer, sir?
13 A Well, since I graduated from college in '77. And I got my
14 professional engineering license, I believe, in '85.
15 Q With that level of experience, do you think you would need
16 to do testing in order to render an opinion about the chances of
17 doing that much damage to a tree stand in a 15-foot drop onto
18 dirt?
19 A Well, in this case, we don't have a real good way of
20 reconstructing this. Now, I do see that we've got -- when you
21 raise those seat tubes out where they are, in effect, parallel
22 to the frame, you've got about a three-foot lever arm.
23 Q You mean pointing straight up in the air.
24 A Well, it depends on how the stand is configured. If it's
25 still on the tree, it would be pointing up in the air. Now, it
- 62 -

1 was on its way down so let's just say parallel to the frame.

2 Q Inline with the frame, parallel to the frame. Okay, I

3 understand.

4 A Inline with the frame. And the frame is folded a little

5 bit down towards the platform, in other words, in a somewhat

6 folded fashion.

7 Q Right.

8 A Which could happen, particularly if you take into account

9 that when a person sits on the stand, in particular with 285

10 pounds or whatever -- and I guess it's 270 is what he weighed at

11 the time. I loaded it with 285. And the seat arms deflect

12 downward. Let's see how much. The seat arms deflected downward

13 about three inches, two and a half to three inches. So if the

14 stand were released from a tree, it would, in effect, be thrown

15 downward. So it may have a little extra velocity from that.

16 Then, you have --

17 Q An extra velocity from what?

18 A Rather than just falling freely from gravity.

19 Q Well, what was propelling it to the ground other than

20 gravity?

21 A The springiness of the seat. In other words, when you sit

22 on the seat, the arms deflect --

23 Q Okay, I've got you.

24 A -- about three inches. And so, in effect, if the seat was

25 released, it would throw the seat away from the heavier object

- 63 -

1 up above. If you extend those arms out where they are inline

2 with the frame, from the tip of the seat arm down to the bolt is

3 about three feet. And then the distance between the two frame

4 members is between three and a half and five inches depending on

5 whether you're measuring inside the square tubing or outside

6 square tubing. So what you've got is a lever. And whether or

7 not the stand could land with sufficient impulse, provide a

8 sufficient impulse to deflect these of that amount, I'm not

9 sure. But I do see a mechanism that seems to indicate that.

10 If you look at the alignment of the pivot, the seat pivot

11 bracket, and if you swing the arms up into a position where they

12 are aligned with the frame, the hinge seems to line up a little

13 better. In other words, when you had two pieces of metal that

14 get deflected and they're in contact with each other, you might

15 expect them to show some alignment afterwards. That alignment

16 seems to indicate the arms were in the extended position. And

17 with that and the weight of the -- if it were to land on the tip

18 of the arm in that position, then the weight of the platform

19 would be applied across the bolt of the bottom of the pivot

20 where the platform pivots on the frame.

21 Q Do you have any idea what that platform weighs?

22 A I haven't made it independently, no. But I've handled it,

23 you know, quite a bit.

24 Q Did you have an estimate?

25 A Oh, gosh, no. I'd have to look and see what the actual

- 64 -

1 weight of the stand was. Most of the weight is in the platform

2 and the frame. I'm not sure what it weighs.

3 Q Do you know that most of the weight is in that carbon fiber

4 platform?

5 A Do I know that most of the weight, no, I don't.

6 Q Starting at the top of the tree stand, can you identify for

7 me all of the component parts of this tree stand that are bent

8 or deformed? Let's just work our way from top to bottom.

9 A Well, you've got three bolts. I'm not sure exactly what

10 the sizes are. I actually went out and bought a couple of

11 these. It looks like a five-sixteenth bolt and maybe a quarter-

12 inch bolt at the bottom.

13 Q At the heel?

14 A Right. Now, not all of them are bent. It looks like the

15 one at the top is bent some.

16 Q Is it bent twice?

17 A One on each end, sure.

18 Q Almost is it a little tiny bit like an X?

19 A More like a Z, flat Z.

20 Q Okay.

21 A The one at the bottom does not appear to be bent at all.

22 Q How about the angle irons that are used at the top to form

23 the hinge, are they bent?

24 A Somewhat. I think they're aluminum, aren't they? So they

25 have the appropriate strength of aluminum.

- 65 -

1 Q What about the flat piece of steel that's welded at the

2 top, is that bent?

3 A It's bent somewhat, yes.

4 Q And then how about the bolt on which the hook is attached,

5 did that have some evidence of bending?

6 A It might have a little.

7 Q How about the brace up underneath of the bolt?

8 A That piece of, looks like three-eights inch diameter --

9 Q Bar.

10 A -- rod?

11 Q Yes.

12 A It's bent somewhat.

13 Q It's bent. How about the one down on the bottom there?

14 A It's bent a little bit.

15 Q And the seat tube is broken; right?

16 A The seat tube is broken.

17 Q How about the angle irons at the base, are they bent at

18 all?

19 A You know, I looked at those closely. I don't see any

20 bending in those.

21 Q How about the two vertical members of the tree stand frame?

22 Are they also out of rack?

23 A Well, they have been racked, but they are not bent

24 themselves. As a matter of fact, you can look from one end to

25 the other down the tubes.

- 66 -

1 Q But they're out of rack in several different directions,
2 meaning that one is further forward to the other; correct?
3 A Well, that appears to have occurred whenever these members
4 between the two got bent.
5 Q Right. Not only is it further forward than the others, but
6 one is also a little lower than the other.
7 A Correct. Consistent with the racking that I was talking
8 about earlier that if the arm were to get struck sharply from
9 the -- now, we're talking about the right arm. If it got struck
10 sharply, it would bend the entire frame and all to -- the hunter
11 is in the left and cause the racking that we see.
12 Q Now, what position would the arm have to strike the ground
13 in order to produce this force that you're hypothesizing?
14 A Well, that's like what I was saying earlier. If you extend
15 the arms upward and then have the stand land on the right arm so
16 that it forces the frame to the left with the weight of the seat
17 providing the impulse to it, then, it would be a force in the
18 right direction to produce the damage that we see.
19 Q But the stand would have to turn upside down?
20 A It would land on its right side which is, I think,
21 consistent with the description. At least, Mr. Oxford describes
22 going off to the right. And he landed, I think it was on his
23 right side. He described it as it going down to the right.
24 Q And would that push the arm, the load you're talking about,
25 would that push the broken arm toward the arm on the other side?

- 67 -

1 A Yes.
2 Q That's the direction of the load that you are
3 hypothesizing?
4 A Well, in general. It wouldn't have to be straight that
5 way. Now, if it was too much up or down, it would simply pivot.
6 Q Pivot on the edge.
7 A Right.
8 Q So if he hit it from the bottom which is going to flip it
9 up to the top. And if you hit it from the top, it's going to
10 flip it down to the bottom.
11 A You got it.
12 Q So that thing rotates 270 degrees.
13 A Something like that. I haven't measured the degrees. I'll
14 take your word for it.
15 Q So the only way to actually apply a load by striking that
16 arm would be to push the right arm in toward the left arm.
17 A Or out.
18 Q Or out. And you think he pushed it in.
19 A Now, you know, let's qualify that just a little bit here.
20 We do have dynamic things going here. You've got some
21 rotational inertia that if it got hit, you know, out of that
22 particular direction exactly, then it may still, you know,
23 provide some side force. It may be in the process of pivoting.
24 But you know, essentially, we're saying the same thing here that
25 if you were to strike it from the bottom or from the top, you

- 68 -

1 simply have a pivoting action. You can't really apply a load to
2 it unless it's all the way to one of the stops like it would be
3 in the seating position. But if it's flipped up the way I'm
4 talking about, the force would essentially be from the side.
5 Q Is it your belief that the hook just slipped off somehow?
6 A Well, if you hook it from the front, the hook is, you know,
7 being, in effect, levered off by the tension of the ratchet
8 strap. And my experience was is that in some certain
9 situations, it could rotate off. Sometimes it would catch on
10 the vertical frame member on that side, but it would come
11 completely off as well.
12 Q I'll get to that. But what I'm getting at is when it came
13 off, you're saying it just slipped off.
14 A Right. It snapped. You could hear a snapping sound, and
15 it would fly off, yes.
16 Q And it's your belief that that happened while Mr. Oxford
17 was sitting on the seat?
18 A Yes.
19 Q And he had his feet on the platform.
20 A Well, I presume so. I don't know for sure that he did, but
21 it seems logical that he would.
22 Q Can you envision any reason why he's be sitting on the seat
23 holding his feet up in the air?
24 A No.
25 Q So you presume he had his feet on the platform.

- 69 -

1 A Right.
2 Q And did you see in the deposition where both he and Mr.
3 Green said that he was centered right in the middle of his
4 webbing seat?
5 A Yeah. I did see that. There's hardly enough width there
6 for anybody with a substantial rear end to be too much to the
7 left or to the right.
8 Q So with a 270-pound buttocks, you would expect that Mr.
9 Oxford was, in fact, sitting right in the middle of the seat?
10 A Probably.
11 Q If he's sitting right in the middle of his seat with his
12 feet on the platform and the hook pops off, why doesn't he drop
13 straight down and land on the tree stand?
14 A Oh, well, one of the reasons is this springiness we were
15 talking about earlier. And, in fact, the spring of the seat
16 would tend to propel the seat away from him. You know, in
17 effect, you've got a spring there that's between you and the
18 stand.
19 Q And in what direction relative to Mr. Oxford do you believe
20 it would propel the seat?
21 A It would tend to throw it downward.
22 Q Straight down?
23 A Well, you've got a strap that's unwrapping from the tree so
24 I'm not quite sure how you could predict exactly how it would
25 fall.

- 70 -

1  Q  Once that hooks come off, the strap isn't holding anything
2  anymore, is it?
3  A  Well, no. But you've got friction of it unwrapping from
4  the tree. It's got to fly around the tree. And you've got all
5  the various places where the stand touches the tree. You know,
6  I don't know that you could predict exactly how it would fall.
7  Q  How many hang-on tree stand accidents have you investigated
8  where the hang-on tree stands come off a tree?
9  A  I believe the hang-on sort, this is the only one.
10 Q  Do you know how common this is to land on top of your tree
11 stand when a hang-on tree stand falls off a tree?
12 A  Well, I suppose that you could land on it. You might not
13 land on it. You know, like I said, this stand was -- well, I
14 mean, for you to actually follow it all the way down, I suppose
15 that could happen, but it doesn't necessarily have to be that
16 way. I suppose you could turn the question around and ask has
17 there ever been anybody fall out of a tree with a hang-on type
18 tree stand that did not land on top of their stand.
19 Q  Do you know of anybody other than Mr. Oxford?
20 A  Like I said, this is the only one I've actually
21 investigated. I'm trying to remember the climbing stand, which
22 is much like this one.
23 Q  It's in two sections, though.
24 A  Yes, it's in two pieces. I believe in his case, only the
25 upper section failed. And, of course, I think in that stand,

- 71 -

1  you would have the stand --
2  Q  Bottom strapped to your feet.
3  A  Well, you have the bottom strapped to the feet. You also
4  have the top section of the stand I believe as a complete hoop
5  around you, so you would almost have to land on it in that case.
6  You couldn't get away from it. In this case, you know, like I
7  said, if somebody could prove to me and go out and do this
8  proper survey and determine that nobody has ever fallen out of a
9  tree with a hang-on type tree stand and not landed on their
10 stand, then, you know, I would take that into consideration.
11 Q  Would you expect them to fall straight down?
12 A  I would expect Mr. Oxford to take a pretty straight path to
13 the ground.
14 Q  Would you expect this tree stand to be right underneath him
15 taking that same straight path to the ground? Is that what
16 would you expect as an engineer?
17 A  Well, if you tightly control the fall, perhaps. But he was
18 leaning to the right. I think his testimony says he leaned to
19 the right. And in that case, the stand would be propelled to
20 his left by the spring action of the seat.
21 Q  Is that what you think happened to a reasonable degree of
22 engineering certainty?
23 A  Well, to tell you the truth as we sit here today, I never
24 assumed that -- I never took into account the possibility that a
25 person would never be able to fall out of a tree stand and not

- 72 -

1  land on his stand. That seemed odd to me so I never took that
2  into consideration. You know, the fact that he -- excuse me.
3  You know, if he were to land on his stand, it might explain some
4  of the damage. I'm not sure that it's necessary. But the idea
5  that he could not fall out of a tree and not land on his stand
6  seems odd to me.
7  Q  I'm not saying that it didn't happen. I'm just asking you
8  if you're familiar with it. Let me ask you this. So you
9  believe that it doesn't surprise you that the stand disconnected
10 from the tree and Mr. Oxford somehow hits the ground before the
11 tree stand? Does that seem odd to you?
12 A  Well, perhaps a little bit.
13 Q  And under your --
14 A  I would expect that --
15 Q  -- scenario, the tree stand would have to fold up and tip
16 to the point where the seat hits the ground before the frame;
17 correct?
18 A  Well, you know, if you talk about things falling from a
19 height of 15 feet and one landing on the ground before the
20 other, I would expect them to land in such close chronological
21 order that I'm not so sure that the witness statements would be
22 reliable in that regard.
23 Q  Well, I'm not concerned about that. Let's talk about your
24 theory which is that the stand somehow rotated to a point where
25 the first piece of this tree stand that touched the ground was

- 73 -

1  the outside tip of the right side seat tube; correct?
2  A  Correct.
3  Q  How did it get --
4  A  It's falling through space. And, you know, to assert that
5  it would land in any particular position seems unsupportable.
6  Q  That's what I'm asking you about because in my mind and as
7  a lay person, if the stand comes unhooked, as a lay person, I
8  would expect this stand as a hunter to pretty much fall straight
9  down and hit the ground in pretty much the same fashion that
10 they were oriented up in the air. And what you're describing is
11 a situation where the stand has separated from the hunter, and
12 it has spun around to the point where it's upside down when it
13 hits the ground so that the seat actually touches the ground
14 first as opposed to the platform; is that correct?
15 A  No, that's not correct. My point was is that it landed on
16 its right side. It's not upside down. All it's doing is
17 rotating about 90 degrees to the right. And with the arm
18 extended, if it lands nose down so to speak, then the arm hits
19 before the seat does.
20 Q  Well, that's what I'm talking about. If you're talking
21 about landing nose down, then, what you're saying is the seat
22 was the very first thing to touch the ground.
23 A  The arm on the seat that sticks out about a foot beyond the
24 seat is the first thing that hit the ground.
25 Q  And you think the arm was rotated straight up inline with

- 74 -

1 the frame.

2 A It seems to be -- the evidence tells me that that's the

3 position it was in.

4 Q And with it rotated straight up in the air like that, the

5 arm was the first thing to hit the ground, then the tree stand

6 had to rotate drastically upside down.

7 A No.

8 Q No?

9 A No. It's just simply on its right side.

10 Q How did it rotate more than 90 degrees?

11 A Sir?

12 Q Did it have to rotate more than 90 degrees?

13 A No.

14 Q If it rotates 90 degrees, wouldn't the platform hit the

15 ground before the arm because the platform is wider?

16 A No. Because the arm sticks out of the front.

17 Q Not when you flip the arm straight up in the air.

18 A Well, no. You're taking this and rotating it simply about

19 a single axis. It's rotating in space. And if you take this

20 stand and configure it like I'm showing here, you can have it

21 land on the tip of the arm, and then the platform has still not

22 hit the ground yet.

23 Q Well, and that rotation in your mind could occur in a 15-

24 foot drop.

25 A Yes. I don't have any proof of that. It's just what the

- 75 -

1 evidence tells me.

2 Q What evidence tells you that? Is it this evidence that

3 you're talking about simply your effort to explain where all

4 those bendings came from?

5 A Well, yes. That's the evidence that we're talking about.

6 You've got all the pieces of evidence here. You've got to

7 explain them as best you can.

8 Q And your explanation is that a load applied to the edge of

9 the tree stand arm basically pushing it in the direction of the

10 arm transmitted enough force through the arm to cause all that

11 steel to bend?

12 A That is the best explanation that I can come up with to

13 explain the damage that we see.

14 Q I understand that's your best explanation, sir. Are you

15 happy with that explanation?

16 A I am at this time, yes.

17 Q Now, you say at this time. Do you wish you had a better

18 explanation?

19 A No. If someone were to present new evidence that says, you

20 know, that it could not have happened that way, then I would

21 have to consider it. This is always the case in anything that

22 we look it. You know, if you're a scientist, you've got to

23 accept that you do the best job that you can of explaining the

24 evidence and coming up with a hypothesis that seems to fit the

25 evidence, and that's what we do in every case.

- 76 -

1 Q I understand. And in some cases, the thing fits like a

2 hand in a glove and you're just absolutely 100 percent sure that

3 you've got it all down correct; isn't that true?

4 A I suppose you might have a case like that. I would propose

5 that if you ever feel like you're 100 percent correct, then

6 you're probably not.

7 Q In other cases, you can't make heads or tails of things,

8 very difficult.

9 A There are some --

10 Q True?

11 A There are some cases that are unexplainable. And often

12 times, they involve fires where the evidence is scanty.

13 Hopefully, if you've got sufficient evidence, you can come with

14 an answer that explains the evidence.

15 Q If you were to take this tree stand and put it on a tree

16 and put the hook on there from behind like plaintiff says he put

17 his, and then grab one of those seat tubes and pull the platform

18 and rotate the tree stand while it is still firmly strapped and

19 hooked onto the tree, could you apply a load to cause bending?

20 A I haven't thought about your question before you asked it.

21 Q Did you say you have not?

22 A No.

23 Q So you've never considered that possibility?

24 A Well, certainly.

25 Q Well, which is it? You thought about it, or you didn't?

- 77 -

1 A No, I haven't thought about that.

2 Q Well, I'm going to --

3 A I do know -- I guess what I was --

4 Q -- that on a tree. Say you were to put it on a tree, and

5 you put it on a tree and your tree stand was installed a couple

6 of feet above your climbing device and you were to step up onto

7 that tree stand or step off of that tree stand either way, I

8 don't care. By putting your put over the edge and then maybe

9 grabbing a hold of the seat tube, which is pointing up toward

10 the tree inline with the vertical -- you know, inline with the

11 tree stand frame. And you would either use that seat tube to

12 support yourself while you were pulling yourself up, or you were

13 to use that to support yourself while you were climbing off.

14 But to some fashion, you were to fall, catch something on the

15 seat tube, grab the seat tube, it hooked your pocket, your cuff

16 or something, and as you're falling, you're applying a load to

17 rotate that tree stand while it is still tied to the tree.

18 Could you bend the tree stand frame in that scenario I've just

19 described with a 270-pound man?

20 A I have tried with one of the exemplars, you know, just to

21 see if I could bend it by hand, and I couldn't. But I didn't

22 really try very hard because I didn't want to mess up my

23 exemplar.

24 Q But what you did really, would it be fair to say, wouldn't

25 replicate --

- 78 -

1 A No, not necessarily.

2 Q -- a 270-pound man in a fall.

3 A Well, I can't answer your hypothetical as we sit here today

4 because I would have to think about it more before I could give

5 you an answer. You know, if a person were to grab a hold of the

6 right side, well, it kind of goes back to what we were talking

7 about earlier where you can't really apply a load to the seat

8 arms in a direction that it will pivot in. And with it strapped

9 to the tree, that's going to intend to inhibit it some. I don't

10 know. I can't answer your question as we sit here today.

11 Q So it may or may not be possible.

12 A I'm having a difficult time envisioning your, you know,

13 this possibility because with an arm straight up in the air,

14 once again, your break is not in the right direction for that.

15 And I'm not quite sure how that -- I can't envision it in my

16 mind as to how that would happen. Perhaps with a better

17 explanation, I could evaluate it better. But as we sit here

18 today, I can't envision that.

19 Q You don't think it's possible?

20 A Well, you're asking me to evaluate whether it's possible,

21 and I just told you I can't evaluate it. So I can't answer that

22 question.

23 Q If you were to just put it on a tree two feet off the

24 ground, okay, and you took your foot and you put it on the edge

25 of the platform on the side and just started giving it a shove

- 79 -

1 to the side to force the stand to rotate either clockwise or

2 counterclockwise, could you bend the tree stand frame at all?

3 A I haven't tried that. I don't know. Like I said, I've

4 pushed on it, pulled on it some myself, but not enough to bend

5 it. So I'm not sure what it would take.

6 Q But it would bend eventually, wouldn't it?

7 A If you put enough force on it, it would bend it, sure.

8 Now, you know, like you said, it might want to rotate on the

9 tree. If it's rotating on the tree, then, you're not bending

10 the stand.

11 Q And that rotation would be limited by how tight you had

12 your strap?

13 A Correct.

14 Q Do you know how much weight a piece of webbing like that

15 can hold?

16 A I haven't tested it. I know it's substantial.

17 Q Substantial meaning more than 1,000 pounds?

18 A Well, like I said earlier, I've seen them break, too. And

19 so I don't know how much in this configuration you would expect.

20 Q Would you expect it to hold more than 1,000 pounds?

21 A Probably.

22 Q In your report, your first report that you called a

23 preliminary report, and on page 3, you have a paragraph that

24 begins with the words the action that bent the hook. Do you see

25 that?

- 80 -

1 A Yes.

2 Q You said that action is not known for certain. But the

3 current bent position suggests that the tip of the hook slipped

4 past the adjacent vertical member, pushed it to the side. Do

5 you see that?

6 A Yes.

7 Q Then, you say this might suggest that the hook was

8 installed from the back of the stand with the hook facing upward

9 or from the front with the hook facing down. Each of those is

10 consistent with the damage to this frame; correct?

11 A Well, you made note that it was a preliminary report. And

12 I did, like I said, later laid this stand out in a drawing that

13 I have here.

14 Q Well, I'm not going to ask you about your drawing right

15 now. What I'm going to ask you about right now was that

16 sentence I just read to you. You have referred to photograph

17 numbers 7 and 8 as support for the notion that the damage could

18 be from the back facing up or from the front facing down. And

19 in those photographs, do you agree that it is consistent, those

20 photographs are consistent with the damage?

21 A Yes.

22 Q Earlier, you discussed something of a rotational mark that

23 you saw on the inside of the left frame member. Do you remember

24 that scratching the paint?

25 A Yes.

- 81 -

1 Q If you look at plate number 7 from your original report, is

2 the tip of the hook rubbing on the inside of the left seat frame

3 or left tree stand frame?

4 A You said plate 7?

5 Q Plate 7.

6 A Yes.

7 Q So if that were to be hooked from behind facing upward and

8 then rotated in a certain direction, the tip of the hook could

9 produce scratches on the inside of that tube; correct?

10 A Yes.

11 Q Plate number 8 demonstrates the hook from the front facing

12 down; correct?

13 A Yes.

14 Q The way I understand it, this hook in plate number 8 would

15 not put any marks on the back corner of that seat or of that

16 tree stand frame, would it?

17 A Well, I can see where the lower one might be made as it

18 comes out. I'm not too sure about the top one.

19 Q The lower one might be made if the tip of the hook was

20 literally resting on the frame.

21 A Yes. If it rotated out. When it rotates out, it should

22 contact the frame in that area.

23 Q But if it rotates out in that direction, it's going to

24 catch on to the tree stand frame, isn't it?

25 A No, not necessarily. Like I said, that happened more often

- 82 -

1 than not. But if you look at the gap between the present
2 position of the latch and the tip of the hook, it's only about
3 three-eights of an inch or so. And with it reduced to that
4 amount, the hook would tend to fly off and not get caught on the
5 frame member. I did see that happen a couple of times in my
6 tests. And if it does, if the tip of the hook does rotate out
7 in that direction, it will make that scratch that's visible in
8 plate 7 as well.
9 Q I'm looking at your report, sir. In your October 28 report
10 page 4 top paragraph, you say Mr. Oxford was using a
11 commercially available ladder stand to climb up to the desired
12 height basically. Have you ever seen the instructions that came
13 with that ladder stand?
14 A No.
15 Q Have you ever seen the ladder stand?
16 A No.
17 Q Have you ever talked to Mr. Oxford about any requirements
18 either on that ladder stand or in the instructions in that stand
19 to wear a safety belt?
20 A I don't recall talking with him about that.
21 Q In that same paragraph on page 4 is you say that a fall
22 protection device cannot be used while proceeding up or down a
23 ladder stand.
24 A That's been my experience, yes.
25 Q Can you put on a fall protection device when you reach the
- 83 -

1 opinion that the use of a fall protection device was impractical
2 while ascending and descending the ladder; correct?
3 A Correct.
4 Q But rendered no opinion about what to do at the top of the
5 ladder?
6 A Correct.
7 Q On page 3 of your report, you have a sentence under the
8 discussion part here, the fact that the racket strap released
9 and allowed the stand to fall is most remarkable. And you've
10 used that word earlier in this deposition that it was
11 remarkable. Have you used that word because it seems like a
12 highly unlikely event?
13 A It's a common term that we use in our business to say that
14 it's worthy of a remark.
15 Q And that's all you meant by the phrase remarkable?
16 A That means it seems significant. I suppose that another
17 word would be significant. It's worthy of remark.
18 Q So when you say remarkable, you don't mean hard to believe?
19 A No. It means it's something that needs to be explained.
20 Q Have you seen the instructions that come with the tree
21 stand?
22 A Yes. Well, I've seen several sets of instructions. I
23 don't know what actually came with this particular stand. We've
24 got --
25 Q Well, we have Exhibit Number 8 to the deposition which was
- 85 -

1 top of your ladder?
2 A Yes.
3 Q Was there any physical reason why Mr. Oxford could not have
4 put on a safety belt before stepping onto his tree stand?
5 A Not that I'm aware of.
6 Q Do you have an opinion about whether or not he should have
7 had a safety belt on before climbing onto his tree stand?
8 A Before he got off of the ladder stand onto his tree stand?
9 Q Yes.
10 A No.
11 Q You have no opinion?
12 A Right.
13 Q But you do assert an opinion in this report that he
14 couldn't wear one while he was just climbing the ladder.
15 A Well, it's just been my experience with the ladder stand
16 business that you really -- there's not a way to use a fall
17 protection device while you're going up and down a ladder stand.
18 Q You have an opinion about that, but you don't have an
19 opinion about whether or not he should put one on before getting
20 onto his tree stand?
21 A Right.
22 Q Although you're not aware of any physical reason why it
23 could not have been done?
24 A Correct.
25 Q In your preliminary conclusions, you note that you had the
- 84 -

1 according to your report blurry, but we sent counsel with a
2 plain copy. Have you ever seen the clean copy?
3 A I believe it was a response to request number 10 that I
4 have seen. And there was some other booklets that came with the
5 exemplar stands that I saw. But the one that, I guess -- I
6 don't know what request for document production number 10
7 actually said. What I asked for was a clear copy of the
8 instructions, and that's what was provided.
9 Q Do you have a clear copy of instructions in front of you
10 now?
11 A I can. Just a moment. How about if I -- I've got your
12 Defendant's Deposition Number 8, Exhibit 8. I've got --
13 Q One copy was faxed, and the other was just not faxed. I
14 want to make sure you have a copy that's clear. I don't know
15 that there's any difference between any of these. I'm just
16 looking to see if you can get yourself a clear copy so I can ask
17 you some questions.
18 A If we just talk about a clear copy, I've got a booklet that
19 came with one of the exemplars that we got.
20 Q What's the title?
21 A Instructions for Ol' Man Terra & Terra Elite II, Fixed
22 Position Tree Stands. And date -- I don't see a date.
23 Q I'm assuming, sir, that those are the correct instructions.
24 And I will tell you that that to be a fairly expensive tree
25 stand because of the carbon fiber. And it did not last very
- 86 -

1 Q  Do you have any criticism of the instructions in any
2 regard?

3 A  Well, I believe that in my report, I pointed out how figure
4 10 is misleading.  You asked about that earlier.  It does show
5 the stand hooked from the back, but it's difficult in that
6 diagram to understand it.  Because in true practice, you would
7 not see the stand from that side.  The tree would be in your
8 way.

9 Q  Have you ever asked Mr. Oxford whether he was confused by
10 figure 10?

11 A  No.

12 Q  Are you assuming that he was confused by figure 10?

13 A  Well, he stated to me that he thought he hooked it from the
14 back.  It just appears to me that the evidence tells me that it
15 was hooked from the front.  And I see that in the diagram here
16 that it appears to me that it's hooked from the front until you
17 look closely and notice that the little legs that contact the
18 tree are pointing at you there.  But you do have to look
19 closely.

20 Q  When you wrote your initial report based on your phone
21 conversation to Mr. Oxford, you not only noted that he told you
22 that it was hooked from behind, or actually I think the word was
23 from the back.  But you also stated as indicated by the
24 instructions; correct?

25 A  I believe those were his words.

- 89 -

---

1 long because the product didn't sell.  So I don't know that
2 there were ever any changes to the instructions.  I'm not sure
3 one way or the other.  But I'm assuming we have a good set of
4 instructions.

5 A  There's a number at the bottom of page 2.  It says
6 04152000.

7 Q  I have that in front of me.  Now, on the front cover of
8 this instructional manual is a photograph of the stand.  And
9 it's hooked from behind, is it not?

10 A  Yes.

11 Q  And on page 1, there's a photograph of the stand, and it is
12 hooked from behind?

13 A  Yes.

14 Q  And there's the second photograph from the side on page 1,
15 and that is hooked from behind?

16 A  Yes.

17 Q  Have you read the instructions?

18 A  Yes.

19 Q  There are several pictures on page 8 of the tree stand;
20 correct?

21 A  Yes.

22 Q  One showing a gentleman levering down the seat?

23 A  Correct.

24 Q  Figure 12?

25 A  Yes.

- 87 -

---

1 Q  I understand.  So his words were I hooked it from the back
2 as indicated by the instructions.

3 A  Right.

4 Q  So he did not express to you any uncertainty about the
5 proper method of hooking the stand, did he?

6 A  Well, I don't recall how certain or uncertain he sounded at
7 the time.  As I recall -- well, I mean --

8 Q  What you recall is that you had mistakenly thought it was
9 hooked from the front, and he actually corrected you?

10 A  I don't believe that was the character of it.  At the time
11 I asked him whether it was hooked from the front or the back, I
12 believe that was the second conversation, and he said he thought
13 he hooked it from the back.

14 Q  And you had originally sketched it wrong, though.  Didn't
15 you tell me you sketched it wrong and he corrected you?

16 A  No.  I had sketched it wrong, and I corrected myself.

17 Q  Based on what he told you?

18 A  Yeah.  Because he didn't see my sketch.

19 Q  So based on what he told you, you realized that you had
20 gotten your sketch wrong?

21 A  Well, I wouldn't say it was wrong.  You know, the way he
22 thought that he hooked it up, right, yeah.

23 Q  Well, either your sketch is wrong, you're saying that Mr.
24 Oxford is wrong.

25 A  I'm not sure I follow you.

- 90 -

---

1 Q  That stand is hooked from behind?

2 A  If you look closely, you can see that.

3 Q  And 6 and 10, that stand is hooked from behind.

4 A  Yes.

5 Q  Have you read the portion of these instructions?  Well,
6 have you read them in their entirety?

7 A  I believe at one time or another, I've read all of them,

8 yes.

9 Q  Do you have an opinion about whether or not Mr. Oxford
10 followed the instructions with regard to the use of the safety
11 belt?

12 A  Do I have an opinion?

13 Q  Yes.

14 A  I've not voiced any opinion about that.

15 Q  That is something that is outside your area of expertise?

16 A  Well, it's outside of the scope with what I was asked to do
17 here.

18 Q  So you will not be rendering any opinions in this case on
19 either the propriety or impropriety of Mr. Oxford's safety belt
20 usage?

21 A  Correct.  I've really concentrated on why the stand fell
22 from the tree and why the fall occurred, and that's it.

23 Q  So is it fair to say that, then, you have no criticism of
24 the instructions as they pertain to the use of a safety belt?

25 A  Correct.

- 88 -

1 Q He either hooked it from the back, or he hooked it from the
2 front. He said he hooked it from the back, and you say he
3 hooked it from the front; correct?
4 A Well, he recalled when I asked him that he thought that he
5 had hooked it from the back. Now, I recall him saying it about
6 that way. I don't recall him being adamant about it, you know,
7 in the character of him landing on the stand or not.
8 Q Whatever the character of your conversation was, the fact
9 is that you summarized that conversation in your report with a
10 sentence that says he also recalls hooking the hook on the
11 appropriate bolt from the back of the stand as indicated by the
12 instructions. That's what you wrote in your report; correct,
13 sir?
14 A Yes, sure.
15 Q In your second report, did you have some additional
16 material to analyzed? That's when you wound up with the
17 chain-on tree stand? It turned out to be the wrong one?
18 A Okay, yes.
19 Q And it turned out you couldn't do the type of testing you
20 wanted to do with that tree stand; correct?
21 A Correct.
22 Q In this report, you concluded that the seat was up when the
23 stand hit the ground; correct?
24 A Just like we talked about earlier.
25 Q Meaning that it was pointing in line with the vertical

- 91 -

1 parts of the frame.
2 A In general, yes. It doesn't have to be perfectly inline,
3 just in that general character, yes.
4 Q I understand. And when you say in your report a sharp
5 impact that is the outboard tip of the right seat arm would
6 provide the appropriate force, et cetera, we already talked
7 about that. But what you're meaning is you would have to be
8 pushing the outboard tip generally in the direction of the other
9 seat arm.
10 A Correct.
11 Q And you're saying it's quite possible for this to come into
12 that position during a fall of the ground. Did we already talk
13 about that? That was because of the springing and other things
14 that you think it would get into that position?
15 A Right.
16 Q But you didn't know to confirm any of that, did you?
17 A That's true.
18 Q Is that testable?
19 A Well, now, you're talking about trying to precisely
20 reconstruct this situation. There's an awful lot of unknowns
21 there. You might be able to test it to see if it's possible for
22 it to happen without saying that you accurately reconstructed
23 this incident because there's simply too many unknowns.
24 Q Do you have any idea how many hunters, when they're
25 finished using their tree stand, unhook it from a tree and then

- 92 -

1 just toss it to the ground instead of carrying it down with
2 them?
3 A Well, I would suppose it would be a common practice.
4 Q And do you believe that would be a common practice if, in
5 fact, that practice was capable of damaging a tree stand?
6 A I don't know that for sure.
7 Q How many times would you toss your tree stand to the ground
8 if it broke every time you did it?
9 A Probably none. I might not throw it to the ground either,
10 though.
11 Q I understand. But you understand that hunters might do
12 that; right?
13 A If they were angry at it, they might throw it down.
14 Otherwise, if it costs 180 bucks, they might, you know --
15 Q They might not.
16 A They might dangle it down as far as the strap would allow
17 them and then drop it.
18 Q Or they might start climbing from a lot higher than 15
19 feet, too.
20 A Yeah, that's possible, too. I would suppose that they
21 dropped it and threw it to the ground and it broke, they
22 wouldn't have much of -- it wouldn't be all that likely to go
23 tell everybody about it, either.
24 Q Well, I'll let that one go. Now, in the January 14th
25 report page 2 you have a sentence that says, it said that it's

- 93 -

1 difficult to envision a scenario where the fracture of the arm
2 would cause the release of the strap bolt. Have you already
3 talked about some -- as I recall, you told me that you don't
4 think the broken seat arm caused the stand to come out of the
5 tree; correct?
6 A That is what is consistent with what we talked about
7 already today.
8 Q Right. That's a result of the accident and not a cause of
9 the accident.
10 A Yes.
11 Q In your opinion.
12 A Right.
13 Q And you believe that the distortion is from striking the
14 ground?
15 A That's the best explanation that I can come up with.
16 Q And saying that that's the best explanation you can come up
17 with, do you believe to a reasonable degree of mechanical
18 engineering certainty that that is the cause of the damage of
19 this tree stand?
20 A Yes.
21 Q Based on your experience and schooling and everything that
22 you bring to the table?
23 A Right.
24 Q You've indicated here that the deformation of the hook
25 latch is most remarkable. That just means that the way you're

- 94 -

1 using that phrase, that just means that it's worth looking at.

2 A  Yes. It's meaningful.

3 Q  On page 3, you've indicated it might be possible that this

4 engaged the hook, but you didn't have one to test at that time;

5 right?

6 A  Correct.

7 Q  You talk about that figure 10 in here, but Mr. Oxford never

8 expressed to you any uncertainty about how to connect the stand?

9 A  That's a true statement. I didn't ask him that. Well, I

10 mean, I asked him how he hooked it on. I didn't ask him how

11 uncertain he was about it.

12 Q  But based on the description of your conversation that you

13 put into your report, it indicates that he understood that

14 hooking it from behind was the way the instructions told us to

15 do it.

16 A  I recall him saying that.

17 Q  And is it fair to say that because you did not have an

18 exemplar at the time, your supplemental report really doesn't

19 add a heck of a lot more than we've already discussed?

20 A  Right. There was some sort of legal deadline there that

21 they needed a supplemental report. And I said --

22 Q  I understand that completely. So just so that you

23 understand what happened, I had a conversation with Mr. Hodges.

24 He told me that he had located an exemplar. I didn't bother to

25 send him the one that my guys used because he said he found one.

- 95 -

1 And then it turns out the one he found was the wrong one. So we

2 sent him, you know, the other one out.

3 A  I appreciate that.

4 Q  And then after you got this appropriate exemplar or you got

5 an exemplar that you could use to make an appropriate exemplar,

6 you produced your second supplemental report; correct?

7 A  Right, yes.

8 Q  And that is, in fact, the final report in this case.

9 A  It is.

10 Q  Now, do you believe there's any work left that you're going

11 to be doing after today?

12 A  I'm not planning any at this point.

13 Q  I hope not because I don't know that the judge will let us

14 do anything. But once they give me a trial date coming up. The

15 second supplemental report dated January 26; correct?

16 A  Yes.

17 Q  There was a difference between the subject tree stand and

18 the exemplar tree stand in that one had a ratcheting mechanism,

19 and other had a canning buckle; correct?

20 A  When I first received it, yes.

21 Q  But as far as the way you would actually attach the hook to

22 the bolt, where they substantially similar?

23 A  Yes.

24 Q  The accident tree stand and the exemplar?

25 A  Correct.

- 96 -

1 Q  Do you believe you could perform meaningful tests with the

2 original strap?

3 A  Well --

4 Q  Or is there any significant difference between the canning

5 strap and the ratcheting strap, or was the important thing the

6 hook?

7 A  The important thing is the hook.

8 Q  You say there was one difference in the shape in the

9 exemplar hook and the subject hook. What were the differences,

10 and do you have photos?

11 A  I believe there are photos in the --

12 Q  Look at page 4 of your report. Can you use that to tell me

13 what the difference was?

14 A  Oh, okay. Well, they were so close, I didn't do a lot of

15 documentation on them. I recall that the subject hook, the

16 final angle, if you want to call it that, of the tip was a

17 little bit more open I guess if you want to call it that. If

18 you look at the angle between the --

19 Q  The gap is a little wider.

20 A  The gap's a little wider between the back of the hook and

21 the tip, if you want to call it the back and the tip.

22 Q  Do you know if it was in that condition when it was sold or

23 whether there was some force that pried that hook open?

24 A  No, I don't know that. It didn't appear to me to be

25 anything more than simple manufacturing variances at the time

- 97 -

1 that I looked at it. But I didn't quantify that to be sure.

2 But, you know, I've been in the manufacturing business enough to

3 know that there are some variances you might expect.

4 Q  Do you know if this is in it? Do you consider the

5 difference between these two hooks to be insignificant to the

6 purpose of using and protecting?

7 A  Well, that's a difficult question. They're so close

8 together, I would like to say no, but we're talking about a

9 situation that's so particular to the beginning point that I

10 don't know that I can answer that question. I would tend to

11 think no, but I don't know that for sure.

12 Q  So you would tend to think that the differences are

13 insignificant.

14 A  I would tend to think that the differences are

15 insignificant, but I can't be for sure.

16 Q  And you also don't know whether those two hooks might have

17 had the exact same gap at some point and that the subject hook

18 could've been pried open a little bit by some force.

19 A  Well, you're statement is true. Although -- let me see.

20 Now, how did I do this?  To get the actual strap that I used in

21 this testing -- you know, I had the hook off of the can strap.

22 And I needed to get that onto a ratchet strap. So I used an

23 existing ratchet strap, and I had to pry the hooks off of the

24 ends of that ratchet strap so that I could hook the ratchet end

25 of the strap onto the stand and put the canned strap hook on the

- 98 -

1 end of the strap on the subject to ratchet strap.

2 Q Did you do that simply by sliding the piece of webbing up

3 and around and off the tip of the hook?

4 A Well, the particular hooks on that existing ratchet strap,

5 which I believe were a little bit lighter gauge, but I don't

6 remember for sure. They were fairly similar in gauge or in

7 thickness to this hook. All these ratchet strap hooks of this

8 basic load range or a fairly similar. The eye was too closed

9 for the ratchet strap loop to slip over it. So I actually had

10 to clamp the free end of the eye in a vice and open it up. And

11 it takes a fair amount of force to bend these formed wire hooks.

12 So, yes, I guess the answer to your question would be yes is

13 that it could've been altered subsequent to it leaving the

14 factory. But it would take a pretty substantial force to do it.

15 And it would have to be applied to the tip of th hook, when the

16 normal application of the load is at the bottom of the hook.

17 Q Understood.

18 A In other words, I had to kind of come up with a special

19 arrangement to be able to get the forces on that eye in a

20 particular direction to be able to open it up. It wasn't all

21 that easy.

22 Q Testing of the exemplar 2, which is what you're referring

23 to as the exemplar that you popped it with a ratchet; correct?

24 A Yes.

25 Q Your January 26 report last paragraph, in a hook that

- 99 -

1 attached to its bolt from the front of the stand as in plate 2

2 it is loaded with 286 pounds, it's possible for the hook to

3 disengage. Did you, in fact, hook it and put 286 pounds on

4 there?

5 A Yes. It was myself and a 70-pound bag of sand.

6 Q When you did that, was the hook attached from the front?

7 A Yes.

8 Q Did it disengage?

9 A Oh, oh, I'm sorry. Wait a minute. In the paragraph you're

10 talking about, I state testing of exemplar, the EX02, reveals

11 when the hook is attached from the front of the stand as seen in

12 plate 2. Yes, it was attached to the front of the stand.

13 Q Did it disengage when you put 280 -- when you applied the

14 force with the sand, did it disengage?

15 A Well, as I state in the report and in my notes, the first

16 few times I tried it, it would disengage, but it would hook onto

17 the vertical member of the frame.

18 Q And what happened when that occurred? Did the stand fall

19 to the ground?

20 A No. It did not fall to the ground. It would fall, you

21 know, some distance, a short distance of, you know, a half a

22 foot maybe whenever that would happen, enough where the hook

23 would slide up the frame to -- let's see. Where did it go to?

24 Q Up toward the bottom of the seat.

25 A Yeah. Up to one of the pegs that protruded from the top

- 100 -

1 rear of the stand and touched the tree.

2 Q Oh, like a stand-off tube.

3 A Stand-off tube. It would slide up through the stand-off

4 tube. I appreciate your clearing my terminology up.

5 Q Okay. And it would catch on that. Then, the thing would

6 stay in the tree.

7 A Right. Which is not what happened. So the chore there,

8 the next step was to determine what, if anything, different

9 about it would cause it to come off completely rather than hook

10 on that frame.

11 Q Did you do any tests where you rotated things once you got

12 it into a certain position?

13 A You mean like twist the stand on the tree?

14 Q Yeah. Rotating clockwise and counterclockwise.

15 A No.

16 Q You say that the tightening of the ratchet strap, the

17 result in the side load on the hook was the hook latch would

18 push the latch to the side.

19 A Yes.

20 Q Did any of your testing cause your exemplar stand to

21 deform?

22 A No.

23 Q Any bolts or braces, anything bend in the manner that the

24 plaintiff's stand is all bent up?

25 A No.

- 101 -

1 Q Did you ever get the stand to come completely unhooked?

2 A Yes.

3 Q While standing on it.

4 A I believe I was sitting, and it did come unhooked a couple

5 of times.

6 Q What happened when that occurred?

7 A Well, as shown in plate 4, I did this from the safety of my

8 deck out in front of my office so it would fall to the deck.

9 Q Did you land on top of it when it fell to the deck?

10 A Yes, I did.

11 Q As I can see in plate 4, I hadn't noted this before. But

12 you're sitting on some sand, aren't you?

13 A Yes.

14 Q That's a 70-pound bag plus -- what do you weigh?

15 A Well, too much, about 206 or so today.

16 Q So did anything happen to the seat tubes when you and the

17 sand landed on it?

18 A No.

19 Q Is that remarkable in any way?

20 A Anything happening to the seat tubes?

21 Q The fact that nothing broke when you dropped down and

22 landed on it.

23 A Well, I don't know that I landed on it because, you know,

24 as you can see, my feet are on the platform. The platform came

25 down and hit the deck, and I was left standing by it all. So I

- 102 -

1 don't know if there's anything remarkable about that. It fell
2 all of, you know, maybe ten inches.
3 Q When you got the exemplar tree stand that you're testing in
4 these photographs from your second supplemental report, was it
5 twisted or deformed in any manner?
6 A Not that I recall. I did not measure it in detail, but I
7 did not notice any gross deformities that concerned me.
8 Q Nothing similar at all to the bends and twists in
9 plaintiff's stand; correct?
10 A Not that I recall.
11 Q Is that remarkable in light of the fact that Mr. Burk has
12 500 pounds of sand on that which he then pushed down on and it
13 broke the seat tube, fell and landed on the platform?
14 A No.
15 Q You would not expect any twists or bends or damage from 500
16 pounds of sand falling off the seat down onto the platform?
17 A I remember -- hold on just a second. It appears that Mr.
18 Burk did much of what I did and found that the tree stand very
19 close to the ground. And --
20 Q Hold on just a second. When Mr. Burk did a test, the stand
21 never came off the tree.
22 A Right.
23 Q What happened when he did the test was he pushed down on it
24 -- as I understand what he's going to say, he pushed down on top
25 of the sand because he ran out of sand until the seat broke.
- 103 -

1 And then all of the sand fell from seat down and hit the
2 platform.
3 A Right.
4 Q But that the platform never came off the tree.
5 A Understood.
6 Q Is that remarkable in any way to you?
7 A I don't think it relates to our incident.
8 Q Do you have any idea what type of forces a 500 pounds of
9 sand would create dropping from the height of that seat down to
10 the height of the platform?
11 A It would be fairly substantial, I'm sure. But the platform
12 is designed to have a 300-pound man standing and presumably may
13 be dancing on the stand. So, you know, that's pretty stout.
14 And plus, you would have even loading on each end of the bolt
15 that's attached to the tree. So I wouldn't expect it to produce
16 racking.
17 Q Depending on how things fell.
18 A Right.
19 Q Page 2 of your final report, the loading and release of the
20 hook from its bolt was repeated numerous times. Can you tell me
21 how many times you got the hook to release from the bolt?
22 A Oh, to actually release completely from the bolt and from
23 the stand completely?
24 Q No. You first sentence just says hook released from its
25 bolt.
- 104 -

1 A I think it was eight to ten, something like that. You
2 know, it got to the point where I would just try it and see what
3 it would do. I would put the hook into a little bit different
4 configuration and see what it would do.
5 Q Now, your next sentence, in some instances, the hook would
6 remain on the bolt. How many times did you try and get it off
7 where it wouldn't come off at all, just stayed on the bolt?
8 A I believe that was -- well, I don't know an exact number.
9 Q If I understand, when you were trying to get this hook off,
10 you had three different results. It never came off the bolt at
11 all; it came off the bolt that caught on the tree stand
12 somewhere else; or everything came off.
13 A Right.
14 Q Is that correct?
15 A Yes.
16 Q Can you tell me how many times you got each of those three
17 results, approximate? Or do you have notes? Do you have any
18 notes at this testing?
19 A Some, yes.
20 Q And those, you'll be producing for us to copy; right?
21 A Right.
22 Q And to the extent that we might not understand what they
23 mean, or they may be illegible, I'd like you to go through those
24 notes and tell us what they said.
25 A I did not keep detailed notes of how many times it
- 105 -

1 performed in each configuration. But I can tell you that most
2 of the time and particularly, if the hook was completely engaged
3 all the way to the bottom of the hook, that it would not come
4 off. If it was applied such that the tip of the hook would
5 slide adjacent to the frame member, then, it would tend to come
6 off and hook on the vertical frame member. And it wasn't until
7 later that I closed the gap a little bit on the spring latch to
8 match the subject stand, the accident stand that it would come
9 off and not catch on the frame member. But I would say based on
10 my recollection that out of, let's say, ten times just for
11 example, that -- well, if the hook was completely engaged, it
12 would not come off.
13 Q So if you put the hook completely on the bolt, it would not
14 come off.
15 A Right.
16 Q And that's whether you hook it from the front or the back.
17 A True. Now, if I had to hold it in that position to get it,
18 you know, often to get it to remain fully engaged while you
19 ratchet the ratchet strap tight, it would tend to want to hang
20 down from its own weight which would rotate the tip back away
21 from the frame member and allow it, when it tightened up, to
22 miss and not be fully engaged.
23 Q You're doing all this on the ground?
24 A Yes, yes.
25 Q How high off the ground was the tree stand?
- 106 -

1 A  Well, it was on my deck. The tree stand was, like I said,
2 about eight inches off the deck probably. And it's still a
3 handful even with that. You know, being on top of a ladder
4 would be even more trying.
5 Q  Was the weight of the tree stand just gravity causing the
6 stand to hang down into the bottom of the hook?
7 A  It could. It could. It depends on if you're holding the
8 stand with one hand and running the ratchet around with the
9 other and trying to ratchet it up and all that. So at that
10 angle, it could tend to rotate it around.
11 Q  But if you let go of the stand, it's going to drop down
12 into the belly of the hook?
13 A  True.
14 Q  Which is something that's more likely to happen when you're
15 hanging this thing at elevation than it would be if you were
16 just standing on your deck doing it.
17 A  Well, I don't know about that. You know, if you're holding
18 the stand with one hand and you have to switch hands when you
19 would go around the tree with the hook, you know, I'm not just
20 real sure how he was doing all that. If I were putting it up
21 myself, I would tend to want to try to keep the slack out of the
22 ratchet strap as much as I could.
23 Q  But it's your feeling that what he did was hold -- did he
24 hold his stand with his right or left hand?
25 A  Well, it depends on when you're talking about. I wasn't

- 107 -

1 there, and I don't know that anybody could explain. Maybe even
2 he himself might not have an easy time of explaining exactly
3 what he did before this accident. But I know that if you're up
4 on top of a ladder stand and you're trying to hold this stand,
5 it was to his right, I'd say that eventually, he ended up with
6 the stand in his right hand tightening the ratchet with his
7 left.
8 Q  Well, there's no other way to do it if your stand is off to
9 your right, is there?
10 A  At that point, right. Now, if you want to hold the stand
11 with your right hand and go around the tree with the hook around
12 to the left, then, at some point, you've got to hold the stand
13 with your left hand and grab the hook with your right and hook
14 it on unless you can reach all the way around the tree. And I
15 think this was a fairly large tree so I don't know that he could
16 reach all the way around it.
17 Q  Reaching around the tree would broaden your experience with
18 your testing?
19 A  Well, yeah. You may want to throw the hook around and
20 catch it with the other side. So I mean, it's --
21 Q  If you throw the hook around and catch it with the right
22 hand, what's holding up the tree stand while you're throwing the
23 hook with one hand and catching it with the other?
24 A  You've got a good point. It's difficult. You need three
25 hands ideally, especially if you're going to be holding the

- 108 -

1 instructions with the other hand.
2 Q  So you hold the tree stand with your right hand. You reach
3 around with your left hand and place the hook onto the tree
4 stand while you're holding it.
5 A  Well, if it's a small enough tree. And I don't know if
6 that's what he did or not.
7 Q  You said it was an 18-inch tree. That's pretty small,
8 isn't it?
9 A  18 inches is a fairly good size tree. Let me see. I'm not
10 sure exactly what circumference that would be, but it's a fairly
11 good size tree. I don't know whether he reached around and
12 handed himself the hook, or reached around and tried to hook it
13 on, or threw it around.
14 Q  Do you know if the tree was 18 inches at ground level or 18
15 inches at the elevation where he connected?
16 A  Well, I don't know. I've seen pictures of the tree. It's
17 difficult to say how big it is.
18 Q  So you don't know one way or the other how difficult it was
19 to reach around this particular tree?
20 A  True.
21 Q  In your final report, top paragraph, you said the loading
22 and release of the hook from its bolt was repeated numerous
23 time. We've talked about that. And in some instances, it would
24 remain on the bolt. We talked about that. When the hook did
25 disengage, the usual result was the hook snagging on the

- 109 -

1 adjacent frame member. When you say that was the usual result,
2 that implies to me that that happened more than 50 percent of
3 the time. Is that true?
4 A  Yes, yes. As a matter of fact, it happened every time up
5 until I reduced the gap of the spring latch to match the basic
6 shape of the subject.
7 Q  That's the next sentence here. You say however, when the
8 hook latch was shaped to closely match the subject latch, the
9 hook released from the bolt without catching the frame. And the
10 stand would fall. Tell me specifically what you did to the hook
11 latch to shape it mostly to the subject latch?
12 A  I basically just took a pair of pliers and --
13 Q  And moved it out of the way?
14 A  And worked on the latch and held the subject latch up to it
15 and tried to get it basically the same shape.
16 Q  So that the bending that we see in photograph number 3 on
17 page 4 of your January 26 report is not a consequence of your
18 testing, that is something that you did with a pair of pliers?
19 A  No.
20 Q  No.
21 A  No. Actually, that photograph was taken before the --
22 well, now, wait a minute. No, this photograph was taken before
23 any modifications were made to the latch.
24 Q  So when the hook --
25 A  See, my assertion is that it appears to me that this

- 110 -

1 distortion to the latch was done before it came off.

2 Q  Let me just clarify this, then.  The bending that we see in

3 photograph number 3, which you call plate 3.

4 A  Yes.

5 Q  Engineers make me crazy with this plate stuff instead of

6 photo, but that's a conversation for another day.  Plate number

7 3, the bending of the exemplar hook when it was bent in the

8 fashion shown in this photograph, were you able to get it to

9 come off, or did you have to make a change?

10 A  I believe that this one is the configuration where it would

11 hook to the vertical member.

12 Q  So the stand would not come out of the tree; correct?

13 A  Right.

14 Q  Then you changed it after this.

15 True.  And by looking at it, it's not a lot of difference.

16 It's just basically closing up the gap between the latch and tip

17 of the hook.

18 Q  How did it get in this condition in the first place if you

19 didn't do that with pliers?

20 A  It was pushed to the side as it's shown in plate 2.  When

21 you tighten the ratchet strap down, it gets pushed to the side.

22 Q  And you wound up having to bend it back up?

23 A  Yes.

24 Q  So that on the occasions where you were able to get the

25 hook to come off the tree, they were only occasions where you

- 111 -

1 had taken pliers and bent the hook into a particular position

2 before you ever connected it to begin with?

3 A  That particular position that I went to with it was one

4 matching the subject hook.

5 Q  So at the time that you connected the hook, you already had

6 the spring bent?

7 A  Yes.

8 Q  Is it your understanding that at the time Mr. Oxford

9 connected his hook, it was in a brand new condition with the

10 spring where it belonged?

11 A  Correct.

12 Q  And see, that goes back to what I was saying earlier.  The

13 evidence tells me that the spring latch got pushed to the side

14 when the ratchet strap got tightened up.  And the force of the

15 tension on the strap was what pushed the latch to the side.  At

16 that point -- and really, all that latch is doing is telling me

17 that this is how it got bent.  It just appears to me that that's

18 the best explanation to explain the bending on the latch.

19 Q  When you start with a spring that is where it belongs, does

20 the spring tend to guide the hook onto the bolt?

21 A  I don't believe I would agree with that statement.  Are

22 you're talking about the spring on the latch?

23 Q  The spring that you have to push out of the way, the one

24 you call the hook latch.

25 A  That's the metal latch that Dr. Burk refers to in his

- 112 -

1 report, yes.

2 Q  But the hook latch when it's intact tends to strike the

3 hook onto the bolt.

4 A  I don't believe that having a latch there would tend to

5 guide the hook onto the bolt or not.  In other words, if the

6 latch was not there, you still could hook the place to hook on

7 the bolt.  So I don't think I agree with your statement.

8 Q  Take number 2, the photograph that you took on the bottom

9 of page 3.

10 A  Yes.

11 Q  Was that picture taken before or after you bent the latch

12 with the pliers?

13 A  That was before.

14 Q  And in this configuration here, plate number 2, you were

15 not able to get it to come off?

16 A  It would come off, but it would hook to the frame.

17 Q  So you couldn't get the tree stand to come off the tree?

18 A  Right.  In the times that I tried it, not to say that it

19 wouldn't eventually.  It's just -- when it --

20 Q  It happened when you were doing your testing.

21 A  Right.  When it pops off the bolt, when it rotates off the

22 bolt, you know, it's either going to hook onto the vertical

23 member, or it's going to fly completely off.  And in the

24 configuration there, it would tend to hook onto the vertical

25 member.  And after you configured it to the shape that we see in

- 113 -

1 the subject latch, then, it flew off.  It may be that it would

2 --

3 Q  But the stand connecting with the configuration that

4 resulted in a disconnect?

5 A  I missed your question.  I'm sorry.

6 Q  Yeah.  I'm wondering why -- I don't see any photographs

7 that you took in the ultimate, you know, configuration where the

8 stand could release.

9 A  Well, it looks much the same as what you see here.  It's

10 just the gap is a little bit smaller than the one that you see.

11 And the photographs are included on CD-Rom.  You're welcome to

12 those.

13 Q  Okay.  So when you say in this top paragraph, the sentence

14 is however, the latch was shaped to closely match the subject

15 latch.  The hook released from the bolt without catching the

16 frame, and the stand would fall.  What you're talking about

17 there is shaping it with a pair of pliers.

18 A  Right.  In this case, it happened to be a pair of pliers.

19 Q  Then, the next paragraph says it should be noted that it is

20 not known whether these testing conditions closely match the

21 conditions at the time of the incident, as those precise

22 conditions are not known.  Do you agree with that?

23 A  Let's see.  Where are we here?  Oh, okay.

24 Q  Second paragraph.

25 A  Well, it's my own report.  I certainly agree with it.

- 114 -

1 Nothing has changed.

2 Q When you say that you don't know whether your test

3 conditions closely match the conditions at the time of the

4 incident, would it be fair to say that as you sit here today,

5 you don't know whether your testing conditions were

6 substantially similar to the conditions at the time of the

7 incident?

8 A I believe that's a correct statement. You know, I guess

9 the point here is that I'm not trying to reconstruct that

10 precise --

11 Q Right. That's your next sentence.

12 A Yeah.

13 Q You say the testing merely confirms that it's possible for

14 the hook to disengage from the bolt when it is applied from the

15 front of the stand and that this result is a deformed hook latch

16 similar to the subject latch.

17 A Right.

18 Q And you say it resulted in the deformed hook latch similar

19 to the subject latch. But when the deformation occurred

20 actually, the stand didn't actually fall off the tree. That

21 wasn't until you shaped it with the pliers.

22 A Well, now, keep in mind, I think what's going on here with

23 this latch gap business, if that's what we want to call it, is

24 that it depends on how much this latch gets bent to the side

25 when it's first applied and the ratchet strap is tightened. You

- 115 -

1 A Well, if you hook it from the back, once you get the hook

2 over the bolt and the latch snaps and you tighten up the ratchet

3 strap, then it is fully seated. And there's really not much of

4 a way for it to be anything other than fully seated.

5 Q So once you have it fully seated, the tighter you make the

6 ratchet, the more firmly you've seated.

7 A Precisely. And that's the way these ratchet strap hooks,

8 and for that matter, any sort of lifting hook is designed to be

9 used which is the forces are directly inline with the axis of

10 the hook. And there's no side forces on it.

11 Q Is it your opinion that Mr. Oxford hooked up his tree stand

12 in the manner shown in plate number 2 on the January 26 report?

13 A That's what the evidence tells me, yes.

14 Q That's what the physical evidence tells you, not the

15 testimonial evidence from Mr. Oxford; correct?

16 A Correct.

17 Q Do you consider that hook to be completely engaged on the

18 bolt?

19 A No.

20 Q And do you consider that spring-loaded keeper, do you

21 consider that to be snapped into place?

22 A Not as we see it in plate 2. It's been pushed to the side

23 by the tension of the strap.

24 Q When you did all your testing, there are four points of

25 contact from the back of this tree stand. When you did your

- 117 -

1 know, when I tightened that in my case, I may have deformed the

2 latch more so, which allows it to be a wide enough gap to pass

3 over the three-quarter inch steel square tubing that make up the

4 frame of this stand. And if it was reduced to what we actually

5 see in the subject stand, it provided less of a gap for it to be

6 able to get over the three-quarter inch square tubing. And so

7 what I was trying to do was to, you know, determine why the hook

8 would tend to come off the bolt and not catch on the side piece

9 rather than catching on the side piece. And that seemed to be

10 the deciding factor was the actual gap that got produced when

11 the latch got pushed to the side before the hook came off.

12 Q And all of this assumes that Mr. Oxford is wrong about

13 hooking it from the back?

14 A Right.

15 Q And you also mentioned earlier, if I remember correctly,

16 that with the -- even when you hook it from the front, if the

17 hook is seated on the bolt, if it's completely engaged on the

18 bolt, it holds.

19 A And, of course, by completely engaged, we're talking about

20 are you able to keep the hook in place while you're getting the

21 ratchet strap tight, and can you see that. So the answer to

22 your question is yes. The question is could that be done in

23 actual practice.

24 Q Well, is it something you have to do, or is it possible

25 that you just hook it up and it stays there where you put it?

- 116 -

1 testing, did you get all four points of contact in touch with

2 the tree?

3 A I believe so.

4 Q Did you see where Mr. Oxford testified in his deposition

5 that he had his hook completely engaged on the bolt?

6 A It seems like I recall that, yes.

7 Q And you think he did not?

8 A Correct.

9 Q And he said he came in from the back, but you think he did

10 not?

11 A Correct.

12 Q Do you think the installation shown in plate number 2 on

13 page 3 --

14 A Which report are we in now?

15 Q The final report.

16 A Okay.

17 Q It indicated you think he hooked the way it's shown in

18 plate number 2. Do you think that photograph resembles any

19 photograph of any installation shown in the instructions that

20 came with the product?

21 A This seems similar to figure 10 on page 8.

22 Q Plate number 2 and figure 10 seem similar to you?

23 A Well, I believe in the supplemental report of January 14th,

24 I have some photographs comparing the two, plates 5 and 6.

25 Q Let me take a quick look at that.

- 118 -

1  A   Keep in mind that plate 5 is a reproduction of the response
2  for production number 10 that you guys sent.
3  Q   Would it be fair to say that in plate number 6 of your
4  January 14th report, you have the hook completely engaged on the
5  bolt?
6  A   Yes.
7  Q   And when you put it in that configuration, you can't get it
8  off the tree, can you?
9  A   Well, if you're able to get the strap tight with it in that
10 position. But I found that it was difficult to do that.
11 Q   Why?
12 A   Because the weight of the hook would tend to rotate it
13 around this as we're looking at it crosswise. And the tip of
14 the hook would get inside the frame as we see in plate 2 of the
15 January 14th report.
16 Q   Explain for me the method that you used to hook the tree
17 stand up that would result in that happening. I want you to
18 give me sort of a blow by blow because I'm not following that.
19 A   Well, I would hold the stand up with the left hand and run
20 the ratchet strap around. And I had to do a little hand
21 switching to get it in place. But once it's hooked on, now,
22 you're holding the stand with your right hand and ratcheting it
23 with your left.
24 Q   You would hold the stand with your left hand?
25 A   No. I'd hold the stand with my right hand and ratchet it

- 119 -

1  with my left.
2  Q   When you started this procedure, were you standing up?
3  A   I was standing on my deck.
4  Q   Right. And was the tree stand off to your right or off to
5  your left?
6  A   It was to my right.
7  Q   Off to your right. Was it in your right hand?
8  A   Yes.
9  Q   So you're using your right hand to hold it up against the
10 tree?
11 A   Correct.
12 Q   Are you on your knees?
13 A   No. I was standing.
14 Q   You're standing, and you're doing this so that the tree
15 stand is only eight inches off the ground.
16 A   Right.
17 Q   So this whole installation is taking place down below waist
18 level.
19 A   Well, I would say that the stand was -- well, maybe it was.
20 Yeah, I guess it was around waist level. That's where --
21 Q   So I guess that's where it's about 18 to 20 inches between
22 the platform and the seat. Plus, you have it, you know, say a
23 foot off the ground. So the whole thing would be down below
24 your waist; right?
25 A   Right. You know, I would start up higher, and it would

- 120 -

1  slip down some. So I'm not sure where I started out, but it was
2  a struggle.
3  Q   What did you put in your right hand?
4  A   When?
5  Q   When you were trying to connect the tree stand.
6  A   The stand was in my right hand.
7  Q   But what part? What did you hold on to?
8  A   Oh, gosh, it varied from time to time. I did this
9  multiples of times. But it was usually -- oh, gosh, I guess
10 it's probably the frame. You couldn't hold on to anything else.
11 It would pivot.
12 Q   Anywhere near that bolt?
13 A   I don't recall.
14 Q   So you would just reach around with your left hand and hook
15 it?
16 A   I believe I actually swung it around and swapped hands and
17 caught it.
18 Q   And when you did that, did you have the webbing threading
19 through the ratchet in a fashion that was loose so that you
20 could then grab the tail end and pull it tight?
21 A   Yes.
22 Q   Did you slide it through and then pull it tight?
23 A   Pull it tight and then start ratcheting.
24 Q   Do you do anything to release the hook from a seated
25 position with your hands, or did that happen naturally? Did you

- 121 -

1  never really see the hook to begin with?
2  A   I believe I did try it a time or two with it fully seated.
3  But that was really -- see, that's not what I think happened.
4  You know, the evidence tells me with the latch pushed to the
5  side that it was not seated completely.
6  Q   Well, I'm trying to figure out is did you seat the thing
7  completely and it unseated itself, or did you hook it up before
8  you had it tip loaded right from the start?
9  A   There was a couple of times. Well, there were several
10 times that it would go into that position naturally.
11 Q   The tip loading?
12 A   If you want to call it tip loading. It would be where the
13 tip of the hook was inside of that frame member. And when you
14 tightened it up, it would push the latch to the side.
15 Q   In plate number 2, the tip of the hook is bearing weight in
16 your final report; correct?
17 A   Yes.
18 Q   And with a 275-pound man on that tree stand, you would
19 expect there to be a significant load on the tip of the hook.
20 A   It depends on what you mean by significant. Yes, there
21 would be a load on the tip of the hook, yes.
22 Q   Did you put it in that position as shown in plate number 2,
23 or did it move into that position by itself?
24 A   There were times when it would move into the position by
25 itself. There were other times I wanted to test it so I would

- 122 -

1  place it in that position.

2  Q   And then you just seated the thing fully, would it move

3  itself into that position, or once it was fully seated, would it

4  stay in that position?

5  A   I believe if you managed to get the strap tight with it

6  fully engaged, it would stay that way.

7  Q   And to get the strap tight, all you have to do is let go of

8  the tree stand, and the weight of the tree stand itself will

9  tighten the strap, won't it?

10  A   Well, I didn't try that because the stand would drop, and

11  it ended up too low.  It would slide down the tree if you let go

12  of the tree without the strap being tight.

13  MR. CULLEN: Peter, I keep thinking you're wrapping

14  up, but our court reporter here is about to pass out.  She's

15  been talking into this mask for three hours straight.

16  MR. LENTINI: I believe that we are wrapping up.

17  MR. CULLEN: Okay.  With these three tough guys around

18  the table, it doesn't bother us, you understand.

19  MR. LENTINI: I think we're done.

20  MR. CULLEN: Very good.

21  MR. LENTINI: Thank you, Mr. Ford.

22  THE WITNESS: You're welcome, Mr. Lentini.

23  WHEREUPON, the deposition was concluded at 2:52 p.m. on February

24  14th, 2005.

25

- 123 -

CERTIFICATE

STATE OF ARKANSAS )

               )ss

COUNTY OF SALINE   )

    I, Amanda B. Poe, Certified Court Reporter and Notary

Public, do hereby certify that the facts stated by me in this

caption on the foregoing proceedings are true; and that the

foregoing proceedings were recorded verbatim through the use of

the Stenomask and thereafter transcribed by me or under my

direct supervision to the best of my ability, taken at the time

and place set out on the caption hereto.

    I FURTHER CERTIFY that I am neither counsel for, related to,

nor employed by any of the parties to the action in which these

proceedings were taken; and further, that I am not a relative or

employee of any attorney or counsel employed by the parties

hereto, nor financially interested, or otherwise, in the outcome

of this action.


WITNESS MY HAND AND SEAL this __ day of _____, 2005.



_____

AMANDA B. POE

CERTIFIED COURT REPORTER #639

My Commission Expires:  8/15/2011

- 124 -

MILL DEP by Kenson

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page |

$2 ... 8
$3 ... 8
04152000 ... 87
1 ... 4, 5, 80, 87
1,000 ... 80
10 ... 21, 23, 42, 86, 88, 89, 95, 118, 119
100 ... 60, 77
12 ... 23, 87
14 ... 23
14th ... 4, 23, 93, 118, 119, 123
15 ... 62, 73, 75, 93
18 ... 50, 109, 120
180 ... 93
1953 ... 4
1998 ... 15
2 ... 8, 21, 87, 93, 99, 100, 104, 111, 113, 117-119, 122, 123
2:52 ... 123
20 ... 17, 21, 120
2000 ... 5
2001 ... 5
2003 ... 23
2004 ... 5, 23, 31, 47
2005 ... 19, 123
206 ... 102
23rd ... 47
25 ... 30
25th ... 56
26 ... 96, 99, 110, 117
270 ... 63, 68, 70, 78, 79
275 ... 122
28 ... 21, 53, 83
280 ... 100
285 ... 63
286 ... 100
3 ... 8, 21, 80, 85, 95, 110, 111, 113, 118
30 ... 33
300 ... 104
36 ... 42
4 ... 23, 83, 97, 102, 110
40 ... 17
45 ... 40
5 ... 23, 48, 118, 119
50 ... 110
500 ... 103, 104
6 ... 23, 48, 88, 118, 119
60 ... 17
6th ... 23, 56
7 ... 23, 81-83
70 ... 100, 102
7th ... 47
8 ... 81, 82, 85-87, 118
80 ... 17
8th ... 22, 31, 47
90 ... 16, 17, 42, 74, 75

**A**

abandoned ... 39
abbreviation ... 15
able ... 38, 41, 72, 92, 99, 111, 113, 116, 119
above ... 9, 10, 55, 64, 78
accept ... 76
accepted ... 60
accepting ... 59
accident ... 15, 16, 27,

43-45, 47, 56, 59, 94, 96, 106, 108
accidents ... 71
According ... 46, 86
account ... 7, 63, 72
accounts ... 57
accurately ... 92
across ... 39, 40, 64
action ... 69, 72, 80, 81
actual ... 9, 64, 98, 116
adamant ... 91
add ... 39, 95
added ... 8
Addison ... 5, 7, 18
addition ... 25
address ... 29
adjacent ... 81, 106, 110
adjustment ... 7
adversary ... 5, 6
advisable ... 6
affect ... 33, 41, 42
against ... 8, 39, 120
agree ... 39, 41, 47, 49, 56, 81, 112-114
Agreed ... 35
agreement ... 22, 24
ahead ... 3, 5, 25
aid ... 57
air ... 13, 62, 69, 74, 75, 79
aligned ... 64
alignment ... 64
allow ... 93, 106
allowed ... 6, 11, 85
allows ... 116
alloy ... 29
altered ... 11, 99
alternative ... 8
aluminum ... 41, 65
amount ... 7, 58, 64, 83, 99
analysis ... 39, 58, 59
analyze ... 39, 41
analyzed ... 91
analyzing ... 39
angle ... 28, 50, 65, 66, 97, 107
angry ... 93
anticipate ... 26
anymore ... 27, 71
Anywhere ... 59, 121
API ... 5, 20
apologize ... 37
Apparently ... 23, 28, 47
appear ... 41, 42, 56, 65, 97
appeared ... 10
appears ... 17, 36, 41, 53, 67, 89, 103, 110, 112
appliance ... 16
application ... 99
applied ... 39, 41, 58, 64, 76, 99, 100, 106, 115
apply ... 29, 68, 69, 77, 79
applying ... 28, 78
appreciate ... 25, 34, 46, 96, 101
approach ... 29
approached ... 14
appropriate ... 26, 29, 44, 57, 65, 91, 92, 96
approximate ... 105

area ... 3, 10, 30, 40, 41, 49, 54, 82, 88
areas ... 4
Arkadelphia ... 4
Arkansas ... 4, 23, 29
Arkla ... 14, 16
arm ... 28, 32, 33, 36-39, 41, 62, 64, 67, 68, 74-76, 79, 92, 94
arms ... 7, 8, 33, 63, 64, 67, 79
arrangement ... 9, 50, 99
ARTI ... 14-16
ascending ... 85
aspects ... 52
assembly ... 33
assert ... 74, 84
assertion ... 110
assignment ... 22, 52, 56
assist ... 17
Associated ... 31, 32, 43, 45
asymmetrical ... 40
asymmetries ... 40
asymmetry ... 42
attach ... 96
attached ... 5, 6, 11, 33, 34, 47, 49, 53, 66, 100, 104
attaches ... 33
attachment ... 7, 33, 34
attachments ... 22
attempt ... 23
attorney ... 3, 6, 31, 53
attorneys ... 17
available ... 21, 26, 83
aware ... 84
awful ... 92
awfully ... 61
axis ... 75, 117

**B**

BA ... 4
back ... 5, 10, 12, 14, 16, 17, 19, 24, 26, 28, 34-36, 38-40, 44-50, 52, 54-58, 61, 79, 81, 82, 89-91, ... 97, 106, 111, 112, 116-118
background ... 4
bag ... 100, 102
bags ... 36, 39
Baptist ... 4
bar ... 45, 66
barring ... 36
base ... 66
based ... 30, 32, 89, 90, 94, 95, 106
basic ... 38, 43, 99, 110
basing ... 43
Bear ... 17, 31, 45, 47
bearing ... 122
became ... 11
becomes ... 27
begins ... 80
behind ... 35, 45, 46, 48-50, 52, 54, 56, 58-61, 77, 82, 87-89, 95
belief ... 69
believed ... 37
belly ... 107

belonged ... 112
belongs ... 112
below ... 10, 45, 49, 57, 120
belt ... 11, 12, 83, 84, 88
bend ... 50, 51, 67, 76, 78, 80, 99, 101, 111
bending ... 38, 39, 50, 51, 66, 77, 80, 110-112
bendings ... 76
bends ... 42, 45, 103
bent ... 34, 38, 48, 50, 65-67, 80, 81, 101, 111-113, 115
bicycle ... 7
big ... 9, 13, 109
birth ... 4
bit ... 16, 21, 22, 33, 61, 63-66, 68, 73, 97-99, 105, 106, 114
Block ... 31, 53
blow ... 119
blurry ... 86
body ... 26, 27
boilers ... 13, 14
bolt ... 33, 44, 45, 47, 51, 54, 55, 57, 59, 64-66, 91, 94, 96, 100, 104-106, 109, 110, 112-119, 121
bolts ... 38, 65, 101
booklet ... 22, 86
booklets ... 86
both ... 16, 25, 49, 55, 70
bother ... 95, 123
bottom ... 9, 10, 28, 41, 55, 61, 64-66, 68, 72, 87, 99, 100, 106, 107, 113
bought ... 33, 65
bounce ... 37
brace ... 66
braces ... 101
bracket ... 28, 64
braid ... 6
branch ... 14
brand ... 112
break ... 36-38, 40, 41, 43, 79, 80
breaking ... 33, 38, 43
breaks ... 41, 42
brief ... 32
brittleness ... 28
broaden ... 108
broke ... 8-11, 36, 37, 42-44, 51, 93, 102, 103
broken ... 10, 33-39, 41, 44, 66, 67, 94
BS ... 4
buckle ... 96
bucks ... 93
buddy ... 33
build ... 19
buildings ... 14
built ... 18
bullet ... 25
Burk ... 36, 39, 41, 45, 46, 51, 103, 112
Burks ... 31, 34, 38, 47
Burner ... 23
business ... 84, 85, 98, 115
buttocks ... 70

**C**

call ... 6, 8, 10, 12, 34, 42, 52, 97, 111, 112, 115, 122
called ... 4, 5, 8, 13, 14, 21, 80
calls ... 3
Can ... 3, 4, 17, 19, 21, 22, 24-27, 32-34, 36, 38, 40, 43, 45-50, 54, 56, 58, 59, 65, 66, 69, 75-77, 80, ... 82, 83, 86, 88, 94, 97, 98, 102, 104-106, 108, 116, 119
canned ... 98
canning ... 96, 97
capable ... 93
carbon ... 65, 86
care ... 78
carefully ... 54
carrying ... 28, 93
case ... 4-9, 11, 12, 16-18, 20, 22, 23, 33, 35, 37, 38, 40, 41, 46, 50, 52, 55, 62, 71, 72, 76, 77, 88, 96, ... 114, 116
cases ... 5, 11, 12, 19, 77
castings ... 13
catch ... 51, 69, 78, 82, 101, 106, 108, 116
catching ... 108, 110, 114, 116
caught ... 51, 83, 105, 121
cause ... 16, 40, 43, 44, 67, 76, 77, 94, 101
caused ... 8, 11, 28, 43, 44, 50, 94
causing ... 11, 37, 43, 107
CD ... 26, 27, 114
Center ... 14
centered ... 70
certain ... 32, 60, 69, 81, 82, 90, 101
certainly ... 18, 21, 29, 47, 77, 114
certainty ... 33, 72, 94
cetera ... 92
chain ... 7, 8, 18, 91
chains ... 9
chances ... 62
change ... 60, 61, 111
changed ... 111, 115
changes ... 30, 87
character ... 90-92
characteristic ... 6, 27, 40
characteristics ... 50
Characterizing ... 7
Chinese ... 6
choose ... 30
chore ... 101
chronological ... 73
chronologically ... 25
circle ... 42
circumference ... 109
claim ... 3
clamp ... 6, 99
clarifications ... 30
clarify ... 111
clarifying ... 32

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|
| class ... 28 | 76, 98, 117 | damaged ... 11 | diameter ... 50, 66 | email ... 23 |
| clean ... 86 | consideration ... 28, 72, 73 | damaging ... 93 | diamond ... 6 | emails ... 24 |
| clearing ... 101 | considered ... 77 | dancing ... 104 | difference ... 86, 96-98, 111 | employer ... 16 |
| climb .. 20, 83 | considering ... 30, 34, 47 | danger ... 8 | differences ... 97, 98 | ending ... 4, 7 |
| climbed ... 12, 19 | consistencies ... 38 | dangle ... 93 | different ... 13, 22, 25, 29, | ends ... 9, 98 |
| climbing .. 5-8, 10, 12, 18, | Consistent ... 35, 41, 48-50, | Danny ... 23, 60 | 39, 55, 67, 101, 105 | Energy ... 14 |
| 20, 71, 78, 84, 93 | 52, 54, 55, 60, 67, 81, | dark ... 8 | difficult ... 12, 77, 79, 89, | engaged ... 44, 45, 59, 95, |
| clip ... 8, 34, 50, 51 | 94 | date .. 4, 31, 86, 96 | 94, 98, 108, 109, 119 | 106, 116-119, 123 |
| clipped ... 51, 59 | construction ... 13 | dated ... 22, 47, 96 | digital ... 26, 27 | engagement ... 6, 7 |
| clockwise ... 80, 101 | Consult ... 52 | dates ... 54 | direction ... 11, 38, 40-42, | engine ... 9 |
| close ... 32, 55, 56, 73, 97, | consulting ... 31 | day ... 111 | 48, 49, 55, 67, 68, 70, | engineer ... 13, 31, 62, 72 |
| 98, 103 | contact ... 27, 56, 64, 82, | days ... 14 | 76, 79, 82, 83, 92, 99 | engineered ... 13 |
| closed ... 59, 99, 106 | 89, 117, 118 | deadline ... 95 | directions ... 35, 67 | engineering ... 4, 13-16, 28, |
| closely .. 38, 41, 66, 88, 89, | contacting ... 34 | deairation ... 13 | directly ... 40, 49, 117 | 29, 33, 52, 62, 72, 94 |
| 110, 114, 115 | contacts ... 17 | dealer ... 23 | dirt ... 62 | engineers ... 15, 111 |
| closing ... 111 | contain ... 27 | dealers ... 23 | disconnect ... 114 | entire ... 67 |
| college .. 4, 14, 30, 62 | Continue ... 58 | dealing ... 12 | disconnected ... 8, 10, 73 | entirely ... 43, 49 |
| colleges ... 4 | continuous ... 9 | Dean ... 23 | Discovery ... 23, 55 | entirety ... 56, 88 |
| combination ... 30 | contractor ... 24 | decided ... 19, 43 | disengage ... 100, 109, 115 | envision ... 34, 69, 79, 94 |
| come ... 11, 14, 18, 34, 46, | contraindicate ... 52 | deciding ... 116 | distance ... 27, 64, 100 | envisioning ... 79 |
| 51, 52, 59, 60, 69, 71, | contrary ... 44 | decision ... 30 | distortion .. 41, 94, 111 | equipment ... 13, 16 |
| 76, 77, 85, 92, 94, 99, | control ... 72 | deck ... 102, 107, 120 | document ... 32, 86 | essentially ... 68, 69 |
| 101, 102, 105, 106, | conversation ... 26, 56-59, | deemed ... 58 | documentation ... 97 | estimate ... 17, 24, 64 |
| 111, 113, ... 116 | 89-91, 95, 111 | deer ... 4, 7, 12, 19, 55 | documents ... 22 | estimated ... 57 |
| comes ... 27, 74, 82 | convinced ... 36, 54 | defendants ... 36 | door ... 7, 14, 16 | et ... 92 |
| coming ... 6, 50, 76, 96 | cooperative ... 4 | defense ... 17, 24 | doors ... 14 | evaluate ... 16, 30, 79 |
| comment ... 30 | copied ... 32 | deficiency ... 7 | double ... 7 | evaluated ... 28 |
| commercial ... 13, 14 | copies ... 22-24 | define ... 34 | downward ... 39, 48, 63, 70 | evaluation ... 15 |
| commercially ... 83 | copy .. 23, 26, 27, 86, 105 | defined ... 30 | Dr .. 31, 34, 36, 39, 41, | eventually ... 14, 80, 108, |
| common ... 9, 71, 85, 93 | corner ... 48, 55, 82 | definite ... 15 | 45-47, 51, 112 | 113 |
| companies ... 13-15 | corrected ... 57, 90 | definition ... 28 | drastically ... 75 | everybody ... 15, 93 |
| company ... 13-16, 19 | correctly ... 6, 116 | deflect ... 63, 64 | draw ... 56 | everything ... 13, 21, 94, 105 |
| comparing ... 118 | correspond ... 35 | deflected ... 63, 64 | drawing ... 50, 81 | evidence ... 30, 34, 38, 43, |
| complaint ... 23 | correspondence ... 23, 24 | deform ... 101 | drawings ... 22 | 44, 47, 50, 52, 66, |
| complete ... 23, 72 | cost ... 8 | deformation ... 94, 115 | drew ... 57 | 75-77, 89, 112, 117, |
| completed ... 4 | costs ... 16, 93 | deformed ... 65, 103, 115, | drilled ... 20 | 122 |
| completely ... 59, 69, 95, | counsel ... 24, 52, 86 | 116 | droop ... 57, 58 | EX02 ... 100 |
| 101, 102, 104, 106, | count ... 21 | deformities ... 103 | drop .. 37, 62, 70, 75, 93, | EXAMINATION ... 3, 32, |
| 113, 116-119, 122 | counterclockwise ... 80, 101 | degree .. 4, 33, 40, 72, 94 | 107, 123 | 42 |
| complicated ... 39 | couple .. 5, 15, 27, 65, 78, | degreed ... 15 | dropped ... 93, 102 | examined ... 21 |
| component ... 39-41, 65 | 83, 102, 122 | degrees ... 4, 42, 68, 74, 75 | dropping ... 62, 104 | example ... 16, 18, 20, 25, |
| compression ... 13 | course ... 15, 28, 33, 71, | demonstrates ... 82 | drum ... 10 | 29, 37, 39, 45, 106 |
| computerized ... 13 | 116 | deny ... 46 | due ... 39 | except ... 7, 62 |
| concentrate ... 52 | courses ... 28 | department ... 14 | duly ... 3 | exemplar ... 23, 25, 36, 78, |
| concentrated ... 27, 88 | court ... 16, 17, 22, 123 | dependent ... 58 | dust ... 33 | 86, 95-97, 99-101, 103, |
| concentrating ... 11 | cover ... 87 | deposed ... 3 | dynamic ... 68 | 111 |
| concerned ... 73, 103 | crash ... 47 | deposition .. 3, 5, 23, 30, | **E** | exemplars ... 51, 78, 86 |
| concerning ... 56 | crazy ... 111 | 32, 33, 35, 37, 52, 59, | each ... 22, 39, 40, 64, 65, | Exhibit .. 4, 5, 85, 86 |
| concluded ... 91, 123 | create .. 6, 22, 104 | 60, 70, 85, 86, 118, | 81, 104-106 | exhibited ... 36 |
| conclusion ... 39 | created ... 52, 53 | 123 | earlier ... 16, 32, 40, 45, 46, | expect ... 33, 40-42, 47, 50, |
| conclusions ... 84 | crimp ... 9 | depositions ... 22-24, 31 | 49, 51, 52, 60, 67, 70, | 59, 64, 70, 72-74, 80, |
| condition ... 97, 111, 112 | crimps ... 10 | derive ... 38 | 79-81, 85, 89, 91, 112, | 98, 103, 104, 122 |
| conditions ... 114, 115 | criticism ... 88, 89 | derived ... 30 | 116 | expected ... 59 |
| configuration ... 80, 105, | cross ... 9, 47, 49 | descending ... 85 | early ... 12, 16, 23, 45, 58 | expensive ... 86 |
| 106, 111, 113, 114, | crosswise ... 119 | describe ... 27 | easier ... 59 | experience ... 5, 20, 38, 50, |
| 119 | cuff ... 78 | described ... 59, 67, 78 | easy ... 99, 108 | 62, 69, 83, 84, 94, 108 |
| configure ... 75 | CULLEN ... 22, 31, 32, 36, | describes ... 67 | edge ... 68, 76, 78, 79 | experimented ... 19, 20, 34 |
| configured ... 62, 113 | 45, 123 | describing ... 74 | educational ... 4 | expert ... 27, 48 |
| confirm .. 46, 92 | curl ... 42 | description ... 32, 67, 95 | effect ... 62, 63, 69, 70 | expertise ... 3, 4, 30, 88 |
| confirms ... 115 | curling ... 41, 42 | design .. 7, 8, 13, 14, 18, 19, | effort ... 39, 76 | experts ... 36 |
| confused ... 89 | current ... 14, 81 | 28 | eight ... 16, 17, 22, 105, 107, | explain ... 15, 19, 44, 50, 59, |
| connect ... 54, 95, 121 | curriculum ... 4, 28 | designed ... 17, 19, 104, 117 | 120 | 73, 76, 108, 112, 119 |
| connected ... 109, 112 | curse ... 27 | designing ... 13 | eights ... 66, 83 | explained ... 85 |
| connecting ... 114 | customers ... 13, 14 | despite ... 47 | electromechanical ... 16 | explaining ... 76, 108 |
| connection ... 3, 12, 18, 19, | CV ... 4 | detailed ... 105 | elevation ... 21, 107, 109 | explains ... 77 |
| 27, 43 | **D** | determine ... 29, 38-40, 72, | eliminate ... 34 | explanation ... 52, 76, 79, 94, |
| connections ... 20 | damage ... 33, 38, 41, 44, | 101, 104 | eliminated ... 36 | 112 |
| consequence ... 110 | 59, 60, 62, 67, 73, 76, | device ... 12, 16, 78, 83-85 | elimination ... 46 | express ... 90 |
| consider .. 12, 29, 30, 55, | 81, 94, 103 | diagram ... 56, 57, 89 | Elite ... 23, 86 | expressed ... 27, 95 |

| Word ..... Page | Word ..... Page | Word ..... Page | Word ..... Page | Word ..... Page |
|---|---|---|---|---|
| extend ... 64, 67 | fix ... 8 | 26, 27, 32, 38, 42, 46, | heard ... 24 | illustrate ... 26 |
| extended ... 64, 74 | fixed ... 12, 86 | 49, 51, 54, 56, 58, 64, | heaters ... 14 | impact ... 43, 92 |
| extents ... 51 | flat ... 42, 65, 66 | 67, 69, 72, 74, 83, 86, | heavier ... 63 | implies ... 110 |
| extra ... 63 | flew ... 114 | 92, 98, ... 99, 102, 105, | heavy ... 11, 34 | important ... 31, 55, 97 |
| eye ... 7, 99 | flight ... 42 | 106, 110, 111, 113, | heck ... 95 | impractical ... 85 |
| **F** | flip ... 21, 68, 75 | 116-119, 123 | heel ... 65 | impression ... 38 |
| fabrication ... 13 | flipped ... 41, 69 | gets ... 111, 115 | height ... 73, 83, 104 | Improper ... 7 |
| face ... 39 | fly ... 69, 71, 83, 113 | give ... 17, 21, 34, 38, 50, | held ... 110 | impropriety ... 88 |
| facing ... 81, 82 | focusing ... 49 | 54, 79, 96, 119 | help ... 17 | impulse ... 64, 67 |
| factory ... 99 | fold ... 73 | given ... 30, 60 | helpful ... 49 | inch .. 22, 65, 66, 83, 109, |
| factually ... 37 | folded ... 63 | glove ... 77 | hesitate ... 52 | 116 |
| failed ... 5, 71 | folks ... 14, 47 | go ... 3, 5, 12, 16, 20, 21, 25, | high ... 4, 106 | inches ... 22, 50, 57, 63, 64, |
| fails ... 50 | follow ... 5, 18, 71, 90 | 26, 29, 35, 37, 40, 45, | higher ... 93, 120 | 103, 107, 109, 120 |
| failure ... 11 | followed ... 88 | 72, 93, 100, 105, 107, | highly ... 85 | incidence ... 44 |
| fair ... 21, 78, 88, 95, 99, | following ... 119 | 108, 122, 123 | hinge ... 64, 65 | incoming ... 13 |
| 115, 119 | follows ... 3, 25 | going ... 3, 8, 12, 17, 22, 24, | hired ... 17, 52, 53 | inconsistent ... 52 |
| fairly ... 8, 10, 11, 15, 29, 34, | foot ... 9, 62, 74, 75, 79, | 34, 35, 40-43, 48, 51, | history ... 12 | incorporated ... 8 |
| 36, 39, 86, 99, 104, | 100, 120 | 67, 68, 78, 79, 81, 82, | hit ... 36, 37, 60, 61, 68, 74, | increase ... 9 |
| 108, 109 | force ... 15, 34, 44, 67-69, | 84, 96, 103, 107, 108, | 75, 91, 102, 104 | independently ... 64 |
| fall ... 10, 12, 36, 37, 59-62, | 76, 80, 92, 97-100, | 113, ... 115 | hitch ... 8, 18 | index ... 22 |
| 70-74, 78, 79, 83-85, | 112 | gone ... 16, 21 | hits ... 73, 74 | indicated ... 57, 60, 89-91, |
| 88, 92, 100, 102, 110, | forces ... 67, 99, 104, 117 | good ... 24, 35, 36, 51, 61, | Hitting ... 37 | 94, 95, 118 |
| 114, 115 | Ford ... 3, 4, 123 | 62, 87, 108, 109, 123 | Hodge ... 5 | indication ... 34, 50, 58 |
| fallen ... 34, 72 | forensic ... 16, 28 | grab ... 77-79, 108, 121 | Hodges ... 5, 6, 21, 23, 95 | indications ... 58 |
| falling ... 34, 39, 63, 73, 74, | form ... 21, 25, 32, 65 | grabbing ... 78 | hold ... 18, 25, 32, 46, 47, | indistinguishable ... 53 |
| 78, 103 | formed ... 99 | grade ... 6 | 78-80, 103, 106-109, | industrial ... 14 |
| falls ... 71 | former ... 16 | graduated ... 4, 62 | 119-121 | Industries ... 14 |
| familiarity ... 32 | formulate ... 44, 46, 52 | graduation ... 12 | holding ... 42, 69, 71, | industry ... 13 |
| family ... 13 | forth ... 36 | Grand ... 5 | 107-109, 119 | inertia ... 68 |
| far ... 36, 53, 93, 96 | forward ... 28, 67 | grass ... 10 | holds ... 33, 116 | inevitable ... 42 |
| fashion ... 25, 35, 36, 40, 50, | found ... 10, 23, 47, 95, 96, | gravity ... 63, 107 | hole ... 9 | inherent ... 9 |
| 63, 74, 78, 111, 121 | 103, 119 | Green ... 30, 33, 61, 70 | holes ... 8, 20 | inhibit ... 79 |
| fault ... 16, 37 | four ... 5, 16, 19, 22, 39, 57, | grip ... 6 | hollow ... 6 | initial ... 10, 47, 89 |
| faulty ... 7 | 60, 117, 118 | gross ... 103 | homemade ... 19 | initiating ... 44 |
| favor ... 24 | fracture ... 38-41, 94 | ground ... 6, 10, 13, 21, 33, | hook ... 9, 10, 33, 34, 36, 37, | Inline ... 63, 64, 74, 78, 92, |
| faxed ... 86 | fractured ... 32, 44, 54 | 36-38, 43, 59-63, 67, | 39, 43-52, 55-59, 66, | 117 |
| Fayetteville ... 4 | frame ... 33, 38, 41, 43, 47, | 72-75, 79, 91-94, 100, | 69, 70, 77, 80-83, 91, | inside ... 23, 55, 64, 81, 82, |
| feature ... 34 | 49, 51, 56, 62-67, 69, | 103, 106, 109, 120 | 94-101, 104-119, 121, | 119, 122 |
| February ... 5, 19, 47, 123 | 73, 75, 78, 80-83, 92, | growing ... 15 | 122 | insignificant ... 98 |
| feed ... 7, 33 | 100, 101, 106, 110, | guess ... 3, 18, 21, 30, 43, | .. hooked 14, 34, 44-52, | insist ... 59 |
| feel ... 6, 56, 77 | 113, 114, ... 116, 119, | 44, 49, 60, 63, 78, 86, | 54-59, 77, 78, 82, | install ... 20 |
| feeling ... 107 | 121, 122 | 97, 99, 115, 120, 121 | 87-91, 95, 117-119 | installation ... 118, 120 |
| feet ... 60, 62, 64, 69, 70, 72, | free ... 99 | guessing ... 24 | hooking ... 36, 46, 52, 54, | installed ... 44, 78, 81 |
| 73, 78, 79, 93, 102 | freely ... 63 | guide ... 112, 113 | 55, 57, 90, 91, 95, 116 | instructional ... 87 |
| fell ... 6, 10, 11, 33, 88, | friction ... 71 | guys ... 95, 119, 123 | hooks ... 23, 71, 98, 99, 117 | instructions ... 23, 57, 83, |
| 102-104 | friend ... 19 | **H** | hoop ... 72 | 85-91, 95, 109, 118 |
| fellow ... 11, 32, 53 | front ... 5, 34, 35, 46, 47, | habit ... 21 | hope ... 96 | insufficient ... 7 |
| felt ... 28 | 49, 51, 52, 54, 55, 57, | half ... 8, 18, 63, 64, 100 | Hopefully ... 77 | insurance ... 15-17 |
| fiber ... 65, 86 | 58, 61, 69, 75, 81, 82, | hand ... 77, 78, 107-109, | horizontal ... 42 | insures ... 16 |
| field ... 28, 29 | 86, 87, 89-91, 100, | 119-121 | hours ... 123 | intact ... 113 |
| figure ... 43, 52, 87, 89, 95, | 102, 106, ... 115, 116 | handcuffs ... 6 | Howard ... 3 | intend ... 79 |
| 118, 122 | full ... 26 | handed ... 109 | hundred ... 22, 26, 27 | intent ... 57 |
| figured ... 46 | fully ... 106, 117, 122, 123 | handful ... 107 | hunt ... 19 | interest ... 59 |
| figuring ... 43 | further ... 52, 67 | handle ... 29 | hunter ... 19, 35, 67, 74 | interesting ... 33, 37, 50 |
| file ... 21, 22, 24, 26 | furthest ... 35 | handled ... 64 | hunters ... 5, 92, 93 | internal ... 15 |
| film ... 27 | **G** | handling ... 13 | hurt ... 17 | Internet ... 23 |
| final ... 41, 42, 96, 97, 104, | gap ... 83, 97, 98, 106, 110, | hands ... 107, 108, 121 | hypotheses ... 46, 52 | interview ... 26, 30, 32 |
| 109, 118, 122 | 111, 114-116 | handwriting ... 22 | hypothesis ... 34, 43, 44, 46, | interviewed ... 26 |
| find ... 23, 27, 43, 52, 58 | garage ... 16 | handwritten ... 26 | 50, 52, 76 | investigated ... 71 |
| fine ... 38 | Gary ... 23 | handy ... 27 | hypothesizing ... 67, 68 | investigation ... 16, 17 |
| fire ... 16 | gas ... 13, 14, 16 | hang ... 11, 12, 20, 71, 72, | hypothetical ... 79 | Investigations ... 15 |
| fires ... 77 | gauge ... 99 | 106, 107 | hypothetically ... 60 | investigator ... 16 |
| firmly ... 77, 117 | gave ... 43 | hanging ... 107 | **I** | involve ... 77 |
| first ... 3, 10, 12, 16, 21, | general ... 4, 29, 40, 68, 92 | happening ... 102, 119 | ideally ... 108 | involves ... 15 |
| 25-27, 33, 34, 38, 41, | generally ... 92 | happy ... 76 | IDENTIFICATION ... 5 | inward ... 39, 41 |
| 51, 53, 56, 60, 73-75, | generated ... 22, 54 | hard ... 17, 59, 78, 85 | identifies ... 16 | Ironically ... 28 |
| 80, 96, 100, 104, 111, | gentleman ... 9, 87 | heading ... 57 | ignoring ... 43 | irons ... 65, 66 |
| 115 | gently ... 48 | health ... 30 | II ... 23, 86 | irrelevant ... 44 |
| five ... 13, 16, 64, 65 | get ... 4, 7, 8, 12, 23, 24, | hear ... 69 | illegible ... 105 | issue ... 6, 7, 11, 33, 39, 44, |

| Word ...... Page | Word ..... Page | Word ...... Page | Word ....... Page | Word .... Page |
|---|---|---|---|---|
| 55 | licenses ... 29 | manufactured ... 19 | 102, 103, 107, 114, | Orbit ... 13 |
| issued ... 31 | lifting ... 117 | manufacturer ... 7, 13, 18 | 115, ... 117 | order ... 25, 30, 62, 67, 73 |
| issues ... 11, 31, 36 | light ... 103 | manufacturing ... 97, 98 | multiples ... 121 | oriented ... 42, 54, 74 |
| item ... 8, 21, 25 | lighter ... 55, 99 | many ... 13, 17, 21, 47, 60, | **N** | origin ... 16 |
| items ... 22, 25 | liked ... 28 | 71, 92, 93, 104, 105 | named ... 53 | original ... 1, 14, 22, 31, 45, 47, |
| **J** | likelihood ... 11 | March ... 22, 31, 47 | natural ... 14 | 48, 52, 56, 82, 97 |
| Jack ... 13-16 | limited ... 12, 51, 80 | mark ... 4, 49, 55, 81 | naturally ... 121, 122 | originally ... 90 |
| James ... 22, 31 | line ... 10, 28, 64, 91 | MARKED ... 5 | near ... 16, 121 | Otherwise ... 24, 28, 93 |
| January ... 5, 93, 96, 99, 110, | link ... 7-9 | marketing ... 14 | necessary ... 28, 50, 73 | Ouachita ... 4 |
| 117-119 | links ... 8, 18 | marking ... 55 | needed ... 62, 95, 98 | outboard ... 92 |
| Jay ... 31 | list ... 4, 21, 25, 29 | markings ... 45, 47 | needing ... 23 | Outdoors ... 5 |
| job ... 76 | listed ... 21, 25, 26 | marks ... 45, 47-49, 52-56, | neglected ... 16 | outward ... 41, 42 |
| joint ... 28 | listening ... 37 | 82 | neither ... 46 | overhead ... 14 |
| judge ... 96 | literally ... 82 | mask ... 123 | net ... 39 | overseeing ... 13 |
| July ... 5 | litigated ... 19 | match ... 41, 54, 106, 110, | new ... 52, 76, 112 | Overstreet ... 5, 6, 12, 18, 20 |
| **K** | litigation ... 4, 15, 17-19, | 114, 115 | nobody ... 72 | overwelding ... 27 |
| keeper ... 59, 117 | 49, 50 | matching ... 112 | normal ... 99 | own ... 19, 21, 26, 43, 106, |
| knees ... 120 | load ... 11, 39-42, 48, | material ... 21, 41, 42, 91 | Norman ... 31 | 114 |
| knowing ... 37 | 67-69, 76-79, 99, 101, | materials ... 4, 5, 8, 30 | nose ... 74 | owned ... 13 |
| knowledge ... 29, 30 | 122 | Math ... 4 | Notary ... 3 | Oxford ... 21, 30, 32, 33, 36, |
| known ... 81, 114 | loaded ... 39, 59, 63, 100, | matters ... 17 | note ... 25, 81, 84 | 43-45, 56, 59-62, 67, |
| **L** | 117, 122 | meaningful ... 95, 97 | noted ... 47, 89, 102, 114 | 69-73, 83, 84, 88-90, |
| lab ... 28 | loading ... 36, 58, 104, 109, | means ... 3, 85, 94, 95 | notes ... 22, 24, 26, 56-58, | 95, 112, 116-118 |
| Laboratories ... 31 | 122 | meant ... 85 | 100, 105 | **P** |
| laborious ... 39 | loads ... 39, 58 | measure ... 103 | noteworthy ... 58 | P.E. ... 3 |
| ladder ... 5, 9-12, 20, 83-85, | local ... 13, 14 | measured ... 68 | notice ... 8, 22, 89, 103 | p.m. ... 123 |
| 107, 108 | located ... 95 | measuring ... 64 | notion ... 36, 81 | package ... 4 |
| ladders ... 9 | locations ... 40 | Mechanical ... 4, 11, 15, 16, | November ... 47 | paid ... 19 |
| laid ... 50, 81 | locator ... 23 | 28, 29, 94 | nuclear ... 29, 30 | paint ... 81 |
| land ... 60, 62, 64, 67, 70-75, | locking ... 20 | mechanism ... 33, 54, 55, 64, | numbers ... 17, 81 | pair ... 110, 114 |
| 102 | logical ... 69 | 96 | nuts ... 38 | parallel ... 62, 63 |
| landed ... 59-61, 67, 72, 74, | long ... 9, 13, 14, 62, 87 | meet ... 14 | **O** | parked ... 16 |
| 102, 103 | longer ... 7, 23 | meeting ... 57 | Oak ... 5, 6, 18 | particularly ... 41, 63, 106 |
| landing ... 61, 73, 74, 91 | look ... 16, 24, 39, 41, 45, | member ... 49, 69, 81, 83, | object ... 63 | partner ... 14 |
| lands ... 74 | 48, 50, 53-56, 64, 66, | 100, 106, 110, 111, | Objections ... 24 | parts ... 65, 92 |
| large ... 8, 108 | 76, 82, 83, 88, 89, 97, | 113, 122 | occasion ... 20 | pass ... 8, 24, 116, 123 |
| larger ... 7 | 118 | members ... 64, 66, 67 | occasions ... 60, 111 | past ... 81 |
| Larry ... 31 | looked ... 38, 41, 45, 46, | memory ... 61 | occur ... 62, 75 | path ... 72 |
| latch ... 34, 83, 94, 101, 106, | 50, 54, 66, 98 | mentions ... 47 | occurred ... 39, 40, 58, 62, | pegs ... 100 |
| 110-117, 122 | looking ... 5, 38-40, 44, 47, | merely ... 115 | 67, 88, 100, 102, 115 | people ... 29, 49 |
| late ... 12 | 53-55, 58, 61, 62, 83, | mess ... 78 | October ... 15, 21, 23, 56, 83 | perceive ... 11 |
| later ... 25, 28, 38, 57, 58, | 86, 95, 111, 119 | metal ... 42, 43, 53, 64, 112 | odd ... 73 | percent ... 15-17, 24, 42, 60, |
| 81, 106 | loop ... 9, 99 | metallurgical ... 28, 31 | offer ... 29, 52 | 77, 110 |
| leaned ... 72 | loose ... 10, 46, 52, 121 | metallurgist ... 42, 47, 53 | offered ... 30, 32 | percentage ... 15-17 |
| leaning ... 72 | loss ... 15 | Metallurgists ... 31, 32, 45 | office ... 14, 23, 102 | perfectly ... 56, 92 |
| learned ... 28, 30 | losses ... 15 | metallurgy ... 28, 29 | often ... 17, 26, 77, 82, 106 | perform ... 97 |
| leaving ... 13, 14, 99 | lot ... 15, 18, 27, 59, 92, 93, | metals ... 30 | oil ... 13 | performed ... 13, 106 |
| left ... 10, 16, 34, 35, 42, 47, | 95, 97, 111 | method ... 5, 7, 90, 119 | Oklahoma ... 31 | perhaps ... 72, 73, 79 |
| 60, 61, 67, 68, 70, 72, | Louis ... 31 | methods ... 6 | one ... 5, 7, 9, 11, 16-20, 23, | permanently ... 33 |
| 81, 82, 96, 102, | low ... 123 | mine ... 19 | 27-29, 31, 33, 34, 40, | person ... 14, 31, 63, 72, 74, |
| 107-109, 119-121 | lower ... 67, 82 | misleading ... 89 | 41, 43, 45-47, 51, | 79 |
| legal ... 29, 95 | lumber ... 14 | miss ... 106 | 54-56, 58, 62, 65-67, | personal ... 32 |
| legalities ... 29 | lump ... 22 | missed ... 114 | 69-71, 73, ... 77, 78, | personally ... 29 |
| legally ... 29 | Lynwood ... 23 | missing ... 25 | 82, 84, 86-88, 91, 93, | perspective ... 61 |
| legs ... 10, 11, 18, 89 | **M** | mistakenly ... 90 | 95-97, 100, 107-109, | Peter ... 3, 22, 123 |
| Lentini ... 3, 5, 22, 25, 31, | machine ... 13 | misunderstood ... 32, 57 | 111, 112, 114 | petroleum ... 13 |
| 32, 36, 45, 123 | main ... 58 | MODELEVSKY ... 24 | ones ... 55 | phone ... 26, 30, 89 |
| lettering ... 8 | mainly ... 14 | modifications ... 18, 110 | online ... 23 | photo ... 54, 111 |
| letters ... 24 | majority ... 17 | modified ... 18, 20 | open ... 97-99 | photocopied ... 55 |
| level ... 13, 21, 59, 62, 109, | make ... 7, 21, 22, 29, 30, | money ... 16 | opening ... 8 | photograph ... 27, 50, 55, 81, |
| 120 | 43, 59, 77, 83, 86, 96, | morning ... 3, 27 | opinion ... 3, 11, 12, 30-33, | 87, 110, 111, 113, 118 |
| lever ... 62, 64 | 111, 116, 117 | motions ... 23 | 36-38, 46, 62, 84, 85, | photographs ... 22, 25-27, |
| leverage ... 11 | making ... 7 | motorcycle ... 7-9 | 88, 94, 117 | 31, 32, 45, 47, 49, 50, |
| levered ... 69 | man ... 20, 23, 32, 78, 79, | mounted ... 32, 33 | opinions ... 12, 21, 25, 27, | 53-55, 81, 103, 114, |
| levering ... 87 | 86, 104, 122 | move ... 122, 123 | 37, 88 | 118 |
| Lewis ... 27, 36 | managed ... 123 | moved ... 12, 110 | opposed ... 74 | photography ... 27 |
| license ... 62 | manager ... 14 | much ... 6, 7, 15, 18, 24, 28, | opposing ... 6 | photos ... 24, 54, 97 |
| licensed ... 15 | manual ... 87 | 35, 36, 57, 59, 62, 63, | opposite ... 40, 58 | phrase ... 85, 95 |
| | manufacture ... 14 | 68, 70, 71, 74, 80, 93, | | physical ... 84, 117 |

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|

physically ... 9
picture ... 55, 58, 113
pictures ... 26, 53, 54, 87, 109
piece ... 4, 16, 28, 31, 42, 66, 73, 80, 99, 116
pieces ... 6, 64, 71, 76
pile ... 24
pin ... 8, 20
pins ... 18
piping ... 14
pitch ... 7
Pivot ... 28, 64, 68, 79, 121
pivoting ... 68, 69
pivots ... 64
place ... 34, 37, 39, 48, 109, 111, 113, 116, 117, 119, 120, 123
places ... 49, 71
plain ... 86
plainly ... 45
plaintiff ... 17, 26, 37, 38, 61, 77
planning ... 96
plant ... 29, 30
plastic ... 6
plate ... 48, 82, 83, 100, 102, 111, 113, 117-119, 122
plates ... 118
platform ... 9, 11, 37, 63-65, 69, 70, 74, 75, 77, 79, 102-104, 120
play ... 59
playing ... 48, 49
pliers ... 110-115
pocket ... 78
pointed ... 34, 57, 89
pointing ... 41, 48, 62, 78, 89, 91
points ... 28, 117, 118
pole ... 32, 47, 53
polypropylene ... 6
popped ... 99
pops ... 70, 113
portion ... 88
portions ... 58
position ... 12, 15, 36, 42, 58, 64, 67, 69, 74, 75, 81, 83, 86, 92, 101, 106, 112, 119, 121-123
positioned ... 56
positions ... 34
positively ... 60
possibilities ... 34
possibility ... 46, 72, 77, 79
post ... 52
pound ... 70, 78, 79, 100, 102, 104, 122
pounds ... 63, 80, 100, 103, 104
power ... 7-9, 29, 30
practical ... 12
practice ... 9, 89, 93, 116
pre ... 4
precise ... 114, 115
Precisely ... 37, 92, 117
preclude ... 36, 46
predict ... 70, 71
preliminary ... 21, 53, 80, 81,

84
premise ... 43, 59
preparation ... 25
preparing ... 25
present ... 76, 83
presented ... 8, 32
presumably ... 104
prevented ... 8
previous ... 4, 11
pried ... 97, 98
principles ... 28
print ... 27
printed ... 26
Printout ... 23
printouts ... 23
prior ... 5, 11
problem ... 7, 27, 34
procedure ... 120
proceed ... 5, 22, 40
processes ... 46
produce ... 67, 82, 104
produced ... 96, 116
producing ... 105
product ... 14, 19, 87, 118
production ... 23, 86, 119
professional ... 15, 62
professors ... 28
program ... 4
prone ... 6
proof ... 75
propel ... 70
propelled ... 72
propelling ... 63
proper ... 12, 72, 90
property ... 15
propose ... 77
propriety ... 88
protecting ... 98
protection ... 12, 83-85
protruded ... 100
proved ... 36
provide ... 13, 34, 64, 68, 92
provided ... 86, 116
provider ... 14
providing ... 67
pry ... 98
Public ... 3, 30
pull ... 4, 45, 77, 121
pulled ... 80
pulling ... 78
pumping ... 13
pumps ... 13
purely ... 28
push ... 51, 67, 68, 101, 112, 122
pushed ... 34, 51, 68, 80, 81, 103, 111, 112, 116, 117, 122
pushes ... 51
pushing ... 76, 92
putting ... 14, 40, 78, 107

**Q**

qualified ... 3, 12, 29
qualify ... 68
quantify ... 98
quarter ... 65, 116
quick ... 118
quote ... 15, 29

**R**

R.J. ... 53
rachet ... 9, 10, 33
rack ... 66, 67
racked ... 66
racket ... 85
racking ... 41, 43, 67, 104
radial ... 55
rails ... 9, 10
raise ... 62
ramifications ... 30
ran ... 13, 17, 40, 103
range ... 99
ratchet ... 55, 56, 58, 69, 98, 99, 101, 106-108, 111, 112, 115-117, 119, 121
ratcheting ... 10, 51, 54, 96, 97, 119, 121
rather ... 3, 22, 63, 101, 116
reach ... 83, 108, 109, 121
reached ... 109
Reaching ... 108
realize ... 28
realized ... 28, 90
rear ... 47, 48, 50, 51, 57, 70, 101
reason ... 19, 43, 58, 69, 84
reasonable ... 24, 33, 72, 94
reasons ... 46, 70
recalled ... 91
recalls ... 57, 60, 91
receive ... 30
received ... 27, 96
recently ... 31, 61
recognize ... 28, 29
recommendations ... 18
recommended ... 7
recommending ... 7
reconsider ... 59
reconstruct ... 92, 115
reconstructed ... 92
reconstructing ... 62
Reconstruction ... 15
recorded ... 60
records ... 52
reduce ... 9
reduced ... 83, 110, 116
Reese ... 5, 9, 18
references ... 30
referred ... 27, 45, 81
refers ... 112
register ... 23
relative ... 70
release ... 36, 39, 43, 44, 50, 94, 104, 109, 114, 121
released ... 6, 8, 9, 34, 37, 43, 63, 85, 104, 110, 114
relevance ... 44
reliable ... 61, 73
reliably ... 47
remain ... 33, 105, 106, 109
remained ... 10
remove ... 33
render ... 12, 62
rendered ... 12, 38, 85
rendering ... 88
repeated ... 60, 104, 109
repeatedly ... 60

replicate ... 78
report ... 21, 22, 25, 26, 31, 34, 45-48, 51, 53, 57, 80-86, 89, 91-93, 95-97, 99, 100, 103, 104, 109, ... 110, 113, 114, 117-119, 122
reporter ... 22, 123
reports ... 5, 21, 22, 24-27, 31, 35, 36, 46, 47, 51
reproduction ... 119
request ... 23, 86
requests ... 13
required ... 3
requirements ... 14, 83
researched ... 6
resembles ... 8, 118
reside ... 50
response ... 48, 55, 86, 119
responses ... 23
resting ... 82
result ... 17, 54, 94, 101, 109, 110, 115, 119
resulted ... 114, 115
results ... 105
resume ... 22
reveals ... 100
reviewed ... 25, 27
reviewing ... 25
rip ... 11
ripped ... 42
Rock ... 12, 53
rod ... 66
roll ... 27
roller ... 7, 8
Rom ... 114
room ... 62
rope ... 6, 7, 18
rotate ... 11, 50, 51, 69, 75, 77, 78, 80, 83, 106, 107, 119
rotated ... 73-75, 82, 101
rotates ... 68, 75, 82, 113
rotating ... 51, 74, 75, 80, 101
rotation ... 75, 80
rotational ... 68, 81
round ... 45
rounds ... 45
rubbing ... 82
run ... 119
running ... 13, 107

**S**

safety ... 11, 12, 83, 84, 88, 102
sale ... 8
sales ... 13, 15
samples ... 28
sand ... 36, 39, 100, 102-104
sat ... 59
satisfied ... 52
saw ... 30, 31, 33, 38, 47, 53, 60, 81, 86
sawhorse ... 53, 54
scanty ... 77
scenario ... 37, 38, 60, 73, 78, 94
scenarios ... 34
schedule ... 4

scheduling ... 23
school ... 4, 28
schooling ... 94
scientist ... 76
scope ... 88
scratch ... 18, 83
scratches ... 82
scratching ... 81
seat ... 33, 36-40, 42-44, 55, 57, 58, 62-64, 66, 67, 69, 70, 72-74, 77, 79, 82, 87, 91, 92, 94, 100, 102-104, ... 120, 122
seated ... 35, 116, 117, 121-123
seating ... 69
second ... 14, 16, 21, 25, 31, 45, 47, 87, 90, 91, 96, 103, 114
seconds ... 23
sectional ... 9
sections ... 5, 9, 49, 71
secure ... 10, 28
secured ... 9
securing ... 5, 10
see ... 7-9, 12, 16, 17, 21, 22, 24, 26, 30-32, 36, 38, 41, 43-45, 49-54, 56, 59, 60, 62-64, 66, 67, 70, ... 76, 78, 80-83, 86, 88-90, 92, 98, 100, 102, 105, 109-114, 116-119, 122
seeing ... 61
seen ... 24, 28, 31, 32, 41, 49, 60, 62, 80, 83, 85, 86, 100, 109
selected ... 26
sell ... 87
semester ... 28
sending ... 21
senior ... 13
sent ... 21, 86, 96, 119
separate ... 22, 29
separated ... 10, 11, 17, 74
separation ... 11
September ... 5
series ... 3
service ... 13, 41
set ... 4-6, 23, 31, 45, 49, 87
sets ... 85
settled ... 33
seven ... 14, 16, 17
several ... 14, 22, 26, 41, 54, 67, 85, 87, 122
shape ... 97, 110, 113
shaped ... 110, 114, 115
shaping ... 114
shared ... 30
sharp ... 92
sharply ... 67
sheer ... 39
sheet ... 52, 55
shelf ... 8
shock ... 41
shop ... 13
shove ... 79
show ... 36, 37, 47, 50, 59, 62, 64, 89

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|
| showed ... 19, 36 | 112, 117 | substantial ... 70, 80, 99, 104 | th ... 99 | transcript ... 59 |
| showing ... 36, 47, 75, 87 | springiness ... 63, 70 | substantially ... 25, 96, 115 | theories ... 34 | transcripts ... 30, 32 |
| shown ... 37, 102, 111, 117, | springing ... 92 | sued ... 16 | theory ... 52, 73 | transfer ... 44 |
| 118, 122 | sprocket ... 9 | suffered ... 59 | THEREUPON ... 3 | transmission ... 7-9 |
| shows ... 36, 38 | spun ... 74 | sufficient ... 6, 64, 77 | these ... 3, 8, 14, 17, 19, 29, | transmitted ... 76 |
| side ... 9, 11, 34, 35, 37, 40, | square ... 64, 116 | suggests ... 81 | 36, 47, 52-55, 64, 65, | transmitting ... 9 |
| 42, 50, 51, 58, 67-69, | St ... 31 | sum ... 16 | 67, 86, 88, 98, 99, 103, | transportability ... 9 |
| 74, 75, 79-81, 87, 89, | stack ... 24 | summarized ... 91 | 114, 117, 123 | tree ... 3, 5-12, 17-21, 23, 25, |
| 101, 108, 111, 112, | stacked ... 39 | sunk ... 10, 11 | thick ... 22 | 32-40, 42, 44-47, 50, |
| 115-117, ... 122 | stand ... 3, 5, 7-12, 17-21, | supplemental ... 21, 22, 25, | thickness ... 99 | 51, 53, 54, 56, 58-63, |
| sieged ... 34 | 23, 25, 30-40, 42, | 34, 45, 47, 95, 96, 103, | Thomas ... 23 | 65, 66, 70-73, 75-80, |
| significant ... 34, 85, 97, 122 | 44-51, 53-67, 70-78, | 118 | threading ... 121 | 82, ... 84-89, 91-94, 96, |
| similar ... 7, 34, 96, 99, 103, | 80-96, 98, 100-111, | supplementary ... 31, 47 | three ... 4, 6, 9, 13, 16, 19, | 101, 103-109, 111, |
| 115, 118 | 113-117, 119-123 | supplied ... 55 | 22, 43, 57, 60, 62-66, | 113, 115, 117-123 |
| simple ... 59, 97 | ... standard 8 | supply ... 53 | 83, 105, 108, 116, 123 | trial ... 5, 96 |
| simply ... 3, 7, 9, 46, 68, 69, | standing ... 61, 102, 104, | support ... 21, 33, 78, 81 | threw ... 93, 109 | trimming ... 28 |
| 75, 76, 92, 99 | 107, 120 | suppose ... 38, 44, 49, 60, | throw ... 63, 70, 93, 108 | truth ... 3, 72 |
| single ... 21, 75 | stands ... 4-6, 8, 18, 20, 23, | 71, 77, 85, 93 | throwing ... 108 | tube ... 38, 40-44, 54, 55, 58, |
| sit ... 19, 20, 25, 40, 42, 43, | 71, 86 | surface ... 39, 40 | thrown ... 40, 42, 63 | 66, 74, 78, 82, 101, |
| 52, 54, 63, 72, 79, 115 | start ... 22, 29, 93, 112, | surprise ... 73 | tie ... 43 | 103 |
| site ... 23 | 120-122 | survey ... 72 | tied ... 15, 78 | tubes ... 58, 62, 66, 77, 102 |
| sits ... 63 | started ... 13, 40, 41, 79, | suspect ... 36 | tight ... 51, 80, 106, 116, | tubing ... 28-30, 64, 116 |
| sitting ... 35-40, 42, 53, 54, | 120, 121 | swapped ... 121 | 119, 121, 123 | turn ... 43, 67, 71 |
| 69, 70, 102 | Starting ... 65 | Swindoll ... 22, 31, 53 | tighten ... 111, 117, 123 | turned ... 91 |
| situation ... 74, 92, 98 | state ... 3, 44, 62, 100 | swing ... 64 | tightened ... 106, 112, 115, | turns ... 22, 96 |
| situations ... 69 | statement ... 60, 61, 95, 98, | switch ... 107 | 116, 122 | twice ... 96 |
| six ... 16 | 112, 113, 115 | switched ... 27 | tightening ... 101, 108 | twist ... 101 |
| sixteenth ... 65 | statements ... 30, 31, 73 | switching ... 119 | tighter ... 117 | twisted ... 103 |
| size ... 9, 109 | stay ... 101, 123 | sworn ... 3, 60 | tightly ... 72 | twists ... 45, 103 |
| sizes ... 13, 65 | stayed ... 105 | swung ... 121 | Tile ... 14 | two ... 4, 10, 14, 16, 27, 43, |
| sketch ... 90 | stays ... 116 | system ... 13, 33, 34 | Tim ... 23 | 55, 58, 63, 64, 66, 67, |
| sketched ... 90 | steel ... 13, 66, 76, 116 | systems ... 13, 14 | time ... 10, 11, 14, 15, 23, | 71, 79, 98, 118, 122 |
| sketches ... 22 | step ... 78, 101 | | 26-28, 45, 56, 57, 63, | Tyler ... 13, 15, 16 |
| skills ... 29 | stepping ... 12, 84 | **T** | 76, 79, 88, 90, 93, 95, | types ... 29 |
| slack ... 107 | stick ... 20 | table ... 94, 123 | 97, 106, 108-110, 112, | |
| Slam ... 5 | sticking ... 39 | tail ... 121 | 114, ... 115, 121, 122 | **U** |
| slide ... 58, 100, 101, 106, | sticks ... 5, 6, 12, 18, 20, | tailgate ... 53 | times ... 10, 16, 17, 21, 25, | ultimate ... 114 |
| 121, 123 | 74, 75 | tails ... 77 | 26, 41, 60, 77, 83, 93, | umbrella ... 29 |
| sliding ... 99 | stitching ... 10, 11 | taking ... 3, 72, 75, 120 | 100, 102, 104-106, | unattached ... 34 |
| slightly ... 60 | stop ... 36 | tall ... 10 | 113, 121, 122 | uncertain ... 90, 95 |
| slip ... 9, 10, 99, 121 | stops ... 69 | tang ... 50, 51 | tiny ... 65 | uncertainty ... 90, 95 |
| slipped ... 69, 81 | story ... 33 | Tara ... 23 | tip ... 41, 51, 64, 73-75, | underneath ... 49, 56, 66, 72 |
| slips ... 51 | stout ... 104 | tear ... 42 | 81-83, 92, 97, 99, 106, | undersigned ... 3 |
| slow ... 22 | straight ... 35, 39, 62, 68, | Tech ... 31 | 111, 119, 122 | understood ... 9, 29, 52, 95, |
| small ... 8, 15, 109 | 70, 72, 74, 75, 79, | Technical ... 15, 28 | title ... 32, 86 | 99, 104 |
| smaller ... 114 | 123 | technique ... 9 | today ... 19, 21, 25, 34, 36, | undone ... 6 |
| Smith ... 34, 46 | strap ... 9-11, 33, 34, 47, | telephone ... 26 | 40, 43, 52, 54, 72, 79, | unexplainable ... 77 |
| snagging ... 109 | 51, 69-71, 80, 85, 93, | telling ... 25, 112 | 94, 96, 102, 115 | unhook ... 46, 92 |
| snapped ... 69, 117 | 94, 97-99, 101, 106, | tells ... 38, 75, 76, 89, 112, | Tommy ... 36 | unhooked ... 74, 102 |
| snapping ... 69 | 107, 111, 112, | 117, 122 | took ... 4, 37, 50, 72, 73, 79, | units ... 7 |
| snaps ... 117 | 115-117, 119, 123 | temporarily ... 11 | 110, 113, 114 | University ... 4 |
| soil ... 11 | ... strapped 72, 77, 79 | ten ... 15, 24, 103, 105, 106 | top ... 6, 9-11, 43, 49, 55, 56, | unknowns ... 92 |
| sold ... 97 | strength ... 36, 65 | tendency ... 6 | 61, 65, 66, 68, 71, 72, | unless ... 69, 108 |
| somewhat ... 28, 42, 58, 63, | stresses ... 39 | tension ... 69, 112, 117 | 82-85, 100, 102, 103, | unlikely ... 85 |
| 65, 66 | strike ... 67, 68, 113 | tenure ... 16 | 107-109, 114 | unreliable ... 43 |
| sorts ... 13 | striking ... 68, 94 | term ... 28-30, 85 | tops ... 10 | unseated ... 122 |
| sound ... 18, 69 | strong ... 36 | terminology ... 101 | torsion ... 39 | unsupportable ... 74 |
| sounded ... 90 | struck ... 67 | Terra ... 86 | torsional ... 39, 40 | unwittingly ... 3 |
| sounds ... 24, 61 | structure ... 16 | test ... 92, 95, 103, 115, 122 | toss ... 93 | unwrapping ... 70, 71 |
| space ... 74, 75 | struggle ... 121 | testable ... 92 | total ... 16 | upper ... 71 |
| spaced ... 49, 56 | studied ... 28 | tested ... 41, 80 | touch ... 11, 28, 74, 118 | ups ... 5, 55 |
| special ... 99 | studies ... 40 | testimonial ... 117 | touched ... 73, 101 | upside ... 67, 74, 75 |
| specialities ... 29 | study ... 28 | testimony ... 4, 11, 12, 43, | touches ... 33, 35, 71, 74 | upward ... 41, 42, 48, 50, 67, |
| specific ... 7, 29, 30 | subcategories ... 29 | 45, 60, 62, 72 | tough ... 123 | 81, 82 |
| speed ... 22 | submitted ... 31, 53 | testing ... 11, 36, 51, 59, 62, | toward ... 67, 68, 78, 100 | usage ... 88 |
| spend ... 15 | subsequent ... 39, 53, 58, | 91, 98-101, 103, 105, | towards ... 63 | user ... 7, 8, 16 |
| splice ... 6, 7, 18 | 99 | 108, 110, 113-115, | town ... 4 | users ... 13, 14 |
| spring ... 8, 34, 48, 50, 51, | subset ... 29 | 117, 118 | toy ... 6 | using ... 7, 9, 11, 44, 83, 92, |
| 59, 70, 72, 106, 110, | subspecialty ... 29 | tests ... 51, 83, 97, 101 | trained ... 13 | 95, 98, 120 |
| | | Texas ... 29 | | utilized ... 6, 9 |

| Word ...... Page | Word ...... Page | Word ...... Page | Word ...... Page | Word ..... Page |
|---|---|---|---|---|
| **V** | 110 | | | |
| valve ... 13 | working ... 14, 16, 18, 28 | | | |
| valves ... 13 | works ... 27 | | | |
| variances ... 97, 98 | worth ... 8, 95 | | | |
| varied ... 15, 121 | worthy ... 85 | | | |
| vehicle ... 16 | wound ... 91, 111 | | | |
| velocity ... 63 | wrapping ... 123 | | | |
| versions ... 8 | write ... 58, 59 | | | |
| versus ... 5, 17 | wrote ... 52, 57, 89, 91 | | | |
| vertical ... 66, 69, 78, 81, 91, | **Y** | | | |
|   100, 106, 111, 113 | year ... 5, 8, 10, 16, 47 | | | |
| via ... 26 | years ... 4, 13-15, 27, 30 | | | |
| vice ... 99 | yours ... 24 | | | |
| View ... 5, 20 | | | | |
| visible ... 83 | | | | |
| voiced ... 88 | | | | |
| vulnerability ... 7 | | | | |
| vulnerable ... 8 | | | | |
| **W** | | | | |
| waist ... 120 | | | | |
| Wait ... 100, 110 | | | | |
| warning ... 7, 8 | | | | |
| warnings ... 7 | | | | |
| watching ... 61 | | | | |
| ways ... 19 | | | | |
| weak ... 8 | | | | |
| weaker ... 28 | | | | |
| weakness ... 9 | | | | |
| wear ... 11, 12, 83, 84 | | | | |
| weave ... 6 | | | | |
| webbed ... 57 | | | | |
| webbing ... 70, 80, 99, 121 | | | | |
| weigh ... 102 | | | | |
| weighed ... 63 | | | | |
| weighs ... 64, 65 | | | | |
| weight ... 11, 21, 39, 64, 65, | | | | |
|   67, 80, 106, 107, 119, | | | | |
|   122, 123 | | | | |
| welcome ... 114, 123 | | | | |
| weld ... 40-42 | | | | |
| welded ... 28, 66 | | | | |
| welder ... 28 | | | | |
| welding ... 27, 28, 36, 47 | | | | |
| Wellington ... 18 | | | | |
| WHEREUPON ... 123 | | | | |
| White ... 5, 6, 18 | | | | |
| whole ... 3, 11, 24, 120 | | | | |
| wide ... 116 | | | | |
| wider ... 75, 97 | | | | |
| width ... 70 | | | | |
| will .. 26, 34, 79, 83, 86, 88, | | | | |
|   96, 123 | | | | |
| WILLIAM ... 3 | | | | |
| winds ... 10 | | | | |
| Windsor ... 14, 16 | | | | |
| wire ... 99 | | | | |
| wish ... 76 | | | | |
| witness ... 45, 57, 73, 123 | | | | |
| witnesses ... 38, 62 | | | | |
| wooden ... 53, 54 | | | | |
| woods ... 9, 37 | | | | |
| word ... 30, 68, 85, 89 | | | | |
| words .. 48, 49, 53, 63, 64, | | | | |
|   80, 89, 90, 99, 113 | | | | |
| work ... 4, 12-18, 26, 28, | | | | |
|   32-34, 36, 46, 50, 65, | | | | |
|   96 | | | | |
| worked ... 13, 14, 19, 28, | | | | |

# ARTI, LLC    *Accident Reconstruction – Technical Investigations*

P.O. Box 30171 / Little Rock, AR 72260-0171
Joel T. Hicks, P.E. (501) 455-5405 / William H. Ford, P.E. (501) 316-1716

## Preliminary

October 28, 2004

Mr. David Hodges
Hodges Law Firm
Centre Place, Fifth Floor
212 Center Street
Little Rock, AR 72201

      Re:   Oxford v. L. & L. Enterprises, Ol' Man

Dear Mr. Hodges,

      You have asked us to inspect the subject treestand, and this letter will supplement our telephone conversations. The plaintiff, Mr. Gary Oxford, had installed the subject treestand in preparation for later use. He and the stand fell to the ground. We were asked to determine the cause of the fall and to comment on the character of the stand in relation to the incident.

      To-date, the following items have been inspected/reviewed:

- The subject treestand, which consisted of:
  The main body of the stand
  The remains of the broken seat arm
  A net seat
  A chest harness/fall restraint.
- The legal complaint
- Depositions of:
  | | |
  |---|---|
  | Gary Oxford | 05/14/2003 |
  | Danny Green | 05/14/2003 |
  | Lynwood Williams | 10/06/2004 |
  | Tim Carley | 10/06/2004 |
- A page containing 4 photographs of what appears to be the subject stand purporting to have been taken shortly following the incident.
- A set of 12 pages of 24 photographs (2/page) depicting a tree purported to be the tree involved in this incident.
- A booklet containing 28 photographs by R.J. Block.
- Various Internet marketing documents.

Exhibit "E"

## Witness Accounts

Mr. Gary Oxford was interviewed via telephone. From these conversations and the review of his deposition, the following description of the event was derived.

Mr. Oxford had had the stand for some time, but this was its first use. He had reviewed the installation instructions, but did not have them with him at the time. He had used other treestands in the past. He weighted about 270 pounds at the time.

He was accompanied by Mr. Danny Green. They were installing the stand for later use and did not have hunting gear with them. They utilized a separate ladder stand to ascend the tree. The subject stand was attached to the tree at about 14 feet above the ground and to his right as he faced the tree at the top of the ladder stand.

Mr. Oxford recalls installing the ratchet strap with the ratchet mechanism on the side closest to him, which would place the ratchet strap hook on the right side of the stand as one is looking at the stand. If one were to sit in the subject stand's seat, the ratchet mechanism would be on the right and the hook would be on the left.

He also recalls hooking the hook on the appropriate bolt from the back of the stand, as indicated by the instructions. He recalls hearing the hook latch click as expected. He does not remember whether the hook was facing upwards or downwards. He ratcheted the strap snugly.

Mr. Oxford recalls transferring his weight to the subject stand's platform and sitting in the web seat. He was in the seat for less than 30 seconds when he heard a "snap" and he fell to the ground. He does not believe that he fell on the subject stand. The ground was bare, dry and hard.

Mr. Green states in his deposition that he was not looking at Mr. Oxford when he heard the "snap". He does recall looking quickly upward and seeing Mr. Oxford and the stand falling straight down. He recalls that the subject tree was about 2 feet in diameter.

## Equipment Inspection

The subject stand was acquired from your office on October 15, 2004. According to the labeling, it was manufactured by L & L Enterprises. It also included a label identifying it as "Defendant's Deposition Exhibit 4". A poor quality copy of a set of treestand installation instructions, marked "Defendant's Deposition Exhibit 8" were supplied that were purported to match the stand. These instructions identify the stand as a Tara AirElite II. The items received are depicted in Plate 1.

For purposes of this report, the orientation of the stand will be identified from the sitting position. The "right" side will be the right side as seen from the position of sitting in the treestand seat. Likewise for the left side. Front will be the side away from the tree and the back will be the side next to the tree.

The seat support consists of a length of round aluminum tubing bent into a u-shape and supported in the center by a pivot bracket. The right arm of the support has been broken off near the end of the pivot bracket. See Plate 2. A portion of the fracture surface extends into the weld that secures the tubing to the pivot bracket. See Plate 3.

The vertical structure consists of two parallel lengths of ¾ inch square tubing. The tubing material is magnetic and appears to be steel. The two lengths are about 3.5 inches apart and held in position by 1 length of flat bar and 2 lengths of rod, all welded to the vertical members.

In addition, 3 bolts, 5-½ inches long are placed horizontally in the assembly. One supports the seat pivot bracket, one supports the foot platform and the third provides an attachment for the ratchet strap. One end of the ratchet strap is sewn around the bolt. The two vertical members have been "racked" or offset vertically about 3/8 inch with the right member being lower. See Plate 4.

The ratchet strap is assembled in that the loose strap is wrapped around the ratchet spool. The strap is about 79.5 inches long from its attachment to the eye of the hook. The ratchet strap assembly appears to be undamaged except for the hook latch, which is bent to the side. There are various markings on the hook and on the vertical members in the vicinity of the bolt. See Plate 5.

#### Discussion

It is unknown whether the seat arm broke first then the stand fell or if the stand fell and the arm was broken in the fall. Inspection and testing of a suitable exemplar might aid in this determination.

Regardless of whether the arm broke first or later, the outcome would very likely have been different had the stand remained secure on the tree. With the intact arm on the left, the attached net seat and the large platform below, it seems likely that Mr. Oxford would have managed to prevent the fall. Note that he had just mounted the stand and, according to his deposition, was still directing his attention to the stand and its position.

The fact that the ratchet strap released and allowed the stand to fall is most remarkable. With no significant damage to the ratchet strap assembly other than the bent latch, the conclusion would be that the hook came off its bolt.

There are 4 possible ways that the hook can be attached to the bolt: from the back of the stand with the hook facing up or down, and from the front, again with the hook facing up or down. The stand instructions appear to indicate that the hook should be installed from the back of the stand with the hook facing down. See Plate 6.

The action that bent the hook latch is not known for certain, but its current bent position suggests that the tip of the hook slipped past the adjacent vertical member, which pushed the latch to the side. This might suggest that the hook was installed from the back of the stand with the hook facing upwards, or from the front with the hook facing downward. See Plates 7 and 8.

An alternative method of attaching a ratchet strap to the stand would be to weld a rectangular metal bar across the stand in the area now occupied by the bolt. This bar would include a pair of suitable holes, one in each end, to receive hooks. This would allow for the use of a standard ratchet strap, which typically includes a hook on each end. See Plate 9. The cost and weight of this extra component might be offset somewhat by the elimination of the bolt and one of the crossmembers. Its welding operation could be included in the welding of the other crossmembers.

This arrangement would present the user with a secure place to hook the strap without concern as to the precise orientation of the hook. See Plate 10. It also allows for the regular replacement of the strap without disassembly of the bolt. It is generally recommended that the fabric components of a treestand be replaced yearly or when damaged. It should be noted that while the bar is shown on the subject stand in Plates 9 and 10, it was simply placed on the stand for illustrative purposes and the subject stand was not altered.

October 28, 2004
Mr. David Hodges                                                                                    Page 4

The record indicates that Mr. Oxford used a commercially available ladder stand to reach the attachment point on the tree. It should be noted that a fall protection device cannot be used while proceeding up or down a ladder stand. The ladder is not suitable for attachment of the lanyard and the tree is too far away, typically 4-6 feet, to reach in order to slide the tree loop up the tree.

### Further Work

It might be expected for a report of this nature to comment more extensively on the design of the subject stand. This would require access to the manufacturer's design documentation, which would be expected to show dimensions and materials of construction of the components. It is my understanding that this information has been requested but has not been provided by the manufacturer.

A report might also be expected to comment on the manufacturing quality of the stand components. This would also require access to manufacturer's design documentation. This would allow for the comparison of the intended design to the actual components.

As mentioned earlier, testing of a suitable exemplar might reveal the solutions to the remaining questions. An extensive search has been conducted in an attempt to find such. The Internet website of the manufacturer includes a two-page list of dealers under the title of Online Dealer Locator. Over 20 of the dealers listed have been contacted without success. Other dealers of hunting equipment have also been contacted. This search will continue. It is my understanding that an exemplar has also been requested from the manufacturer.

The copy of the stand instructions provided is of very poor quality. Proper evaluation of the instructions, particularly the grayscale illustrations, will require a better quality copy. It is my understanding that a better quality copy has been requested from the manufacturer.

### Preliminary Conclusions

It is my opinion that the cause of the incident was the release of the ratchet strap hook from its bolt. Testing of a suitable exemplar will be required to determine the mechanism of the release. It is also my opinion that a simple and inexpensive method of strap attachment is available that would provide more security. A preliminary version is described above.

It is also my opinion that the use of a fall protection device is impractical while ascending or descending a ladder stand.

Thank you and please feel free to call at your convenience.

Very truly yours,

ARTI, LLC

William H. Ford, P.E.

WHF/wf 4101

October 28, 2004
Mr. David Hodges                                                                    Page 5



PLATE 1:         An overall view of the components received by ARTI.



PLATE 2:         A closer view of the broken seat arm.



PLATE 3:     A close view of the stand end of the fractured arm. The arrow indicates the portion of the fracture that extends into the weld.



PLATE 4:     A view of the frame of the stand.

October 28, 2004
Mr. David Hodges                                                                  Page 7



PLATE 5:          A close view of marks on the stand in the area of the hook bolt, seen at the top
                  of the view. This is the left side of the stand, seen from the front.



PLATE 6:          A view of the hook on the hook bolt.

October 28, 2004
Mr. David Hodges                                                             Page 8



PLATE 7:             Another view of the hook on the hook bolt, seen from the back of the stand.



PLATE 8:             Another view of the hook on the hook bolt. This view is from the front of the stand.

October 28, 2004
Mr. David Hodges                                                                                          Page 9



PLATE 9:       A view of the suggested ratchet strap modification. The arrow indicates
               the referenced bar. The hooks are part of a separate ratchet strap.



PLATE 10:      A view of a hook in Plate 9 reversed, to show the versatility of the design.